## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ELEV8 BALTIMORE, INC.,
    844 Roundview Rd.
    Baltimore, MD 21225

RED CLOUD INDIAN SCHOOL, INC./MAȞPÍYA
LÚTA,
    Historic Mission Building
    100 Mission Dr.
    Pine Ridge, SD 57770

BUR OAK LAND TRUST,
    5 Sturgis Corner Dr.
    Iowa City, IA 52246

PARTNERS FOR CAMPUS-COMMUNITY
ENGAGEMENT,
    600 N. 2nd St., Suite 401
    Harrisburg, PA 17101

NATIONAL COLLEGE ATTAINMENT
NETWORK,
    800 17th St. NW
    Washington, DC 20006

MICHIGAN COLLEGE ACCESS NETWORK,
    200 N. Washington Square #420
    Lansing, MI 48933

NORTH CAROLINA HOUSING COALITION,
    3608 University Dr., Suite 201
    Durham, NC 27707

HOUSING & COMMUNITY DEVELOPMENT
NETWORK OF NEW JERSEY,
    145 W. Hanover St.
    Trenton, NJ 08618

HANDSON SUBURBAN CHICAGO,
    2121 S. Goebbert Rd.
    Arlington Heights, IL 60005

**Case No. 1:25-cv-**

DEMOCRACY MAINE,
        PO Box 18187
        Portland, Maine 04112

THE SERVICE COLLABORATIVE OF WNY,
INC.,
        173 Elm St.
        Buffalo, NY 14203

RAINBOW LABS,
        1037 N. Gardner Ave., Apt. 1
        Los Angeles, CA 90046

SEED COALITION,
        2211 Riverside Ave. S, Campus Box 48
        Minneapolis, MN 55454

ASPIRE AFTERSCHOOL LEARNING,
        909 S. Dinwiddie St.
        Arlington, VA 22204

AMERICORPS EMPLOYEES UNION, LOCAL
2027, AMERICAN FEDERATION OF STATE,
COUNTY & MUNICIPAL EMPLOYEES, AFL-
CIO
        1140 3rd St. NE, Suite 202
        Washington, DC 20002

J. DOE 1-3[1],

                    *Plaintiffs*,

        v.

CORPORATION FOR NATIONAL AND
COMMUNITY SERVICE, *operating as*
AMERICORPS,
        250 E St. SW
        Washington, DC 20525

JENNIFER BASTRESS TAHMASEBI, *in her
official capacity as Interim Agency Head of
AmeriCorps*,
        250 E St. SW
        Washington, DC 20525

NATE CAVANAUGH, *in his official capacity as*
*DOGE Team Lead for AmeriCorps*,
    250 E St. SW
    Washington, DC 20525


                    *Defendants*.

---

[1] Plaintiffs intend to file a motion to waive the requirement under Local Rule 102.2(a) to provide their addresses and to permit Individual Plaintiffs to proceed under pseudonyms.

TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

  JURISDICTION ............................................................................................................ 3

  PARTIES ....................................................................................................................... 4

    Plaintiffs ..................................................................................................................... 4

    Defendants ............................................................................................................... 12

FACTS .......................................................................................................................... 12

I.    AMERICORPS IS THE NATION'S LEADING FEDERAL AGENCY DEDICATED TO DOMESTIC NATIONAL SERVICE .......................................................... 12

II.   STATUTORY BACKGROUND .................................................................... 13

    A.   The Structure of the Agency .................................................................. 13

    B.   AmeriCorps' Programs .......................................................................... 14

    C.   Mandatory Steps the Agency Must Take Before Terminating Programs and Grants ....................................................................................... 19

    D.   Funding Allocations for Programs and Administrative Rulemaking Requirement . 20

III.  THE ADMINISTRATION HAS SYSTEMATICALLY DISMANTLED AMERICORPS .......................................................................................... 20

    A.   Defendants Terminate NCCC ................................................................ 21

    B.   Defendants Abruptly Terminate Grants, Forcing Additional AmeriCorps Participants to Leave Their Service Early .............................................. 22

    C.   Defendants Eliminate the Staff Needed to Carry Out AmeriCorps' Statutory Obligations ........................................................................................ 24

    D.   Neither the CEO Nor Board of AmeriCorps Executed the Dismantling of AmeriCorps Programs and Staff .......................................................... 26

IV.  THE IMPACT OF THE ADMINISTRATION'S ACTIONS ON PLAINTIFFS ............. 27

    A.   Irreparable Harm to Nonprofit Organizations ......................................... 28

    B.   Irreparable Harm to Individual Program Participants ............................... 37

    C.   Irreparable Harm to Local 2027 and Its Members ................................... 39

CLAIMS FOR RELIEF ................................................................................................ 41

FIRST CAUSE OF ACTION ........................................................................................ 41

SECOND CAUSE OF ACTION ................................................................................... 42

THIRD CAUSE OF ACTION ....................................................................................... 44

FOURTH CAUSE OF ACTION .................................................................................................. 44

FIFTH CAUSE OF ACTION .................................................................................................... 46

SIXTH CAUSE OF ACTION .................................................................................................... 47

PRAYER FOR RELIEF ........................................................................................................ 48

## INTRODUCTION

1.      Congress designed AmeriCorps to "foster and expand voluntary citizen service in communities throughout the Nation in activities designed to help the poor, the disadvantaged, the vulnerable, and the elderly," 42 U.S.C. § 4950(b), creating what is often called the "Domestic Peace Corps." In the last thirty years, AmeriCorps has served hundreds of communities in all 50 states and U.S. territories, and has made a difference in countless lives. It has conserved land for use by farmers, hunters, and hikers, provided after-school care to help students from all backgrounds succeed in school, and afforded medical care to seniors and others who might otherwise not have had treatment. All of this progress now hangs in the balance as Defendants work to dismantle the Agency.

2.      The wholesale dismantling of America's flagship civic service Agency cannot be undertaken by unilateral executive overreach that disregards the law and lawmakers' intent. Congress has never authorized the executive branch to reduce this fully functioning Agency to below its statutory minimum. Instead, time and time again, Congress has required that AmeriCorps and its various programs remain active and funded.

3.      Not only that, but in the very statutory scheme that creates AmeriCorps, Congress included language that requires Defendants to follow certain procedures before it may halt, suspend, or terminate AmeriCorps programs and grants. Nor can Defendants lawfully dismantle these programs by halting or eliminating the work of permanent staff who administer these statutorily mandated programs.

4.      But that is exactly what the Defendants have done. In recent weeks, Defendants have effectuated program closures, arbitrary funding withdrawals, and staff layoffs that have

1

crippled the Agency and its operations, leaving local civic service organizations, individual service corps members (hereafter, "Participants"), and Agency staff in disarray.

5.     The effects of their actions have been devastating to the AmeriCorps ecosystem. Defendants' actions have already resulted in cuts to grants totaling approximately 400 million dollars, which standing alone amount to 41% of the Agency's annual budget for fiscal year 2025. As a result, over 1,000 entities have lost critical funding for essential community services in education, disaster response, environmental conservation, and beyond, impacting millions of Americans.

6.     Not only have Defendants, without any reasoned explanation, pulled grants that help communities undertake projects, they have terminated the National Civilian Community Corps ("NCCC"), a statutorily established program that had operated continuously since its creation in 1993, placing 18 to 26-year-olds in projects to support infrastructure improvement, environmental conservation, and other community services.

7.     Without offering any justification, Defendants abruptly closed all four regional NCCC campuses—where NCCC Participants are trained, and from which they are deployed to service projects—dismissed staff overseeing NCCC operations, and abruptly ended the service terms of current Participants, ending a 30-year-old program that involved more than 2,000 young people in community service projects across the country each year.

8.     As part of this wholesale dismantling of AmeriCorps, Defendants placed the overwhelming majority (approximately 85%) of AmeriCorps' 650 full-time staff on administrative leave and began issuing layoff notices on April 24, 2025.

9.     These sweeping actions have forced the early dismissal of Participants, halted ongoing projects at organizations across the country, and jeopardized critical support for

communities nationwide, with particularly severe impacts on rural areas where AmeriCorps programs have traditionally enjoyed bipartisan support.

10.     Plaintiffs each have their unique stories to tell as they deal with navigating the resulting damage and chaos. Plaintiffs include nonprofit organizations hailing from across the country that receive direct grants and/or subgrants to place AmeriCorps Participants in impactful service projects in local communities or to build volunteer and community capacity; individual AmeriCorps Participants whose lives have been upended because their service terms were abruptly and prematurely terminated; and the AmeriCorps Employees Union and its members, who are the federal employees responsible for ensuring the effective oversight and operation of AmeriCorps programs and grants, and who have nearly all found themselves placed on administrative leave and given layoff notices stating they will be terminated from employment effective June 24, 2025.

11.     The Court should not permit such a sweeping attack against the country's foremost institution committed to fighting poverty and advancing civic engagement.

12.     The Court should award declaratory and injunctive relief holding Defendants' actions unlawful under the Administrative Procedures Act and unconstitutional. Plaintiffs request that the Court enjoin Defendants from effectuating the decision to dismantle AmeriCorps.

## JURISDICTION

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (action to redress deprivation of rights secured by the Constitution of the United States), 28 U.S.C. § 1361 (action to compel an officer or employee of the United States to perform their duty), and 5 U.S.C. § 702 (right of review for agency actions).

14.    There is a controversy under 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief under 28 U.S.C. §§ 1361, 2201–2202, 5 U.S.C. §§ 704–706 and the Court's equitable powers.

15.    Venue is proper in this district under 28 U.S.C. § 1391(e) because Plaintiff Elev8 Baltimore is located in this district.

## PARTIES

### Plaintiffs

16.    Plaintiff ELEV8 BALTIMORE, INC. ("Elev8") is a 501(c)(3) nonprofit organization based in Baltimore, MD. Elev8's mission is to partner with schools, families, and the community to ensure that every Baltimore student is prepared for high school, college, career, and life. The organization provides tutoring, after-school activities, and summer programming, among other resources, for families in Baltimore. Under the AmeriCorps Volunteer Generation Fund ("VGF"), Elev8 received an award of approximately $145,000 annually over a 5-year period. Elev8 used these awards to increase internal capacity to recruit, manage, and support 60 individuals in providing tutoring and other out-of-school-time programming in approximately 20 Baltimore City Schools and Programs. On April 25, 2025, AmeriCorps notified Elev8 Baltimore that its VGF award was terminated.

17.    Plaintiff RED CLOUD INDIAN SCHOOL, INC./ MAȞPÍYA LÚTA ("Red Cloud") is a 501(c)(3) nonprofit located in Oglala Lakota County, South Dakota. The organization operates two elementary schools, one middle school, and one high school that serve the Lakota community and offer a Lakota language immersion program. For 26 years, Red Cloud has received direct State and National AmeriCorps awards, which have enabled the organization to train over 400 Lakota AmeriCorps Participants as teaching assistants and paraprofessional educators,

offering vital career and job training opportunities in one of the nation's poorest regions with a critical teacher shortage. On April 25, 2025, AmeriCorps notified Red Cloud that its award was terminated, a decision that has already had a devastating impact on the schools, the Lakota AmeriCorps Participants, and the students they serve.

18.     Plaintiff BUR OAK LAND TRUST ("Bur Oak") is a 501(c)(3) nonprofit organization based in Iowa City, Iowa that has, since 1978, worked to advance biodiversity in eastern Iowa by protecting resilient landscapes and connecting people to nature. Bur Oak's eastern Iowa preserves are protected lands full of plants and wildlife, many of which are open to the public year-round. Through the AmeriCorps awards that it receives from the Iowa State Service Commission, Bur Oak engages year-long AmeriCorps Participants to restore and improve Bur Oak's lands and ecosystems, deliver environmental education, and strengthen community ties to the outdoors. Since 2019, more than 50 AmeriCorps Participants have contributed over 55,000 hours of service to enhance more than 400 acres of land spanning across 19 counties. On April 28, 2025, Bur Oak received notification from the Iowa State Service Commission that its AmeriCorps award had been terminated, impacting its AmeriCorps-supported programs.

19.     Plaintiff PARTNERS FOR CAMPUS-COMMUNITY ENGAGEMENT ("PCCE") is a nonprofit organization based in Harrisburg, Pennsylvania. PCCE works to connect students at higher education institutions throughout Pennsylvania and New York with the communities around them, expanding students' learning experiences through civic engagement and strengthening communities in the process. To fulfill its mission, PCCE has partnered with AmeriCorps through the VISTA program as an AmeriCorps intermediary organization over two decades. With the help of VISTA Participants, PCCE connects the resources of higher education institutions to local community organizations, programs, and emerging efforts. PCCE's VISTA Participants are

strategically placed in communities of need to take on various projects—tutoring and mentoring programs, food security programs at community-based organizations, and financial literacy educational programs, among others. The VISTA program covers 60 AmeriCorps VISTA Participants over three years. On April 25, 2025, PCCE was notified by AmeriCorps that its current VISTA program was terminated.

20.    Plaintiff NATIONAL COLLEGE ATTAINMENT NETWORK ("NCAN") is a 501(c)(3) membership organization based in Washington, DC. NCAN was founded in 1995 to support efforts to expand college access around the country. NCAN's member organizations include community-based and national nonprofits, scholarship providers, public school districts, charter schools, and other youth-serving organizations. At least 24 NCAN members had State and National grants, State Service Commission subgrants, and/or VISTA grants abruptly terminated in April 2025, totaling more than $4.5 million.

21.    Plaintiff MICHIGAN COLLEGE ACCESS NETWORK ("MCAN"), a member of NCAN, is a 501(c)(3) nonprofit organization based in Lansing, Michigan that helps students in Michigan access and attain college certificates and degrees. MCAN's primary mission, which it achieves with the support of AmeriCorps Participants, is to increase the percentage of Michigan residents with degrees and postsecondary certificates, with a focus on providing support to low-income students, first-generation college-going students, and students of color. MCAN has received various types of AmeriCorps awards for the past ten years. In the past year, MCAN has hosted seven AmeriCorps VISTA Participants. On April 25, 2025, MCAN received an email notification from AmeriCorps that its VISTA program had been terminated. On April 28, 2025, MCAN received an email notification from the Michigan State Service Commission that three of its AmeriCorps awards had been terminated.

22.    Plaintiff NORTH CAROLINA HOUSING COALITION ("NCHC") is a 501(c)(3) nonprofit based in Durham, North Carolina. NCHC ensures that every North Carolinian has a home where they can live with dignity and opportunity. In furtherance of that mission, it serves as a HUD-approved intermediary organization supporting a network of over twenty local housing counseling agencies, which provide education and guidance to low-income families seeking housing assistance and access to affordable housing. NCHC works to expand the reach of certified housing counseling agencies so that services are available across North Carolina, from the mountains to the coast. The organization's AmeriCorps VISTA program was designed to place VISTA Participants at under-staffed local housing counseling agencies throughout the state. The VISTA program would have enabled four Participants to deliver housing and home-buying education, counseling, credit rehabilitation, and related support to residents in areas of need. NCHC received an email notification on April 25, 2025, from AmeriCorps that its VISTA program was terminated.

23.    Plaintiff HOUSING COMMUNITY DEVELOPMENT NETWORK OF NEW JERSEY ("HCDNNJ"), a 501(c)(3) organization based in Trenton, New Jersey, is a statewide association of over 250 nonprofit housing and community development corporations, individuals, and professional organizations dedicated to expanding economic opportunities for low-and moderate-income community residents across the state. Since 1989, HCDNNJ has worked to strengthen community development corporations and support neighborhood revitalization efforts throughout the state. As an AmeriCorps VISTA host organization for the past eight years, HCDNNJ has engaged Participants in initiatives focused on lead poisoning prevention, home remediation, emergency hotline intakes for utility assistance, providing emergency resources, and the creation of statewide mapping tools for food resources. In the past year, HCDNNJ has hosted three

AmeriCorps VISTA Participants. On April 25, 2025, HCDNNJ received an email notification from AmeriCorps that its VISTA program had been terminated.

24.     Plaintiff HANDSON SUBURBAN CHICAGO ("HandsOn") is a 501(c)(3) organization based in Arlington Heights, Illinois. Since 1969, HandsOn has worked to strengthen communities by connecting individuals with meaningful community service opportunities, particularly those serving vulnerable groups such as victims of violence, the specially-abled, veterans, older adults, youth, and people in need of food, shelter, mental health services, and other essential services. HandsOn's Volunteer Generation Fund award, which provided HandsOn with approximately $375,000 annually over three years, enabled it to help 150 organizations enhance their volunteer management and build capacity. In addition to this work, HandsOn runs its own school-based programs aimed at serving low-income, high-risk elementary and middle school students, including after-school initiatives to help students succeed in school and lunch-time activities that support early literacy. On April 25, 2025, HandsOn received a notice from AmeriCorps that its Volunteer Generation Fund award was terminated.

25.     Plaintiff DEMOCRACY MAINE, a 501(c)(3) nonprofit organization based in Portland, Maine, is a collaboration of the League of Women Voters of Maine Education Fund, Maine Citizens for Clean Elections, and Maine Students Vote that formed in 2017 to make Maine government more equitable, inclusive, and accessible. Democracy Maine is in the middle of a one-year AmeriCorps award from the Maine State Service Commission, which has enabled it to begin developing civic education and engagement programs focused on reaching rural counties, where young people are especially disconnected from their communities and their government. On April 28, 2025, Democracy Maine received notice from the State Service Commission that its AmeriCorps award was terminated.

26.     Plaintiff THE SERVICE COLLABORATIVE OF WNY, INC. ("Service Collaborative") is a 501(c)(3) nonprofit organization located in Buffalo, New York. For over 20 years, Service Collaborative has partnered with nonprofits to create service opportunities focused on education, park and neighborhood revitalization, and workforce development, aiming to address poverty and strengthen communities. In particular, Service Collaborative has strengthened the Buffalo community by providing critical capacity building services to the City of Buffalo. Service Collaborative places VISTA Participants at local and national nonprofits that it partners with to expand their capacity. These Participants have played key roles in volunteer management, marketing, strategic planning, and program development for partner organizations. In recent years, they have also worked to bridge the digital divide by leading digital education classes for youth and seniors and distributing devices to public housing residents. In the past year, Service Collaborative has hosted 25 AmeriCorps VISTA Participants. On April 25, 2025, Service Collaborative received a notice from AmeriCorps that its VISTA program was terminated.

27.     Plaintiff RAINBOW LABS is a 501(c)(3) nonprofit organization based in Los Angeles, California, that helps LGBTQ+ youth find community, peers, and safe spaces. Rainbow Labs connects LGBTQ+ volunteers with high-school-aged LGBTQ+ youth of color for mentoring services, both virtually and in person. Rainbow Labs has received a Volunteer Generation Fund award since 2022. Since then, it has been able to grow its program to serve more than 500 LGBTQ+ youth. On April 25, 2025, Rainbow Labs received a notice from AmeriCorps terminating its VGF award.

28.     Plaintiff SEED COALITION ("Seed") is a 501(c)(3) nonprofit organization based in Minneapolis, Minnesota that enhances students' lives at college and university campuses in Minnesota and Iowa by providing higher educational professionals who teach them about social

and civic responsibility. In practice, this means that Seed connects professionals at rural and urban campuses, private and public colleges, and trade schools with partnership and professional development opportunities on higher education campuses. Seed has had a VISTA program since 2019, which has allowed it to recruit, train, and manage VISTA Participants who work on projects such as staffing food banks, mentoring first-generation and low-income college students, and providing classes in financial literacy. On April 25, 2025, Seed received a notice from AmeriCorps that its VISTA program was terminated.

29.    Plaintiff ASPIRE AFTERSCHOOL LEARNING ("Aspire") is a 501(c)(3) nonprofit organization based in Arlington, Virginia. For three decades, Aspire has provided third-through eighth-grade students in South Arlington with holistic afterschool and summer learning programs aimed at closing the opportunity gap at no cost to families. Students enrolled in Aspire's programs receive daily literacy support, math support, homework help, social-emotional lessons, and hot meals—a crucial service for parents who cannot help their children in this way because they are working multiple jobs and for Aspire students testing at least two years below grade level. Aspire is the only organization in South Arlington providing these services to third- through eighth-grade students at no cost to their families and in a community marked by significant racial, economic, and educational disparities. On April 28, 2025, Aspire received a notification by email that its State and National AmeriCorps award was terminated.

30.    Plaintiff AMERICORPS EMPLOYEES UNION, LOCAL 2027 of the American Federation of State, County, and Municipal Employees, AFL-CIO ("Local 2027" or "Union") represents a collective bargaining unit of approximately 400 employees of AmeriCorps, spanning the Agency's entire gamut of operations and including Grant Management Specialists, Logistics Assistants, Data and Analytics Officers, Portfolio Managers, and VISTA Training Specialists.

Bargaining unit members work and live all over the country, including in Maryland, California, Texas, Alaska, Colorado, Mississippi, Georgia, Ohio, and Delaware, among other states, as well as the District of Columbia and Puerto Rico. Local 2027 is the exclusive representative for a bargaining unit of nonsupervisory employees of AmeriCorps, and as such is statutorily authorized to represent the interests of all AmeriCorps employees in the bargaining unit including, but not limited to, by entering into collective bargaining agreements with AmeriCorps on their behalf. Local 2027 also provides support, guidance, and resources to its members, whose membership dues payments are entirely voluntary. Local 2027 sues on behalf of its members and itself.

31.    Plaintiff J. DOE 1 is a 20-year-old from San Francisco who has been an NCCC Participant since November 2024. Doe 1 was working on a service project at Habitat for Humanity in Bennington, Vermont and preparing for their next service project in Hamilton, Ohio, where they would be building hiking trails and removing invasive species. Their service was cut short on April 15, 2025, when they received notice from their team leader (later confirmed via email from AmeriCorps) that their service project was terminated and that they should return home immediately.

32.    Plaintiff J. DOE 2 is a 23-year-old recent college graduate originally from New Jersey. Doe 2 first served with AmeriCorps in 2020, between their freshman and sophomore years of college. On April 15, 2025, Doe 2 was leading a team of fellow NCCC Participants to help low-income individuals prepare their taxes in San Diego, California when they received notice on a mid-afternoon team leader call (later confirmed via email from AmeriCorps) that their service was terminated and that they should return home immediately.

33.    Plaintiff J. DOE 3 was a VISTA Participant placed through Plaintiff NCHC to work at Kingdom Community Corporation, a nonprofit organization in Fayetteville, North Carolina, that

helps first-time homebuyers with foreclosure prevention services and HUD-certified counseling. Doe 3 was helping their nonprofit better interface with the community by conducting outreach for community events, drafting newsletters and other communications, and increasing the organization's online presence. They engaged directly with community members on a daily basis, answering 25-75 calls per day and helping community members access resources. Doe 3 started their VISTA program in February 2025 on a one-year commitment, after moving from Philadelphia to North Carolina. Doe 3 received an email on April 28, 2025, stating that their VISTA program would be terminated after May 20 and that they should seek reassignment. They have not been able to find any other program accepting VISTA Participants at this time due to the widescale cuts announced.

**Defendants**

34.     Defendant CORPORATION FOR NATIONAL AND COMMUNITY SERVICE, operating as AmeriCorps, is an executive agency of the United States pursuant to 5 U.S.C. § 105. As such, it engages in agency action and is named as a defendant in this action pursuant to 5 U.S.C. § 702.

35.     Defendant JENNIFER BASTRESS TAHMASEBI is the Interim Agency Head of AmeriCorps. She is named in her official capacity

36.     Defendant NATE CAVANAUGH is, on information and belief, the "DOGE Team Lead" for AmeriCorps. He is named in his official capacity.

**FACTS**

## I.    AMERICORPS IS THE NATION'S LEADING FEDERAL AGENCY DEDICATED TO DOMESTIC NATIONAL SERVICE

37.     AmeriCorps is the federal agency administering national service and volunteer programs. It is structured as a government corporation mandated by the Community Service Trust

Act of 1993. 42 U.S.C. § 12541 et seq., Pub. L. No. 103-82, 107 Stat. (Sept. 21, 1993) (the "1993 Act").

38.     AmeriCorps is the outgrowth of a long history of lawmaking to "foster and expand voluntary citizen service in communities throughout the Nation in activities designed to help the poor, the disadvantaged, the vulnerable, and the elderly." 42 U.S.C. § 4950(b); *see also id.* § 12501.[2]

39.     In 1993, Congress consolidated the management of its various national service and volunteer programs under AmeriCorps. Some of the programs operate as independent initiatives while others are structured as grants to entities that carry out national service programs and/or sub-grant funds to other entities that undertake work authorized by the statute. 42 U.S.C. § 12571(a).

40.     Each year, close to 200,000 people provide community service through AmeriCorps programs at more than 35,000 sites nationwide. AmeriCorps Participants serve with a diverse range of organizations, including nonprofits, faith-based groups, and governmental entities.

## II.    STATUTORY BACKGROUND

### A.    The Structure of the Agency

41.     The Agency is run by a Board of Directors and a Chief Executive Officer. AmeriCorps' Board members and its CEO are all appointed by the President with the advice and consent of the Senate. 42 U.S.C. §§ 12651a(a)(1), 12651c(a).

---

[2] *See also* Economic Opportunity Act of 1964, Pub. L. No. 88-452, § 2, 78 Stat. 508 (Aug. 20, 1964); Domestic Volunteer Service Act of 1973, 42 U.S.C. § 4950 et seq., Pub. L. No. 93-113, §§ 103, 201, 87 Stat. 396, 401 (Oct. 1, 1973); National and Community Service Act of 1990, 42 U.S.C. § 12501 et seq., Pub. L. No. 101-610, §§ 2, 102, 104 Stat. 3129–32 (Nov. 16, 1990); Defense Authorization Act for Fiscal Year 1993, Pub. L. No. 102-484, §§ 195, 106 Stat. 2522–24 (Oct. 23, 1992); Edward Kennedy Serve America Act of 2009, 42 U.S.C. § 12501 et seq., Pub. L. No. 111-13, § 198S, 123 Stat. 1575–77 (Apr. 21, 2009).

42.     The Board has extensive responsibilities regarding oversight and administration of the Corporation. 42 U.S.C. § 12651b. The Board is responsible for "setting overall policy for the Corporation." *Id.* § 12651b(g). The Board is also responsible for "review[ing] and advis[ing] the Chief Executive Officer regarding the actions of the Chief Executive Officer with respect to the personnel of the Corporation, and with respect to such standards, policies, procedures, programs, and initiatives as are necessary or appropriate to carry out the national service laws." *Id.* §§ 12651b(g), (g)(5)(A). And the Board must review and approve the CEO's proposals regarding grants and designations of service positions, among other things. 42 U.S.C. §§ 12651b(g)(3), 12651d(b)(2)(A).

43.     The CEO is "responsible for the exercise of the powers and the discharge of the duties of the Corporation that are not reserved to the Board," and "ha[s] authority and control over all personnel of the Corporation." 42 U.S.C § 12651d(a). The CEO's responsibilities include the hiring of employees to assist in "carrying out the activities described in the national service laws." 42 U.S.C. § 12651f(c). The CEO must ensure AmeriCorps maintains at least one office for each state, in reasonable proximity thereto, that provides state-specific program support. *Id.* § 12651h.

44.     The CEO also has rulemaking authority. *Id.* § 12651c(c).

45.     AmeriCorps Participants are not considered federal employees and are "not [] subject to the provisions of law relating to Federal employment." 42 U.S.C. § 12651g(a)(1)(B); 42 U.S.C. § 12620(a) (NCCC Participants); 42 U.S.C. § 5055(a) (VISTA Participants).

**B.     AmeriCorps' Programs**

46.     AmeriCorps comprises multiple statutorily required programs, five of which are relevant here: National Civilian Community Corps (NCCC), Volunteers in Service to America

(VISTA), State and National Grants, State Service Commission Subgrants, and the Volunteer Generation Fund.

    *i.*    <u>*National Civilian Community Corps (NCCC)*</u>

47.    NCCC was established as a demonstration program in 1992 and then became a mandatory permanent program in 2009.[3]

48.    NCCC is a nine-to-twelve month "national service program" for youth between ages 18 and 26 from "economically, geographically, and ethnically diverse backgrounds." 42 U.S.C. § 12613(a)–(d). It also operates a shorter summer program for youth aged 14 through 18 years to work on projects across the country. *Id.* § 12614(c).

49.    Service projects carried out by NCCC Participants must "meet an identifiable public need, with specific emphasis on projects in support of infrastructure improvement, energy conservation, and urban and rural development." 42 U.S.C. § 12617(a)(1). As an example, the FEMA Corps, an NCCC project, places a specific emphasis on addressing natural disasters, deploying Participants across the country to assist in FEMA-mission-critical functions.[4]

50.    NCCC Participants are not paid salaries. They receive modest subsistence funding and, upon completion of their agreed-upon period of service, they are entitled to a national educational award or a cash benefit. 42 U.S.C. § 12618(a), (b), (e); *see also* 45 C.F.R. §§ 2525.270, 2525.100(a) (Segal AmeriCorps Education Award of over $7,000 to use on future educational expenses or to pay back qualified student loans).

51.    The CEO of AmeriCorps directs the NCCC, 42 U.S.C. §§ 12615, 12619; selects its Participants, 42 U.S.C. §§ 12613(a), (c), 12614(b); and hires permanent staff to run the program,

---

[3] National Defense Authorization Act for Fiscal Year 1993, Pub. L. No. 102-484, § 195, 106 Stat. 2315 (Oct. 23, 1992); Serve America Act of 2009, Pub. L. No. 111-13, § 1505, 123 Stat. 1522 (Apr. 21, 2009).
[4] AmeriCorps NCCC 2024 Annual Report, https://americorps.gov/sites/default/files/document/2025-01/AmeriCorps-NCCC-2024-Annual-Report.pdf., (last visited May 4, 2025).

42 U.S.C. § 12619(a); *see also* 42 U.S.C. § 12619(c)(2) (the CEO "shall establish a permanent cadre that includes the Director and other appointed supervisors and training instructors" to carry out NCCC programs").

52.     NCCC Participants, including Plaintiffs Doe 1 and Doe 2, are trained and housed in four campuses—Vicksburg, Mississippi; Aurora, Colorado; Sacramento, California; and Vinton, Iowa—before being dispatched to serve on projects in nearby communities. 42 U.S.C. § 12615(d), (e). These campuses are strategically "distributed in urban and rural areas such that each Corps unit in a region can be easily deployed for disaster and emergency response to such region." *Id.* § 12615(e).

53.     The campuses also operate under a clear management framework. Each campus is run by a campus director whose role it is to "establish and enforce standards of conduct to promote proper moral and disciplinary conditions in the campus." *Id.* §§ 12615(d), (f)(1). And each Corps Participant is assigned to a unit, led by a supervisor with prior service or supervisory experience to lead teams of Corps Participants. *Id.* § 12615(b)(4). The units are grouped together in one of the four campuses, which provide operational support and boarding. *Id.* § 12615(d). These facilities are in central locations and serve as the headquarters for units. *Id.*

   ii.     *Volunteers in Service to America (VISTA)*

54.     AmeriCorps VISTA was created under the Domestic Volunteer Service Act of 1973 to "strengthen and supplement efforts to eliminate and alleviate poverty and poverty-related problems in the United States," including by "encouraging and enabling persons from all walks of life . . . to perform meaningful and constructive volunteer service." 42 U.S.C. § 4951.

55.     AmeriCorps administers VISTA directly. 42 U.S.C. §§ 4952, 4955, 4960; 45 C.F.R. § 2556.100. To that end, the Agency is required to establish and fully staff a national headquarters

to recruit and place VISTA Participants; advertise and recruit for the VISTA program; establish procedures to place Participants in local and national sponsoring organizations; and pave the way for low-income Participants to find jobs post-service. 42 U.S.C. § 4953.

56.     In selecting recipients for VISTA services, the Agency must act only "on the basis of merit and to accomplish the goals of the VISTA program." 42 U.S.C. § 4960.

57.     In practice, recruitment for and selection of VISTA Participants happens at the sponsor level with local, state, and national sponsors applying to AmeriCorps for a certain number of VISTA Participants for their programs. 45 C.F.R. §§ 2556.600, 2556.625. VISTA sponsors also "provide supervision, workspace, service-related transportation, and any other materials necessary to operate and complete the VISTA project and support the VISTA." 45 CFR § 2556.115(b).

58.      Like NCCC Participants, VISTA Participants are not paid wages for their work, but upon completion of their service, they may elect to receive the Segal AmeriCorps Education Award or an end-of-service stipend. 45 C.F.R. §§ 2556.320(a), (g)–(h).

59.     AmeriCorps' implementing regulations allow it to terminate VISTA Participants early or suspend projects before their end date only in limited circumstances and through prescribed procedures.

60.     AmeriCorps may terminate VISTA Participants for cause "due to deficiencies in conduct or performance." 45 CFR § 2556.400(a). A Participant terminated for cause has appeal rights vis-à-vis the termination. *Id.* § 2556.425.

61.     AmeriCorps may also terminate a Participant from their project early without cause, but only for the following reasons: the Participant (a) voluntarily resigned before a decision was made on their for-cause termination, (b) "did not secure a suitable reassignment to another project," or (c) required a "medical termination." 45 C.F.R. § 2556.430.

17

62.     AmeriCorps may suspend projects only for a "material failure" or "threatened material failure" to comply with the applicable terms of the statute and regulations, VISTA program policy, or a Memorandum of Agreement between the sponsor and AmeriCorps. *See id.*; *see also* 42 U.S.C. § 12636(a). Procedural protections, *e.g.*, notice and opportunity to be heard, attach to such suspensions. 45 CFR § 2556.135(a)–(d).

     *iii.*     <u>State and National Grants and State Service Commission Subgrants</u>

63.     The AmeriCorps statute contemplates a diverse group of stakeholders to carry out the mission of the Agency. States and State Service Commissions can receive AmeriCorps funds either to carry out their own programs or to provide their own grant awards to organizations and community partners. 42 U.S.C. § 12571(a).

64.     A percentage of State and National Grants are awarded "on a competitive basis" to States as well as "to nonprofit organizations seeking to operate a national service program in two or more of those States, and to Indian tribes." 42 U.S.C. § 12581(d)(1); *see also id.* §§ 12571(a), 12521(a) (emphasizing school-based programs). The Corporation must allot 1% of its State and National Grants to Indian Tribes. 42 U.S.C. § 12581(b).

65.     Many states also operate State Service Commissions. 42 U.S.C. § 123638(a)(1)–(2). State Service Commissions also receive grants, which these commissions then subgrant to service programs, including to Plaintiffs Bur Oak, Democracy Maine, Seed Coalition, MCAN, and some of Plaintiff NCAN's member organizations. 42 U.S.C. § 12638(a).

66.     These grants cannot be revoked without providing grantees, including the states and the states' sub grantees, proper notice and opportunity to be heard. 42 U.S.C. § 12636(a)–(b).

     *iv.*     <u>Volunteer Generation Fund</u>

67.     The Volunteer Generation Fund (VGF) program was created under the Serve America Act in 2009. *See* Pub. L. No. 111-13, § 198p, 123 Stat. 1573 (Apr. 21, 2009). It invests in volunteer management practices that strengthen nonprofit organizations and other entities' ability to increase recruitment and retention of volunteers to meet critical community needs through service. 42 U.S.C. § 12653p.

68.     Under this program, the Agency has the authority to make grants from VGF to state service commissions, nonprofits, schools, government agencies, and tribal or faith-based community organizations. 42 U.S.C. § 12653p(a); *see also* https://americorps.gov/partner/how-it-works/volunteer-generation-fund. Plaintiffs Elev8 Baltimore, HandsOn, and Rainbow Labs, are VGF recipients.

69.     Similar to the termination procedures for other grants, VGF grants may not be revoked without providing grantees, proper notice and opportunity to be heard. 42 U.S.C. § 12636(a)–(b).

### C.     Mandatory Steps the Agency Must Take Before Terminating Programs and Grants

70.     The *only* basis identified by statute for which AmeriCorps may cancel grants or contracts providing assistance to a designee is if it determines "there is a material failure to comply with this subchapter or the applicable terms and conditions of any such grant or contract issued pursuant to this subchapter." 42 U.S.C. § 12636(a).

71.     The subchapter referred to in the provision covers all relevant programs in this action, i.e., the NCCC and VISTA programs, State and National Grants, State Service Commission Subgrants, and the Volunteer Generation Fund.

72.     Grants or contracts may not be terminated absent "reasonable notice and opportunity for a full and fair hearing." *Id.* § 12636(a)–(b).

73.     Under the regulations, grantees must receive 7 days' notice of proposed cuts, during which the grantee has the opportunity to submit "written material in opposition to the proposed action" that shows "good cause why such assistance should not be terminated or revoked." 45 C.F.R. § 2540.400.

### D.     Funding Allocations for Programs and Administrative Rulemaking Requirement

74.     Congress appropriated $975,525,000 for the Corporation's 2025 operating expenses. Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, § 312, 138 Stat. 694–95 (Mar. 23, 2024); Full-Year Continuing Appropriations and Extensions Act of 2025, Pub. L. 119-4, § 1101(a)(8), 139 Stat. 9, 11 (Mar. 15, 2025).

75.     Of that amount, Congress earmarked $37,735,000 for NCCC, $103,285,000 for VISTA, $557,094,000 for State and National Grants, $236,917,000 for National Older American Volunteer Programs, $19,538,000 for State Commission Grants, and $14,706,000 for Innovation Assistance and Other Activities. 170 Cong. Rec. H2060–61 (Mar. 22, 2024). These specific appropriations to AmeriCorps programs signal Congress's clear intent to maintain a robust AmeriCorps.

76.     Congress also required that AmeriCorps "shall make any significant changes to program requirements, service delivery or policy only through public notice and comment rulemaking." Further Consolidated Appropriations Act of 2024, § 401, 138 Stat. at 695.

### III.     THE ADMINISTRATION HAS SYSTEMATICALLY DISMANTLED AMERICORPS

77.     The Administration has taken rapid and aggressive actions to dismantle AmeriCorps programs and eliminate its staff.

78.     Defendants cancelled $400,000,000 in AmeriCorps grants—41% of its budget—cutting funding to thousands of organizations and to State Service Commissions, *e.g.*, the Commissions for Iowa and Maine lost their AmeriCorps funding.

79.     In addition, Defendants outright cancelled AmeriCorps programs like NCCC, and have placed on administrative leave and issued layoff notices to 85% of AmeriCorps staff.

80.     The overall result has been detrimental to thousands of grantees and AmeriCorps Participants—and the communities they serve—across the country.

**A.     Defendants Terminate NCCC**

81.     On Tuesday April 15, 2025, without warning, AmeriCorps announced to NCCC Participants, through template letters sent via email, that all NCCC projects were terminated and all Participants would be sent home, effective immediately.

82.     NCCC "sponsors," i.e., organizations that host NCCC Participants and otherwise provide resources to support the success of NCCC projects administered by the Agency, received emails explaining that "AmeriCorps is demobilizing all currently serving NCCC Members and returning them to their Homes of Record." NCCC Participants (sometimes also referred to, as in the template termination letter, as NCCC "Members") received emails with almost identical language.

83.     As a result of these project terminations, approximately 2,000 NCCC Participants, who provide disaster relief, infrastructure improvement, environmental conservation, community development, and support for impoverished communities across the country, were sent home, their projects left unfinished.[5]

---

[5] Sophia Cai, *DOGE Comes for AmeriCorps Staff in Washington and Across the Country*, Politico (Apr. 16, 2025, at 9:58 PM), https://www.politico.com/news/2025/04/16/doge-comes-for-americorps-staff-in-washington-and-across-the-country-00295377.

84.     Because NCCC is a congressionally mandated program, the agency does not have the authority to unilaterally terminate it.

85.     Terminating NCCC constitutes a "significant change" in AmeriCorps policy and programming. The agency failed to follow proper rulemaking procedures before terminating the program and its Participants as required under the Further Consolidated Appropriations Act of 2024, § 401, 138 Stat. at 695. Nor, on information and belief, were these changes to AmeriCorps policy made by the Board, as required by 42 U.S.C. § 12651b(g).

86.     The agency also failed to provide a reasoned explanation or demonstrate that it considered substantial reliance interests in ending the program.

**B.    Defendants Abruptly Terminate Grants, Forcing Additional AmeriCorps Participants to Leave Their Service Early**

87.     In addition to terminating NCCC, Defendants have terminated or decimated their other statutorily mandated grant programs.

88.     In the past few weeks, sponsors of VISTA programs, direct recipients of State and National Grants, recipients of subgrants from State Service Commissions, and recipients of VGF received emails directly from AmeriCorps terminating their grants without any prior notice or individualized explanation.

89.     These emails generally state that the recipient's award "is being terminated per 2 CFR 200.340(a)(4) because it has been determined that your award no longer effectuates agency priorities."

90.     The emails direct recipients to "cease all award activities" and state that "[t]his is a final agency action and is not administratively appealable." They further direct recipients to "notify subrecipients and/or community partners, if applicable, and initiate your internal termination and closeout procedures."

91.     Recipients of State Service Commission subgrants also received emails from their respective State Service Commissions that AmeriCorps terminated the States' grants pursuant to 2 C.F.R. § 200.340(a)(4). The subgrant recipients were similarly directed to close out their programs.

92.      These terminations fail to identify a "material failure" on the part of grant recipients or sponsors and therefore violate 42 U.S.C. § 12636. They also fail to provide adequate notice and opportunity to be heard and therefore violate 42 U.S.C. § 12636.

93.     These terminations also violate the Agency's regulations requiring that the Agency identify the recipients' "material failure" to comply with the terms of the program or the grant and provide recipients notice or opportunity for hearing as required under 45 C.F.R. § 2540.400 and 45 CFR § 2556.135(a)–(b) (pertaining to VISTA sponsors).

94.     VISTA Participants received emails that their programs were terminated and ordered to stop work. They were not terminated for cause, i.e., "due to deficiencies in conduct or performance," 45 CFR § 2556.400(a), and not provided notice or hearing under 45 C.F.R. § 2556.430. The Agency additionally failed to meet the requirements of 45 C.F.R. § 2556.430.

95.     All of these actions constitute "significant changes" to AmeriCorps policy and grants. The Agency failed to follow proper rulemaking procedures before decimating the program and its Participants. Further Consolidated Appropriations Act of 2024, § 401, 138 Stat. at 695. Nor, on information and belief, were the changes to AmeriCorps policy made by the Board, as required by 42 U.S.C. § 12651b(g).

96.     The Agency also failed to provide a reasoned explanation or demonstrate that it considered substantial reliance interests in ending the program.

**C.    Defendants Eliminate the Staff Needed to Carry Out AmeriCorps' Statutory Obligations**

97.    On Wednesday April 16, 2025, many AmeriCorps employees received a notice purporting to come from Defendant Bastress Tahmasebi, informing them that they were placed on administrative leave, effective immediately.

98.    Approximately 85% of AmeriCorps employees—over 600 AmeriCorps staff members, including about 400 of 429 employees (approximately 93%) represented by Local 2027—had to stop working because they were placed on administrative leave. By approximately 5:00 p.m. the same day, bargaining unit members lost access to all AmeriCorps systems, including email.

99.    AmeriCorps staff on administrative leave were not permitted to enter AmeriCorps' offices or access their AmeriCorps email or computer networks. No additional information or explanation was provided beyond the brief notice.

100.    On Thursday April 24, 2025, virtually all AmeriCorps employees on administrative leave began receiving Reduction in Force ("RIF") notices. Many employees first received RIF notices addressed to a different AmeriCorps employee, revealing that other employee's personal information to all who received the erroneous notice. This caused mass confusion, as employees were unsure whether they were in fact receiving a RIF notice themselves or had been sent someone else's notice in error. It turned out both would ultimately prove true.

101.    Later that day, the Agency sent emails to those employees who had received the erroneous RIF notices, explaining they had been "inadvertently sent," and advising recipients to delete the previous RIF notice.

102.    Shortly thereafter, those who were sent erroneous RIF notices were sent a new "Specific Notice of Reduction in Force." These notices informed recipients that they would be "separated from the Federal Service effective Tuesday, June 24, 2025."

103.    Prior to these RIFs, AmeriCorps employed approximately 720 people across the country. Now, about 85% of the Agency has been placed on administrative leave and is not working. Approximately 93% of Local 2027's bargaining unit has been placed on administrative leave and is not working. And almost all of these employees have received RIF notices scheduling their terminations for June 24.

104.    The few remaining staff members left at AmeriCorps will be unable to complete the day-to-day work required to keep the Agency running. The normal management of the full portfolio of AmeriCorps programs and grants requires hundreds of staff. For example, a team of 17 AmeriCorps staff is responsible for managing and disbursing funds from the National Service Trust, a fund established to support AmeriCorps Participants through Segal AmeriCorps Education Awards, which may be used to pay for Participants' future education costs or to repay qualified student loans. In the wake of the dismantling of the agency, there is only one "Trust Officer" left at AmeriCorps, who will now be responsible for processing up to 29,801 AmeriCorps Participants' awards.

105.    As another example, at the current staffing levels (*i.e.*, with 85% of staff on administrative leave), even the remaining AmeriCorps grant and project recipients will not receive the needed technical assistance or program oversight provided by AmeriCorps employees, and will almost certainly have difficulties receiving funds from AmeriCorps due to low staffing. Worse still, in addition to the normal day-to-day management of those thousands of projects, the very small number of remaining staff must process the over 1,000 grant termination actions required after

25

those AmeriCorps grants were abruptly ended on April 25 *en masse*—at a time when AmeriCorps staff who normally handle grant terminations had almost all been on administrative leave for over a week. The grant termination process is quite involved; it will be a difficult and time-consuming task for the remaining ten Portfolio Managers or seven Senior Portfolio Managers supervising them, a small fraction of the previous staff assigned to that work.

106.    Additionally, the Agency will be unable to process new grant or grant continuation applications in a timely manner, if at all, given the current staffing constraints.

107.    Many of the AmeriCorps employees currently on leave work directly with AmeriCorps Participants, such as the individual service corps Participants with the NCCC or VISTA. These AmeriCorps employees undertake a wide range of necessary NCCC and VISTA tasks including onboarding and offboarding Participants, processing the stipend that Participants receive for their service, and processing education awards. These activities will not be completed on time, if at all, with the number of staff remaining.

### D.    Neither the CEO Nor Board of AmeriCorps Executed the Dismantling of AmeriCorps Programs and Staff

108.    Congress directed that the CEO and Board of AmeriCorps were collectively "responsible for the exercise of the powers and the discharge of the duties of the Corporation," and that the CEO would "have authority and control over all personnel over the Corporation," other than the Office of the Inspector General. 42 U.S.C. § 12651d(1).

109.    However, on information and belief, the actions discussed in the foregoing paragraphs were not taken by a confirmed or Acting CEO, nor by the Board.

110.    AmeriCorps does not currently have a CEO or Acting CEO. Defendant Bastress Tahmasebi has been serving as "Interim Agency Head," a position with no statutory authority.

111.    Even if Defendant Bastress Tahmasebi were serving as Acting CEO, critical actions described above were taken by Defendant Cavanaugh or other "DOGE Team" personnel acting at his direction,[6] rather than by Defendant Bastress Tahmasebi herself.

112.    On April 16, an email was sent placing nearly the entire staff on administrative leave. Although the email stated that it was sent "[o]n behalf of AmeriCorps CEO Jennifer Bastress Tahmasebi" (a position that she did not hold on a confirmed or acting basis, and which she had never before identified herself as holding), on information and belief, Defendant Bastress Tahmasebi neither saw nor approved the email before it was sent.

113.    On information and belief, Defendant Cavanaugh or persons acting at his direction made the decision to terminate and in fact terminated AmeriCorps' grants and contracts, not Defendant Bastress Tahmasebi or the AmeriCorps staff responsible for grant terminations. For example, Plaintiff NCHC received an email on April 25, 2025 terminating its AmeriCorps VISTA grant. The email purported to come from NCHC's portfolio manager in AmeriCorps' Southeast regional office. However, that portfolio manager had resigned more than a week prior, had been locked out of AmeriCorps' email system ever since, and had no involvement with the grant termination.

## IV.    THE IMPACT OF THE ADMINISTRATION'S ACTIONS ON PLAINTIFFS

114.    Defendants' actions have already caused harm and will continue to cause harm, including irreparable harm, to Plaintiffs and others, including but not limited to the following:

---

[6] Pursuant to Executive Order 14,158, each agency was required to establish "a DOGE Team of at least four employees, which may include Special Government Employees … in consultation with the [U.S. DOGE Service] Administrator," which would "coordinate their work with [U.S. DOGE Service] and advise their respective Agency Heads on implementing the President's DOGE Agenda." Exec. Order 14,158, 90 Fed. Reg. 8,441, 8,441 (Jan. 20, 2025).

A.    **Irreparable Harm to Nonprofit Organizations**

115.    Elev8's AmeriCorps Volunteer Generation Fund (VGF) award enabled the organization to build an internal staff that recruited, managed, and supported 60 local volunteers who, over the past two years, provided tutoring and after-school programming at approximately 20 Baltimore City schools and programs, serving more than 800 students each week. Elev8 had just entered the third year of its five-year award, which provided about $145,000 annually, when it received a termination notice on April 25. In response, Elev8 plans to cut its human resources and grants teams, funded by VGF, by half. This will severely limit its ability to recruit, train, and monitor tutors. Without these resources, Elev8 anticipates it will have to cut its tutoring and out-of-school-time programming by 30 percent, significantly reducing the number of students served and harming its reputation for consistent support in Baltimore City schools.

116.    Red Cloud was in its final year of a three-year AmeriCorps State and National direct grant it had maintained for 26 years. In the past three years, it received approximately $400,000 a year to support Lakota immersion programs across its elementary schools, one middle school, and one high school serving the Lakota community. The grant enabled Red Cloud to recruit local Lakota youth as AmeriCorps Participants to serve as teaching assistants for a duration of one to three years. These Participants joined in groups of 4–5 to assist a Red Cloud staff teacher to teach classes of approximately twenty students. The Participants provided students with individualized support in math, literacy, and social-emotional development, while also gaining valuable teaching skills. Students benefit from one-on-one attention and see these Participants as role models, inspiring them to envision future possibilities. Many AmeriCorps Participants pursued degrees at local colleges concurrently, with some leveraging the Segal Education Award after completing their service. Notably, ten of Red Cloud's current and permanent teachers began as AmeriCorps

28

Participants. The program's success is evident in its improved student outcomes and strengthened community empowerment through a career pipeline into education.

117. On, April 25, 2025, Red Cloud received an email from AmeriCorpsAwardAction@americorps.gov notifying it that its grant was terminated and to immediately cease all award activities. The letter informed Red Cloud that the action was not administratively appealable. At that time, Red Cloud had 11 AmeriCorps Participants serving in its teaching assistant program. As a result of this termination, Red Cloud felt a moral obligation to retain the former AmeriCorps Participants through the end of the school year (May 16). Doing so has placed an unexpected financial strain on Red Cloud. The school is not in a position to retain these Participants through July 31, the end of the (former) AmeriCorps award. This curtailment of services will have a detrimental effect on the students who rely on these supports to succeed and on their families. In addition, Red Cloud's management team, who regularly communicated with AmeriCorps program officers, noticed that a few weeks before receiving the termination notice, AmeriCorps staff had stopped responding to their calls. Red Cloud had submitted a $1.3 million grant application to continue funding for another three-year cycle after the current grant expired, but, unusually, no one at AmeriCorps headquarters answered their calls or replied to emails. In previous years, Red Cloud would typically receive a response about award continuation within two weeks of the submission date, but this year, they have not received any updates on their application status. Red Cloud schools, their programs, and the prospects of their students and of Lakota youth who participate in AmeriCorps are at serious risk.

118. Bur Oak is currently in the third year of its three-year AmeriCorps award from Volunteer Iowa, the Iowa State Service Commission, which provides $250,000 annually to support 11 AmeriCorps Participants engaged in active land management, disaster response, and the

coordination of roughly 200 volunteers. This program enables Bur Oak to tackle critical issues such as prairie and woodland habitat loss—which drives species decline and accelerates climate change—and the spread of invasive species that degrade local ecosystems. The termination notice Bur Oak received on April 28 arrived during burn season, a crucial period when AmeriCorps Participants conduct managed burns to control invasive species; without these efforts, the health of ecosystems across the state is jeopardized. The loss of its award will not only harm Bur Oak's land and wildlife management but also severely impact its small staff, as AmeriCorps awards also partially cover the salaries of two out of six permanent employees. As a result, Bur Oak anticipates eliminating at least one full-time staff position and is now struggling to find alternative resources to sustain its land management work. This reduction in workforce is already limiting Bur Oak's ability to fulfill its mission and effectively serve eastern Iowa's natural areas.

119.    PCCE is in the midst of a three-year AmeriCorps VISTA grant award spanning 2023 to 2026. The award amounts to a total of $2,500,752 and covers 60 VISTA Participants over a three-year period. During the first year of the grant (2023–2024), PCCE's VISTA Participants provided services to more than 10,000 people, including working with more than 5,800 youth on anti-poverty programming. When PCCE received notice of termination of its award on April 25, it shut down its 19 VISTA projects immediately. VISTA Participants were required to leave their projects mid-stream, and PCCE expects the vast majority of projects will not continue in their absence. Community members benefiting from these VISTA projects—students accessing STEM education, adults taking functional literacy classes, community members who receive food deliveries to their homes—will abruptly lose access to these critical resources. Further, two of PCCE's four staff members' salaries come partially or completely from AmeriCorps, and PCCE

does not have internal funding to maintain their employment. They will likely be terminated in the coming weeks.

120.    NCAN has more than 50 member organizations that receive State and National grants and/or State Service Commission subgrants. Beginning April 25, at least 24 of those organizations received grant termination notices from AmeriCorps or stop work orders from State Service Commissions that require them to immediately cease providing stipends. For some of NCAN's members, these grants provided as much as 70% of their budgets. All told, the cuts eliminated more than $4.5 million, which funded more than 400 AmeriCorps Participants supporting more than 50,000 students. The loss of this funding will force NCAN's members to lay off staff and cut services. For example, NCAN member College Success Foundation, which coaches and supports students from low socioeconomic backgrounds to prepare for and graduate college, lost funding for eight AmeriCorps Participants serving 1,700 students

121.    The timing of Defendants' actions has made the harm to NCAN's members and the students they serve particularly devastating. Many of NCAN's members assist students in completing financial aid paperwork, applying to and choosing between colleges, and interpreting financial aid offers. The deadline for most students to accept offers of admission and financial aid and confirm their enrollment was May 1. NCAN's members thus lost funding and had to close or reduce programs at the precise time their services were most needed. Many students were unable to reach their counselors at a time when they had to make one of the most consequential decisions of their lives. The harm to NCAN's members' ability to provide services and fulfill their organizational missions, as well as to their reputation for reliability with their partners and the students they serve, is irreparable—to say nothing of the harm to the students themselves; the AmeriCorps Participants who lost jobs, education stipends, work experience, and their ability to

keep their commitments to the students with whom they had developed relationships; and Congress's policy of "meeting community needs with demonstrable results, while enhancing students' academic and civil learning." 42 U.S.C. § 12521(1).

122.    MCAN, one of NCAN's member organizations, currently receives four AmeriCorps awards: a VISTA grant and three awards through the Michigan State Service Commission. On April 28, MCAN received an email titled "Stop Work Order" from the Commission. The email directed all recipients to cease work because the Commission's grant had been terminated. MCAN's awards from the Commission—a Pathways Planning grant, an AdviseMI grant, and a College Completion Corps grant—amount to $2.1 million annually, providing for the salaries of 9 of MCAN's 32 full-time employees. Each grant is critical to MCAN's mission. For example, the AdviseMI grant provides for 86 AmeriCorps Participants to work in underserved Michigan high schools and to assist approximately 4,750 students with submitting college applications, taking college entrance exams, and enrolling. As a result of the decision to terminate the Commission's awards, MCAN expects to cancel all of these programs in their entirety and for most of the staff to be let go.

123.    On April 25, MCAN received a notice of termination for its VISTA grant—worth approximately $35,000 annually, enough to fund 7 VISTA Participants. MCAN was in the midst of interviewing for a full-time employee to run its FAFSA program and manage the 7 VISTA Participants. These VISTA Participants would have worked in high-need school districts across Michigan to increase completion of the Free Application for Federal Student Aid ("FAFSA"), reaching approximately 3,850 students. Upon receipt of the termination notice, MCAN pulled down the application posting for an employee and informed interviewees they would not be moving forward with hiring. MCAN intends to inform its school district partners that it will not be

able to continue this work as planned. The cancellation of MCAN's AmeriCorps awards will injure its reputation as a partner to high schools and institutions of higher education and severely hamper its ability to fulfill its mission.

124.    NCHC is in the midst of the second year of its AmeriCorps VISTA grant, which provides for four VISTA Participants for a one-year commitment. In January 2025, it began placing VISTA Participants at local housing counseling agencies in need of additional capacity. Upon receipt of the April 25th email terminating NCHC's AmeriCorps award, it informed its VISTA Participants to stop work immediately. Without the AmeriCorps VISTA grant, NCHC will not be able to send support to these or any other local housing counseling agencies for the foreseeable future, damaging NCHC's reputation and rapport with critical partners who relied on the promise of VISTA Participant capacity.

125.    HCDNNJ is in the midst of its ninth year as an AmeriCorps VISTA grantee. Under its current award, it hosts three VISTA Participants pursuant to a grant of approximately $70,000. The current VISTA Participants provide critical capacity for HCDNNJ's programs—supporting the organization's work as an intake office for New Jersey residents in need of housing support during times of crisis, compiling and disseminating resource guides for the public on food insecurity, safe and healthy homes, and foreclosure and homelessness prevention, and working directly with community members to develop strategies for areas with safety concerns. HCDNNJ will not be able to provide these services without AmeriCorps funding and technical support. Upon receiving a termination letter on April 25, HCDNNJ alerted its VISTA Participants it could no longer support their work. HCDNNJ does not know how it will fill the gaps in coverage for its crisis hotline or the other VISTA-supported projects. Its retreat from these commitments will damage its reputation, its members, and its projects moving forward.

126.    HandsOn just began its third year of a three-year VGF grant. Pursuant to this VGF award, HandsOn receives approximately $375,000 per year to administer two types of programming. First, HandsOn provides support for community volunteering by recruiting and mobilizing community members to serve as volunteers, connecting volunteers with nonprofits, and training nonprofits on volunteer management. Through this work, HandsOn serves 44 cities and villages in the greater Chicago area and empowers over 100 nonprofits, schools, government entities, and community organizations with the service of nearly 3,000 volunteers. Second, HandsOn runs its own educational programs, including a lunch buddies program to connect students with trusted non-family mentors and an afterschool wraparound program for students facing attendance and academic challenges. These programs provide academic, social-emotional, behavioral health, and basic needs support for 200 students. The VGF grant also helps to pay part of the salary of eight of HandsOn's nine staff members. In the coming days, HandsOn expects it will have to terminate several employees.

127.    Democracy Maine's planning grant from the Maine State Service Commission provided it with $60,000 to develop its rural civic engagement program. The goal of the program is to connect young people in rural Maine communities with leadership development, civic education, and civic engagement opportunities, showing them in the process that their voices matter. These students often do not see a role for themselves in civic life, in part because rural students only have a 50% chance of taking a course on American government and only a 30% chance of being given the opportunity to think about where their beliefs fall on the political spectrum. For the past four months, Democracy Maine has been developing the program structure to host AmeriCorps Participants, who would eventually oversee a cohort of high school students engaging their peers in civic work. Democracy Maine has hosted 5–10 high schoolers per semester

three times a year for the past several years, but turned to AmeriCorps funding because the demand for the program exceeded their capacity. When it learned its AmeriCorps funding would be terminated on April 25, Democracy Maine immediately ceased planning for an expansion of its civic engagement program. They have not been able to identify any other funding to support the roles AmeriCorps Participants would have served in. Democracy Maine expects its program expansion will be delayed for several years, if not indefinitely.

128.    Service Collaborative is in year two of a three-year AmeriCorps VISTA grant award worth $120,000 per year. The grant allows Service Collaborative to help nonprofit organizations increase their impact in communities by providing them with resources, increasing their community volunteers, and raising financial resources. With its current VISTA award, SCWNY was on track to benefit 20 local and national nonprofits, with 25 VISTA Participants contributing to this work. In its first year under this grant, Service Collaborative and its VISTA Participants have already recruited more than 2,000 volunteers, who have served more than 17,000 hours in priority projects. When Service Collaborative learned its funding was being terminated on April 25, it quickly informed its VISTA Participants the program was shutting down and worked to determine whether it could assist them in finding new placements. Since then, no Service Collaborative VISTA Participants have been able to find an alternative placement—they will all exit the program. The projects being supported by the VISTA grant will be significantly hampered without this support, and SCWNY's reputation as a reliable community partner has been affected.

129.    Rainbow Labs is currently in the second year of its AmeriCorps VGF award, which provides approximately $165,000 annually for the organization to sustain and expand its mentoring programs for LGBTQ+ youth. This award allowed Rainbow Labs to hire a manager for its mentoring program, tasked with creating a volunteer mentor process and procedures manual,

recruiting 50 new volunteers, and conducting training for new volunteers. Over the first year and a half of the grant, Rainbow Labs was able to increase its impact, expanding from one high school to five high schools in the Los Angeles area and expanding volunteer engagement from approximately 30 volunteers to 150 volunteers. When the termination notice arrived, Rainbow Labs was restructuring its staffing model to hire a program manager funded entirely by AmeriCorps to focus on volunteer recruitment and deeper community collaboration. Without filling that position, the organization will be unable to recruit as many new volunteers, its volunteer retention will likely suffer, and its engagement of external partners will decline. As a result, fewer LGBTQ+ youth will have access to Rainbow Labs' services. The organization's hard-earned reputation among local school partners, who depend on the consistency and quality support provided by these mentoring programs, will suffer.

130.    Seed's VISTA grant is in its third year of an award subject to annual review and renewal, which provides approximately $180,000 and up to 19 VISTA Participants annually. The VISTA Participants engage in a number of different projects aimed at meeting basic student needs on local campuses, working to sustain mentorships with at-risk youth, create financially literate communities, and improve health outcomes. Upon receiving the April 25 termination email, Seed immediately ended its VISTA activities. Seed also received an award from the Iowa Commission on Volunteer Service providing approximately $385,000 annually—more than half of Seed's annual budget—for 76 AmeriCorps Participants to work as part of Iowa's College Corps. These AmeriCorps Participants address low retention rates of first-generation and low-income students at higher education institutions in Iowa through individualized coaching and mentoring to increase student persistence and graduation rates, among other activities. Upon receiving a termination email on April 28, Seed moved to wind down program activities and suspended recruitment of

Iowa College Corps Participants for planned service in the summer of 2025. Without these AmeriCorps awards, Seed cannot move forward with any of these commitments. For now, the organization is surviving day by day. Its relationships with affected member institutions—which are based on a core value of dependability—have already suffered. Multiple staff members charged with managing the VISTA program will likely be terminated in the coming weeks.

131.    Aspire was in its third year of a three-year subgrant from the Virginia Service Commission when it received the email from the Commission terminating its award. Aspire has received AmeriCorps funding for approximately 14 years. Over that time, AmeriCorps has helped to build the organization into what it is today: five of Aspire's 12 full-time staff are former AmeriCorps Participants. Aspire's current grant—worth $468,000 annually—amounts to 25 percent of its current operating budget. The grant supports 28 AmeriCorps Participants who provide tutoring, mentoring, and supervision of 150 third- through eighth-grade students in South Arlington. Aspire has worked for 30 years to establish itself as a reliable, trustworthy partner in the South Arlington community. The cuts to its AmeriCorps funding—and the loss of technical support—will be felt immediately. Without this funding and these AmeriCorps Participants, Aspire expects it will have to cut its services by approximately 30 percent next school year, which means one-third of Aspire students and their families will no longer have a safe place to go after school. Aspire will be forced to go back on promises it has already made to its students and their families, hurting its reputation and its future success as a community partner.

### B.    Irreparable Harm to Individual Program Participants

132.    Doe 1 left their job in January 2025 for a service term as an NCCC Participant that was supposed to run through November 2025. They joined the program with the expectation of earning a $7,395 education award upon completing their service term and had budgeted this

amount towards future educational expenses for college. After receiving the termination notice just two months into their service, they learned they would only receive a pro-rated education award of $1,900.95 based on the hours they had served. As a result, they left without employment and with less money from their year of service than they anticipated. Doe 1 also suffered severe emotional distress due to the abrupt and unexpected nature of their termination. Their team was given an artificial deadline to return in a 15-passenger van from their service project in Bennington County, Vermont to their regional NCCC campus in Vinton, Iowa to make their flights home. Doe 1 and their team were forced to violate NCCC travel safety guidelines and travel in an exhausted state to meet this deadline. Doe 1 was devastated when they realized their team's abrupt departure would detrimentally impact individuals waiting for Habitat for Humanity housing.

133.    Doe 2, as a team leader of NCCC, received a higher stipend than other team Participants: $519 every two weeks. They allocated half of their stipend each month towards paying down their college loans. The abrupt loss of their stipend has significantly disrupted their ability to pay her college loans. Before returning to AmeriCorps, Doe 2 had graduated and planned to launch their career in the theater industry immediately after graduating from college, knowing this was the optimal time to secure a job in their field. They chose, however, to postpone their career to serve as a team leader for NCCC because they strongly believed in AmeriCorps' mission. While serving on a project assisting low-income individuals with tax preparation in San Diego, California, Doe 2 and their team anticipated April 15—Tax Day—to be their busiest. Instead, they were abruptly instructed to pack up and return to their regional NCCC campus in Sacramento at 1 p.m., leaving many individuals without the help they needed on the final day to file taxes. Doe 2 suffered severe emotional distress due to the abrupt and unexpected nature of their termination,

the unsafe nature in which they were forced to race back to the regional campus to meet an artificial deadline, and the knowledge that their team would not be able to assist those in need.

134.    Doe 3 became an AmeriCorps VISTA Participant in February of 2025. They chose to leave their job at the North Carolina A. Phillip Randolph Institute, where they focused on voter registration and engagement, in favor of the opportunities for skill-building and leadership training AmeriCorps could provide. They moved to a new city, Fayetteville, North Carolina, believing AmeriCorps could help them figure out how they could best be of service in their career. They accepted a one-year position with VISTA but quickly decided they would renew for a second year. Once they completed their AmeriCorps stint, Doe 3 planned to go back to school and earn their Master of Arts in history, using their AmeriCorps education award to help pay for it. The sudden cancellation of Doe 3's AmeriCorps position has left them in a new city, without a job, lacking the experience, skill building, and community they signed up for.

### C.    Irreparable Harm to Local 2027 and Its Members

135.    Local 2027 is the exclusive representative of nonsupervisory AmeriCorps employees. As such, Local 2027 negotiates with AmeriCorps management about a wide range of terms and conditions of employment for AmeriCorps employees. Local 2027's core functions include providing support, guidance, and resources to bargaining unit employees about their working conditions and their rights on the job.

136.    Since Defendants began dismantling the Agency, Local 2027 has been inundated with inquiries from affected employees who were blindsided by the changes in their employment and are very concerned about their livelihoods and the mission of the Agency. Members have contacted Local 2027 seeking information, guidance, explanations of their rights, and legal advice. Members are also concerned about the loss of health insurance upon their terminations. Local 2027

has had to divert significant resources to responding to the confusion and concrete needs wrought by Defendants' behavior.

137.    The Agency's actions have obstructed Local 2027's ability to carry out its core function of advising employees about their employment terms and rights and advocating for their working conditions. In particular, the lack of advance notice to Local 2027 regarding the plan to place nearly all staff on administrative leave and to terminate 90% of its bargaining unit has left the Union scrambling to gather information to fill in the gaps created by Defendants. Moreover, because employees were put on administrative leave and locked out of systems without warning, Local 2027 was unable to download important documents, such as information about the composition of the bargaining unit, needed to contact and assist its members upon issuance of the RIF notices.

138.    If Defendants terminate anywhere close to 90% of Local 2027's bargaining unit, as they have proposed to do, it will threaten Local 2027's continued existence, meaning it will be nearly impossible for the Union to provide core services and protection to its members. Because Local 2027 funds its representational activity through voluntary membership dues, the near-complete elimination of its entire membership will deprive the union of nearly all its revenue, not to mention its very purpose. And because collective bargaining relies on strength in numbers, the decimation of its bargaining unit will not only deprive the Union of the resources it needs to function, it will also shrink the bargaining unit to an echo of its former self and thereby weaken the Union's leverage to advocate for dignified working conditions on behalf of employees in the bargaining unit.

139.    Local 2027's members are also irreparably harmed by Defendants' actions. Local 2027's members are dedicated public servants who have devoted their careers to furthering

volunteerism and service in this country. By dismantling this unique agency, Defendants are destroying Local 2027's members' ability to carry out the mission to which they have dedicated their careers. Moreover, the 90% of Local 2027's bargaining unit who are slated for termination are unlikely to find comparable employment. Many of these employees themselves were once AmeriCorps Participants. For AmeriCorps employees, promoting national service through their public service employment is a calling that cannot be replaced by any other job—because there is no other entity in America to promote domestic public service in this country that even remotely compares to AmeriCorps. Local 2027 members are public servants above all, but Defendants have taken the ability to provide that public service from them.

140.    Local 2027's members stand to lose their jobs, including all their wages and benefits, and see the future of their careers decimated. Among the most harmful loss of benefits is that they will lose their employer-provided health insurance. Local 2027 members include individuals with acute medical conditions who rely on their employer-sponsored health insurance to afford their medical care, and these members include pregnant employees and others with serious health conditions who rely on that coverage as a need, not a desire. Without their current coverage, they will be forced to forgo care, placing their health in jeopardy.

141.    The harm to Local 2027 members is not limited to those who will lose their jobs. The small percentage of Local 2027 members who remain in their jobs now face virtually impossible working conditions—a much higher workload with far less support—as they are necessarily tasked with filling the gaping holes left by the mass firings of their colleagues, which has and will continue to lead to emotional distress and other challenges for Union members.

### CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**(against all Defendants)**

**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A):**
**Defendants' Actions Are Arbitrary and Capricious**

142.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

143.    Individually and collectively, Defendants' actions constitute "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704.

144.    Defendants' actions are "arbitrary and capricious." 5 U.S.C. § 706(2)(A). Defendants' conduct constitutes a change in agency policy. Defendants have given no reasoned explanation for their conduct, entirely failed to consider important aspects of the problem Congress created AmeriCorps and its programs to address, failed to consider alternatives (such as allowing NCCC Participants more time for an orderly departure and allowing grantees more time to wind down programs), and ignored reliance interests affected by their actions. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016); *FCC v. Fox Tel. Stations, Inc.*, 556 U.S. 502, 515 (2009); *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983).

145.    Accordingly, Plaintiffs are entitled to an order and judgment, and to a preliminary and permanent injunction, holding unlawful and setting aside the decision to dismantle AmeriCorps and enjoining any action taken to enforce or implement it.

**SECOND CAUSE OF ACTION**
**(against all Defendants)**
**Violation of Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A), (B), and (C):**
**Defendants Actions Are Not in Accordance with Law, Contrary to Constitutional Power,**
**and in Excess of Statutory Authority**

146.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

147.    Individually and collectively, Defendants' actions constitute "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704.

148.    Defendant AmeriCorps is an agency subject to the APA. 5 U.S.C. § 701.

149.    Defendants' actions are "not in accordance with law," "contrary to constitutional right, power" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §§ 706(2)(A), (B), (C).

150.    By unilaterally ceasing statutorily mandated functions, effectively shuttering an agency that Congress has created by statute, Defendants are violating, among other things:

a.    the separation of powers, including the legislature's exclusive authority to make law, U.S. Const. art. I, § 1, and appropriate and spend funds, U.S. Const. art. I, §§ 8–9;

b.    the Full-Year Continuing Appropriations and Extensions Act of 2025, Pub. L. No. 119-4, § 1101(a)(8), 139 Stat. 9, 11 (Mar. 15, 2025), and Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, § 312, 138 Stat. 694–95 (Mar. 23, 2024);

c.    numerous provisions in AmeriCorps' governing statutes, including provisions controlling its governance, *e.g.*, 42 U.S.C. §§ 12651b(g), 12651d(a)-(c), 12651f(c), 12651h; NCCC, *id.* § 12612 *et seq.*; VISTA, *id.* § 4951 *et seq.*; State and National Grants, *id.* §§ 12571 *et seq.*, 12581 *et seq.*, 12638, *id.* §§ 12571 *et seq.*, 12581 *et seq.*; the VGF, *id.* § 12653p; and its notice, hearing, and grievance procedures, *id.* § 12636; and

d.    numerous provisions in AmeriCorps' implementing regulations, including 45 C.F.R. Part 2525 (National Service Trust), § 2540.400 (grant terminations or

suspensions), and Part 2556 (Volunteers in Service to VISTA), as well as 2 C.F.R.

§ 200.340(a)(4) (termination of Federal Awards).

151.    Accordingly, Plaintiffs are entitled to an order and judgment, and to a preliminary

and permanent injunction, holding unlawful and setting aside the decision to dismantle

AmeriCorps and enjoining any action taken to enforce or implement it.

### THIRD CAUSE OF ACTION
### (against all Defendants)
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(1):
### Defendants Have Unreasonably Withheld Agency Action

152.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above

as though fully set forth herein.

153.    The APA provides that a reviewing court "shall" "compel agency action unlawfully

withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1).

154.    Individually and collectively, Defendants' actions constitute "final agency action

for which there is no other adequate remedy." 5 U.S.C. § 704.

155.    By ceasing or gutting AmeriCorps' congressionally mandated programs and

eliminating AmeriCorps staff that administer these programs, Defendants have unlawfully

withheld mandatory agency action.

156.    By withholding appropriated funds whose expenditure was mandated by Congress,

Defendants have unlawfully withheld agency action.

### FOURTH CAUSE OF ACTION
### (against all Defendants)
### Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(D):
### Failure to Observe Procedures Required by Law

157.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above

as though fully set forth herein.

158.    The APA requires that a reviewing court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

159.    In its appropriation for fiscal year 2024, Congress explicitly required that Defendants "shall make any significant changes to program requirements, service delivery or policy only through public notice and comment rulemaking." Further Consolidated Appropriations Act, 2024 § 401, 138 Stat. at 695.

160.    In its appropriation for fiscal year 2025, Congress reappropriated the amounts and conditions from the FY 2024 appropriations act, "under the authority and conditions provided in" that Act. Full-Year Continuing Appropriations Act, 2025, § 1101(a)(8), 139 Stat. at 11.

161.    Defendants made "significant changes to program requirements, service delivery or policy" when they effectuated their decision to dismantle AmeriCorps. Defendants may not cut or decimate entire grant programs or AmeriCorps services, including but not limited to NCCC, or change the criteria by which they judge grants or programs without APA notice and comment rulemaking.

162.    Without having proceeded through notice-and-comment procedures, Defendants' actions are procedurally invalid under the APA.

163.    Defendants are required to provide notice, hearing, and grievance procedures to cancelled grantees and sponsors. *See* 42 U.S.C. § 12636; 45 C.F.R. §§ 2540.400, 2556.135. They failed to do so.

164.    Defendants may only terminate NCCC and VISTA Participants for cause and must conduct cause proceedings and provide an opportunity to appeal. *See* 45 C.F.R. §§ 2556.400,

2556.420, 2556.425, 2556.430. They terminated NCCC and VISTA Participants without even purporting to do so for cause and without even purporting to follow the necessary procedures.

165.     Accordingly, Plaintiffs are entitled to an order and judgment, and to a preliminary and permanent injunction, holding unlawful and setting aside the decision to dismantle AmeriCorps and enjoining any action taken to enforce or implement it.

**FIFTH CAUSE OF ACTION**
**(against all Defendants)**
**Violation of the Separation of Powers/*Ultra Vires***

166.     Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

167.     Plaintiffs have an implied right of action under the Constitution to challenge governmental action that violates the separation of powers. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *Strickland v. United States*, 32 F.4th 311, 365 (4th Cir. 2022).

168.     The power to make law resides exclusively with the legislative branch. U.S. Const. art. I, § 1.

169.     The Constitution vests executive power in the President, U.S. Const., art. II, and imposes on the President a duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3. 151. The President and Executive Branch have no constitutional power to unilaterally enact, amend, or repeal parts of duly enacted statutes. *Clinton v. City of New York*, 524 U.S. 417, 438–39 (1998).

170.     Congress exercised its Article I legislative authority to create AmeriCorps as an independent executive agency. Congress has also exercised its Article I legislative authority to

mandate that AmeriCorps carry out specific functions and appropriate funds that AmeriCorps must spend to carry out those functions.

171.    No statute, constitutional provision, or other source of law authorizes the President or the Executive Branch to terminate AmeriCorps' statutorily mandated programs, render it unable to implement them by eliminating the necessary staff, or prevent the disbursement of congressionally appropriated funds.

172.    Defendants' actions unlawfully usurp Congress's legislative authority and are therefore ultra vires. Defendants' actions override direct congressional mandates.

**SIXTH CAUSE OF ACTION**
**(against Defendants Bastress Tahmasebi and Cavanaugh)**
**Violation of the Appointments Clause**

1.    Plaintiffs have an implied right of action under the Constitution to challenge governmental action that violates the Appointments Clause. *Free Enter. Fund*, 561 U.S. at 491 n.2; *Strickland*, 32 F.4th at 365.

2.    "The Appointments Clause prescribes the exclusive means of appointing 'Officers.'" *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 244 (2018); U.S. Const. art. II § 2, cl. 2.

3.    The Chief Executive Officer of AmeriCorps is a principal officer of the United States requiring Senate confirmation. 42 U.S.C. § 12651c(a).

4.    The voting members of the Board of AmeriCorps are principal officers of the United States requiring Senate confirmation. *Id.* § 12651a(a)(1).

5.    Defendant Tahmasebi is purporting to exercise the authority of the AmeriCorps Chief Executive Officer and/or Board without Presidential appointment, Senate confirmation, or

designation as Acting Chief Executive Officer under the Federal Vacancies Reform Act, 5 U.S.C. § 3345.

6.     On information and belief, Defendant Cavanaugh, and/or others directed by him who are not the CEO of AmeriCorps or voting members of the AmeriCorps Board, is exercising the authority of the AmeriCorps Chief Executive Officer and/or Board without Presidential appointment or Senate confirmation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter each of the following forms of relief:

i.     Declare unlawful and set aside the decision to dismantle AmeriCorps as arbitrary, capricious, and an abuse of discretion under 5 U.S.C. § 706(2)(A);

ii.    Declare unlawful the decision to dismantle AmeriCorps as not in accordance with law under 5 U.S.C. § 706(2)(A), contrary to constitutional right, power, privilege, or immunity under 5 U.S.C. § 706(2)(B), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C);

iii.   Declare that Defendants violated the APA by unlawfully withholding agency action, 5 U.S.C. § 706(1);

iv.    Declare that Defendants violated the APA by acting without observance of procedure required by law, 5 U.S.C. § 706(2)(D);

v.     Declare that Defendants violated the separation of powers and are acting *ultra vires*;

vi.    Declare that Defendants Bastress Tahmasebi and Cavanaugh are acting in violation of the Appointments Clause;

vii.   Preliminarily and permanently enjoin the Defendants from effectuating the decision to dismantle AmeriCorps and order Defendants to restore all AmeriCorps programs, grants, contracts, Participants, and staff to their status as of April 14, 2025;

viii.  Declare that pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the dismantling of AmeriCorps is contrary to law and outside Defendants' authority;

ix.    Order Defendants to file a status report with the Court within 24 hours of entry of a preliminary injunction, and at regular intervals thereafter, confirming compliance with these orders;

x.     Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements as appropriate; and

xi.    Grant such other relief as the Court deems necessary, just, and proper.


*/s/ Norman L. Eisen*
Norman L. Eisen [Bar No. 09460]
Tianna J. Mays [Bar No. 21597]
Pooja Chaudhuri*
Sofia Fernandez Gold*
Joshua Kolb*
**DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Ave. SE
Suite 15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Tianna@statedemocracydefenders.org
Pooja@statedemocracydefenders.org
Sofia@statedemocracydefenders.org
Joshua@statedemocracydefenders.org


*Attorneys for All Plaintiffs*

*/s/ Abbe David Lowell*
Abbe David Lowell [Bar No. 11863]
Brenna L. Frey*
**LOWELL & ASSOCIATES, PLLC**
1250 H St. NW
Second Floor
Washington, D.C. 20005
(202) 964-6110
ALowellpublicoutreach@lowellandassociates
.com
BFrey@lowellandassociates.com

*Attorneys for All Plaintiffs*


49

_/s/ Elena S. Goldstein_
Elena S. Goldstein*
Skye Perryman*
**DEMOCRACY FORWARD
FOUNDATION**
P.O. Box 34553
Washington, D.C. 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org

_Attorneys for All Plaintiffs_

_/s/ Teague P. Paterson_
Teague P. Paterson*
Matthew S. Blumin*
Georgina C. Yeomans*
**AMERICAN FEDERATION OF STATE,
COUNTY, AND MUNICIPAL
EMPLOYEES, AFL-CIO**
1625 L. Street NW
Washington, DC 20036
Tel: (202) 775-5900
Fax: (202) 429-1293
TPaterson@afscme.org
MBlumin@afscme.org
GYeomans@afscme.org

_Attorneys for AMERICORPS EMPLOYEES
UNION, Local 2027 of the American
Federation of State, County, and Municipal
Employees, AFL-CIO_

* Application for admission or admission pro hac vice forthcoming.