**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| ELEV8 BALTIMORE, INC., et al.<br>            *Plaintiffs*,<br><br>     v.<br><br>CORPORATION FOR NATIONAL AND<br>COMMUNITY SERVICE, *operating as*<br>AMERICORPS, et al.<br><br>               *Defendants*. | **Case No. 1:25-cv-01458-MJM** |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND ................................................................................................. 1

   A.  Statutory Background ...................................................................................... 1

   B.  The Administration Has Systematically Dismantled AmeriCorps .............................. 4

      1.  Defendants Terminate NCCC ...................................................................... 4

      2.  Defendants Terminate Grants, Forcing the Nonprofit Plaintiffs to Shut Down or
          Scale Back Their Programs............................................................................ 4

      3.  Defendants Eliminate the Staff Needed to Carry Out AmeriCorps' Statutory
          Obligations, Impacting Plaintiff Local 2027 and the Nonprofit Plaintiffs ............. 6

      4.  Unappointed Employees, Rather Than Officers of AmeriCorps, Effected the
          Dismantling of AmeriCorps Programs and Staff................................................ 7

III.    ARGUMENT .................................................................................................... 8

   A.  The Court Should Grant a Preliminary Injunction............................................... 8

      1.  Plaintiffs Are Likely to Succeed on the Merits.......................................... 9

         a.  Defendants' Actions Violate the Administrative Procedure Act ............... 9

            i.   Defendants' Dismantling of AmeriCorps Is a Justiciable Final
                 Agency Action .............................................................................. 9

            ii.  The Agency's Actions Are Arbitrary and Capricious.................. 11

            iii. The Agency's Actions Are Not in Accordance with Law, Contrary
                 to Constitutional Power, and in Excess of Statutory Authority.... 14

            iv.  The Agency Actions Were Done Without Observance of Procedure
                 Required by Law........................................................................ 16

            v.   The Agency Unlawfully Withheld And Delayed Agency Action  17

         b.  Defendants' Actions Violate the Separation of Powers and Are Ultra Vires
             ............................................................................................................ 18

         c.  Defendants' Actions Violate the Appointments Clause .......................... 18

2.   Plaintiffs Are Suffering Immediate, Irreparable Harm ........................................ 20

        a.   The Individual Plaintiffs Will Suffer Irreparable Harm ........................... 20

        b.   The Nonprofit Plaintiffs Will Suffer Irreparable Harm ........................... 22

        c.   Local 2027 Will Suffer Irreparable Harm................................................. 27

3.   Balance Of Equities and Public Interest Weigh in Favor an Injunction .............. 29

B.   Plaintiffs Have Standing ................................................................................................ 29

1.   Individual Plaintiffs Have Standing.................................................................... 30

2.   Each Nonprofit Plaintiff Has Organizational or Associational Standing ............ 30

3.   Plaintiff Local 2027 Has Both Organizational and Associational Standing........ 31

C.   Plaintiffs' Claims Are Not Channeled by the CSRA............................................ 33

1.   No "fairly discernible" Congressional intent to channel ...................................... 33

2.   Claims are Not of Type Intended for CSRA Review ........................................... 35

D.   The Tucker Act is Inapplicable.................................................................................. 37

IV.       CONCLUSION................................................................................................................. 41

# TABLE OF AUTHORITIES

## Cases

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967) .................................................................... 10

*AIDS Vaccine Advoc. Coal. v. Dep't of State,* 2025 WL 485324 (D.D.C. Feb. 13, 2025). ...................... 40

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, 2025 WL 8336917 (D. Md. Mar. 17, 2025).......... 22, 28

*Am. Fed'n of Gov't Emps. v. Trump*, 2025 WL 1358477 (N.D. Cal. May 9, 2025)................. 33, 34, 35, 36

*Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, 2025 WL 660053 (N.D. Cal. Feb. 28, 2025).............. 33, 37

*Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, 2025 WL 914823 (9th Cir. Mar. 26, 2025) ...................... 33

*Am. Libr. Ass'n v. Sonderling*, 2025 WL 1262054 (D.D.C. May 1, 2025) ......................................... 15

*Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*, 703 F. Supp. 3d 126 (D.D.C. 2023).................. 38

*Amerijet Int'l, Inc. v Pistole*, 753 F.3d 1343 (D.C. Cir. 2014)........................................................ 12

*Axon Enter., Inc. v. FTC,* 598 U.S. 175 (2023)........................................................... 33, 34, 36

*Bennett v. SEC*, 844 F.3d 174 (4th Cir. 2016) ............................................................................. 36

*Bennett v. Spear*, 520 U.S. 154 (1997)................................................................................. 9, 10

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) ........................................................................... 40

*Buckley v. Valeo*, 424 U.S. 1 (1976) ....................................................................................... 19

*Cal. Hum. Dev. Corp. v. United States*, 87 Fed. Cl. 282 (2009) ..................................................... 38

*California v. Dep't of Educ.*, 2025 WL 760825 (D. Mass. Mar. 10, 2025). ....................................... 39

*Clinton v. City of New York*, 524 U.S. 417 (1998) ...................................................................... 18

*Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588 (D.C. Cir. 2015) ............................................... 31

*D. R. Smalley & Sons, Inc. v. United States*, 372 F.2d 505 (Ct. Cl. 1967). ....................................... 38

*Daniels v. Arcade, L.P.*, 477 F. App'x 125 (4th Cir. 2012) ........................................................... 30

*Dellinger v. Bessent*, 2025 WL 559669 (D.C. Cir. Feb. 15, 2025) .................................................. 36

*Dep't of Com. v. New York*, 588 U.S. 752 (2019) ...................................................................... 35

*Dep't of Homeland Security v. Regents of Univ. of Ca.*, 591 U.S. 1 (2020) ................................. 11, 13

*Department of Education v. California*, 145 S. Ct. 966 (2025) ....................................................... 37

*Department of State v. AIDS Vaccine Advocacy Coalition*, 145 S. Ct. 753 (2025) ................................ 40

*E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808 (4th Cir. 2004) ....................................................... 22

*Encino Motorcars v. Navarro*, 579 U.S. 211 (2016) .................................................................... 11

*Epic Sys. Corp. v. Lewis*, 584 U.S. 497 (2018) ......................................................................... 35

*Equal Rights Ctr. v. Abercrombie & Fitch Co.*, 767 F. Supp. 2d 510 (D. Md. 2010) ............................. 30

*Equal Rights Ctr. v. Equity Residential*, 483 F. Supp. 2d 482 (D. Md. 2007)...................................... 32

*Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91 (4th Cir. 2011)......................................... 31, 32

*Faulkner v. Jones*, 10 F.3d 226 (4th Cir. 1993)......................................................................... 20

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ........................................................... 12

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024)............................................................... 31

*Feds for Med. Freedom v. Biden*, 63 F.4th 366 (5th Cir. 2023) ..................................................... 35

*Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 590 U.S. 448 (2020).................................. 19

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010)....................................... 18, 34

*Harris v. Bessent*, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025) ..................................................... 36

*Havens Realty Corp. v. Coleman*, 455 U.S. 36 (1982) ................................................................ 32

*HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021) ........................................................... 21, 22, 29

*Hisp. Nat'l L. Enf't Ass'n NCR v. Prince George's Cnty.*, 535 F. Supp. 3d 393 (D. Md. 2021).............. 21

*Hunt v. Washington State Apple Advert. Comm'n*, 432, U.S. 333 (1977) .......................................... 32

*Imaginarium, LLC v. United States*, 166 Fed. Cl. 234 (2023) ....................................................... 38

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013)................................................................. 14, 15

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332 (D.C. Cir. 2012).................... 19

*Jake's Fireworks Inc. v. U.S. Consumer Product Safety Comm*, 105 F.4th 627 (4th Cir. 2024).............. 10

*JTH Tax, LLC v. Agnant*, 62 F.4th 658 (2d Cir. 2023) ................................................................ 28

*Kenny v. Wilson*, 885 F.3d 280 (4th Cir. 2018) ............................................................ 29

*Kravitz v. Dep't of Com.*, 366 F. Supp. 3d 681 (D. Md. 2019) ...................................... 31

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ................. 22, 29

*Leedom v. Kyne*, 358 U.S. 184 (1958) ........................................................................... 34

*Lucia v. SEC*, 585 U.S. 237 (2018) ........................................................................... 18, 19

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) ........................................................ 9

*Maine Cmty. Health Options v. United States*, 590 U.S. 296 (2020) ................... 38, 39, 40

*Maryland v. Corp. for Nat'l & Comm'y Serv.*, No. 25-cv-1363  (D. Md. Apr. 29, 2025) ........ 10

*Maryland v. USDA*, 2025 WL 1073657 (4th Cir. Apr. 9, 2025) ..................................... 34

*Md. Highway Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246 (4th Cir. 1991) ............ 30

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982). ............................................ 38

*Morris v. McCaddin*, 553 F.2d 866 (4th Cir. 1977) ....................................................... 16

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197 (4th Cir. 2019) ........................................................................................ 20

*Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353 (4th Cir. 2019) ....... 28

*Myers v. United States*, 272 U.S. 52 (1926) ................................................................. 18

*Nat'l Air Traffic Controllers Ass'n v. United States*, 160 F.3d 714 (Fed. Cir. 1998) ............. 39

*New York v. Trump*, 133 F.4th 51 (1st Cir. 2025) ....................................................... 10

*Nken v. Holder*, 556 U.S. 418 (2009) ..................................................................... 9, 29

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ................................................. 17

*Ohio Valley Env't Coal. v. Aracoma Coal. Co.*, 556 F.3d 177 (2009) ............................. 11

*Real Time Medical Sys., Inc. v. PointClickCare Tech., Inc.*, 131 F.4th 205 (4th Cir. 2025) .......... 22, 27, 40

*Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180 (4th Cir. 2007) ............................ 32

*Rhode Island v. Trump*, 2025 WL 1303868 (D.R.I. May 6, 2025) ........................... passim

*Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338 (Fed. Cir. 2008) ............... 39

*Risteen v. Youth for Understanding, Inc.*, 245 F. Supp. 2d 1 (D.D.C. 2002) .................... 28

*Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020) ...................................................... 29

*Rydie v. Biden*, 2022 WL 1153249 (4th Cir. Apr. 19, 2022) ......................................... 35

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175 (4th Cir. 2013) ........................................................................................ 32

*Sanford Health Plan v. United States*, 969 F.3d 1370 (Fed. Cir. 2020) ......................... 39

*Sols. in Hometown Connections v. Noem*, 2025 WL 1103253 (D. Md. Apr. 14, 2025) ............ 39

*Spokeo, Inc. v. Robbins*, 578 U.S 330 (2016) ............................................................. 29

*Strickland v. United States*, 32 F.4th 311 (4th Cir. 2022) ................................... 34, 35, 40

*Thunder Basin Co. v. Reich*, 510 U.S. 200 (1994) ............................................. 33, 35, 36

*U.S. Army Corps of Eng'r v. Hawkes Co., Inc.*, 578 U.S. 590 (2016) ..................... 11, 35

*United States v. Donziger*, 38 F.4th 290 (2d Cir. 2022) ............................................... 19

*United States v. Fausto*, 484 U.S. 439 (1988) .............................................................. 34

*United States v. South Carolina*, 720 F.3d 518 (4th Cir. 2013) ....................................... 8

*United States v. Tingey*, 30 U.S. (5 Pet.) 115 (1831) .................................................... 19

*Watkins v. Greene Metro. Hous. Auth.*, 397 F. Supp. 3d 1103 (S.D. Ohio 2019) ............ 20

*Webster v. Doe*, 486 U.S. 592 (1988). ......................................................................... 37

*White Tail Park, Inc. v. Stroube*, 413 F.3d 45 (4th Cir. 2005) ....................................... 32

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ................................................. 9

*Widakuswara v. Lake*, 2025 WL 1166400 (D.D.C. Apr. 22, 2025) ................................... 10

*Wiley v. Kennedy*, 2025 WL 1384768 (S.D.W. Va. May 13, 2025) ................................ 33

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) ..................................................... 9

*Wis. Gas Co. v. Fed. Energy Reg. Comm'n*, 758 F.2d 669 (D.C. Cir. 1985) .................... 28

**Statutes and Regulations**

2 C.F.R. § 200.340 ........................................................................................................... 5, 10

45 C.F.R. 2556 .................................................................................................................... 4

42 U.S.C. § 12501 .............................................................................................................. 1

42 U.S.C. § 12571 .............................................................................................................. 3

42 U.S.C. § 12581 .......................................................................................................... 3, 15

42 U.S.C. § 12617 .............................................................................................................. 2

42 U.S.C. § 12636 ...................................................................................................... 3, 16, 39

42 U.S.C. § 12651 ...................................................................................................... 7, 15, 19

42 U.S.C. § 12653 .............................................................................................................. 3

42 U.S.C. § 4950 ............................................................................................................... 1

42 U.S.C. § 4951 ............................................................................................................... 2

42 U.S.C. § 4956 ............................................................................................................... 3

42 U.S.C. §§ 12541 ........................................................................................................... 1

42 U.S.C. § 12613 ...................................................................................................... 2, 14, 21

5 U.S.C. § 704 .................................................................................................................. 9

5 U.S.C. § 706 .................................................................................................................. 9

5 U.S.C. § 1101 ................................................................................................................. 33

**Other Authorities**

Exec. Order 14,158 ........................................................................................................... 8

## I.    INTRODUCTION

The vital role of AmeriCorps as our country's engine of national service and civic engagement is under immediate threat. Created by Congress to foster community strength and individual growth through service, AmeriCorps has for thirty years been a force for positive change, impacting every state and territory in our nation. The Defendants, however, have undertaken a sweeping and unlawful dismantling of this agency, slashing its resources and abruptly ending the service of thousands of dedicated Americans, directly defying Congressional intent and statutory requirements. The consequences are already severe: critical support for nonprofits is vanishing, service terms have been abruptly cut short, and widespread layoffs loom. Without immediate intervention, the decades of goodwill and infrastructure built by AmeriCorps will be irrevocably lost. Plaintiffs, comprising affected organizations, AmeriCorps participants, and employees, are actively grappling with the chaos created by these unlawful actions. As detailed *infra* Part III.A.1, Plaintiffs are likely to succeed on the merits, demonstrating violations of the Administrative Procedures Act and core constitutional principles regarding separation of powers. To prevent irreparable harm to the Plaintiffs and the permanent collapse of this essential—and Congressionally-mandated—pillar of civic life, Plaintiffs urgently request this Court to grant preliminary injunctive relief to preserve AmeriCorps' functionality.

## II.    BACKGROUND

### A.  Statutory Background

Congress established AmeriCorps in 1993 through the Community Service Trust Act as a government corporation to lead the nation's federal service and volunteer programs. Pub. L. No. 103-82, 107 Stat. 785 (Sept. 21, 1993), codified at 42 U.S.C. §§ 12541 *et seq.* (the "1993 Act"). AmeriCorps' mission is to mobilize citizens to serve communities and support the most vulnerable. 42 U.S.C. § 4950(b); *see also id*. § 12501. The agency oversees critical programs mandated by

statute, including the National Civilian Community Corps ("NCCC"), Volunteers in Service to America ("VISTA"), State and National Grants, State Service Commission Subgrants, and the Volunteer Generation Fund ("VGF"), each essential to fulfilling AmeriCorps' statutory mission. Congress directed AmeriCorps to spend $732,358,000 on these grant programs in fiscal year 2025, with specific allocations for each program. 170 Cong. Rec. H2060–61 (Mar. 22, 2024); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47 § 401, 138 Stat. 460, 695 (Mar. 23, 2024); Full-Year Continuing Appropriations Act, 2025, Pub. L. No. 119-4 § 1101(a)(8), 139 Stat. 9 (Mar. 15, 2025).

National Civilian Community Corps. NCCC is a full-time, team-based AmeriCorps program for young adults ages 18 to 26 engaged in critical community needs projects nationwide. 42 U.S.C. §§ 12613(a)–(d). NCCC engages young people in service projects across the nation by partnering with local and national nonprofit organizations and FEMA to do crucial service work, including disaster relief, food distribution, environmental conservation, and community support. Ex. 15, Daly Decl. ¶ 12. The CEO of AmeriCorps has supervisory authority over NCCC's operations and must establish a "permanent cadre" that includes the NCCC director and other supervisors and training instructors. 42 U.S.C. §§ 12619(a), (c). Congress assigned various mandatory duties to the NCCC director and the heads of NCCC campuses; for example, campus directors "shall select projects" that serve statutorily specified purposes. *Id.* § 12617(c)(1); *see generally id.* §§ 12611–26.

Volunteers in Service to America. Congress created VISTA as a "program of full-time volunteer service" designed to combat poverty by encouraging meaningful volunteer service from people of all backgrounds and supporting "efforts by local agencies and community organizations to achieve long-term sustainability." 42 U.S.C. § 4951. Through VISTA, AmeriCorps participants

work for sponsor organizations to provide capacity for service-related activities. *See, e.g.*, Ex. 8, Berger Decl. ¶¶ 6–8. Congress imposed numerous statutory requirements, including that "the people of the communities to be served by [VISTA] volunteers" be included in "planning, developing, and implementing programs" "[t]o the maximum extent possible." 42 U.S.C. § 4956; *see generally id.* §§ 4953–60.

State and National Grants and State Service Commission Subgrants. The State and National grant program is AmeriCorps's largest grant program, funding State Service Commissions "to make grants in support of other national service programs … that are carried out by other entities." 42 U.S.C. § 12571(a). More than a third of State and National funding must be allocated among the states, D.C., and Puerto Rico by population, with no discretion in whether to award it. *Id.* § 12581(e)(2)–(3) (AmeriCorps "shall allot" 35.3% of such funds to States on a formula basis, with the minimum being the greater of $600,000 or 0.5% of all formula funds).

Volunteer Generation Fund. Congress created VGF to "carry out volunteer programs or to develop and support community-based entities that recruit, manage, or support volunteers." 42 U.S.C. § 12653p(c). AmeriCorps awards VGF grants to state commissions, nonprofits, schools, government agencies, and tribal or faith-based organizations.

*Statutory Limits on Termination.* AmeriCorps' authority to cancel grants or contracts is explicitly limited by statute to instances of "material failure to comply" with statutory or grant requirements, 42 U.S.C. § 12636(a), and required procedures, *id.* §§ 12636(a)–(b); 45 C.F.R. § 2540.400. This is true for all core programs, including NCCC, VISTA, State and National Grants, and the Volunteer Generation Fund. Before any termination, grantees or contracting parties are entitled to reasonable notice and a fair hearing, including at least 7 days to respond and show good cause why their federal assistance should continue. 45 C.F.R. § 2540.400. For VISTA in particular,

the agency's implementing regulations strictly limit the early termination or suspension of VISTA Participants and projects, without allowing for proper notice and opportunity to be heard. *Id.* §§ 2556.400(a), 2556.425. Early termination without cause is allowed only in the event that a Participant resigns voluntarily, cannot be reassigned, or requires medical termination, and participants must be accorded procedural protections.  *Id.* §§ 2556.430, 2556.135(a)–(d).

### B.  The Administration Has Systematically Dismantled AmeriCorps

#### 1.  Defendants Terminate NCCC

On Tuesday April 15, 2025, without warning or explanation and through template letters sent via email, AmeriCorps terminated all NCCC projects and sent all 2,000 participants home, effective immediately. Ex. 15, Daly Decl. ¶¶ 11, 13. Participants were forced to pay for their own travel home and lost stipends, education awards, and work experience, while sponsors were left with unfinished service projects. *Id.* at ¶ 13.

Plaintiffs Doe 1 and Doe 2 were among the fired participants. Ex. 16, Doe 1 Decl. ¶¶ 10–11; Ex. 17, Doe 2 Decl. ¶¶ 8–9. On the afternoon of April 15, 2025, Doe 1 received an unsigned email from "ANCCC@americorps.gov" confirming that they were being sent home and that they would be on administrative hold until April 30, 2025, at which time they would be exited from the NCCC program. Ex. 16, Doe 1 Decl. ¶ 11; *see also* Ex. 16, Doe 1 Decl., Att. A. Doe 2 was also informed on April 15 that their team should report immediately to their regional campus, and later received a memo stating that they were approved for "early release from the NCCC program for compelling personal circumstances." *See* Ex. 17, Doe 2 Decl. ¶ 8; *see also* Ex. 17, Doe 2 Decl., Att. A. Doe 2 did not request early release.

#### 2.  Defendants Terminate Grants, Forcing the Nonprofit Plaintiffs to Shut Down or Scale Back Their Programs

Defendants cancelled $400,000,000 in AmeriCorps grants—41% of its budget. This ended

funding to over a thousand organizations, including both direct grantees and subgrantees of State Service Commissions. The Nonprofit Plaintiffs[1] were all among the organizations that lost grants. *See, e.g.*, Ex. 13, Barron Decl. ¶ 5. This included VISTA sponsorships, direct State and National Grants, subgrants from State Service Commissions, and VGF grants. *See, e.g.*, Ex. 13, Barron Decl. ¶ 4a (VISTA); Ex. 2 Giorlando Decl. ¶ 5 (State and National); Ex. 14, Fynboh Decl. ¶ 4 (State Service Commission); Ex. 1, Adams Decl. ¶ 5 (VGF).

The terminations arrived without warning in the form of identical boilerplate emails claiming that recipients' grants were being terminated under 2 C.F.R. § 200.340(a)(4) because the agency had determined the awards "no longer effectuate[] agency priorities." *See e.g.*, Ex. 13a, Barron Decl. Attachment A. The messages ordered immediate cessation of all grant activities, declared the decision final and not subject to administrative appeal, and required recipients to notify subrecipients and community partners and begin internal closeout procedures. Subgrantees of State Service Commissions received similar notices from their respective commissions, confirming that AmeriCorps had terminated the states' grants under the same regulation and directing them to wind down their programs as well. *See, e.g.*, Ex. 13c, Barron Decl. Attachment C. Grantees were subsequently informed that their AmeriCorps participants were prohibited from reporting to their projects or working on any project-related activities. *See, e.g.*, Ex. 8, Berger Decl. ¶ 10 & Att. B.

Doe 3 was a VISTA participant fired as part of these cancellations. They were informed by email on April 28, 2025 that their AmeriCorps position had been eliminated and that they would

---

[1] Thirteen of the Nonprofit Plaintiffs lost grants or subgrants themselves: Elev8 Baltimore, Inc.; Red Cloud Indian School, Inc.; Bur Oak Land Trust; Partners for Campus-Community Engagement ("PCCE"); Michigan College Access Network ("MCAN"); North Carolina Housing Coalition ("NCHC"); Housing & Community Development Network of New Jersey ("HCDNNJ"); HandsOn Suburban Chicago ("HOSC"); Democracy Maine; The Service Collaborative of WNY, Inc.; Rainbow Labs; Seed Coalition; and Aspire Afterschool Learning. The fourteenth, National College Attainment Network ("NCAN"), is a membership organization; at least 26 of its members lost grants or subgrants. *See* Ex. 5, Cook Decl. ¶¶ 9–15.

be put on administrative leave for two weeks and then terminated on May 20. *See* Ex. 18, Doe 3 Decl. ¶ 6.

### 3. Defendants Eliminate the Staff Needed to Carry Out AmeriCorps' Statutory Obligations, Impacting Plaintiff Local 2027 and the Nonprofit Plaintiffs

On April 16, 2025, the day after shuttering NCCC, AmeriCorps placed over 600 AmeriCorps employees—approximately 85% of the staff—on administrative leave and instructed them to immediately stop working. Ex. 15, Daly Decl. ¶ 18. An hour later, AmeriCorps locked affected staff out of AmeriCorps systems, including email, and barred them from AmeriCorps' offices. Ex. 15, Daly Decl. ¶ 14; Ex. 20, AmeriCorps Employee 2 ("AE2") Decl. ¶ 8. About 88% of the 400-person AmeriCorps union, Plaintiff Local 2027, was affected. Ex. 15, Daly Decl. ¶ 14. On April 24, 2025, the Agency sent Reduction in Force ("RIF") notices to virtually all staff on administrative leave, informing them they would be "separated from the Federal Service effective Tuesday June 24, 2025." Ex. 15, Daly Decl. ¶ 16. Now, nationwide, there are only 116 AmeriCorps employees still on active employment status. *Id.* at ¶ 17.

As a direct result of the Agency's actions, AmeriCorps cannot "perform the work needed to run this agency in compliance with its statutory duties." *Id.* at ¶ 19. There are insufficient staff to provide "needed technical assistance or program oversight," "process new grant or grant continuation awards in a timely manner, if at all," ensure that AmeriCorps Participants "receive their proper stipends or education awards on time, if at all," train new VISTA participants, or even process grant terminations. *Id.* at ¶¶ 20–29. The loss of technical expertise, institutional knowledge, and staff is directly impairing the flow of funds, provision of technical assistance, and processing of grant applications. *Id.* at ¶¶ 19–20, 23–27. The remaining AmeriCorps staff members have been given the impossible job of keeping the Agency afloat with wholly insufficient resources. *Id.* at ¶¶ 18–20. For example, the single "Trust Officer" left at the Agency is now

responsible for processing up to 29,801 AmeriCorps participants' education awards. *Id.* at ¶ 19.

### 4. Unappointed Employees, Rather Than Officers of AmeriCorps, Effected the Dismantling of AmeriCorps Programs and Staff

By statute, most major decisions at AmeriCorps must be made by the Board of Directors or the Chief Executive Officer. The Board is responsible for "setting overall policy for the corporation." 42 U.S.C. § 12651b(g). The CEO must submit to the Board a strategic plan and proposals regarding grants, contracts, and other matters, which the Board must review and approve. *Id.* §§ 12651b(g)(1)–(3), 12651(b)(2). The CEO is "responsible for the exercise of the powers and the discharge of the duties of the Corporation that are not reserved to the Board" and "ha[s] authority and control over all personnel of the Corporation," *Id.* § 12651d(a). The CEO and voting Board members are appointed by the President with Senate confirmation. *Id.* §§ 12651a(a)(1)(A), 12651c(a).

Many of the relevant actions here, however, were not taken by the Board and the CEO. Neither a CEO nor Acting CEO has been exercising the Corporation's powers and duties for four months, as AmeriCorps has not had a CEO since the previous CEO's resignation on January 20, 2025. Rather than the President appointing an Acting CEO, as has happened at the beginning of prior administrations, the former deputy director of AmeriCorps State and National, Defendant Tahmasebi, is serving as "interim agency head," a position with no formal authority under the statute. *See* Ex. 19, AmeriCorps Employee 1 ("AE1") Decl. ¶¶ 5–6; AmeriCorps, "Interim Agency Head," https://www.americorps.gov/leadership/jennifer-bastress-tahmasebi.

Even if Defendant Tahmasebi could exercise the statutory authority of the AmeriCorps CEO, many of the actions challenged in this case were taken not by her but by the "DOGE Team"[2]

---

[2] Pursuant to Executive Order 14,158, each agency established "a DOGE Team of at least four employees, which may include Special Government Employees … in consultation with the [U.S. DOGE Service] Administrator," which

led by Defendant Cavanaugh. According to an agency employee, the decision to close NCCC so abruptly was made over the objection of Defendant Tahmasebi, who argued for giving its participants—many of whom are as young as 18—more time to return from their projects. Ex. 19, AE1 Decl. ¶ 8. Similarly, Defendant Tahmasebi did not approve or even see the email placing AmeriCorps's staff on administrative leave until after it was sent—despite the email purporting to be sent "[o]n behalf of AmeriCorps CEO Jennifer Bastress Tahmasebi" (a position she did not hold on a confirmed or acting basis, and which she had not otherwise identified herself as holding). Ex. 19, AE1 Decl. ¶¶ 9–10 & Att. A;  Ex. 20, AE2 Decl. ¶ 7.

## III.    ARGUMENT

Defendants' decision to dismantle AmeriCorps is unlawful under the Administrative Procedure Act ("APA"), the separation of powers, and the Appointments Clause. Congress directed AmeriCorps to perform statutorily mandatory functions, using money Congress appropriated. The Executive Branch lacks authority to disregard these commands by unilaterally ending programs, impounding appropriations, and cutting staff to the point where compliance with Congress's directives is impossible. Even if it could, the APA prohibits it from doing so without explanation and observance of required procedures. Defendants' conduct implementing their unlawful decision has irreparably harmed Plaintiffs and will continue to do so if not enjoined pending resolution of this case on the merits.

### A.  The Court Should Grant a Preliminary Injunction

Granting a preliminary injunction can "protect the status quo," "prevent irreparable harm during the pendency of a lawsuit," and give the Court time to "render a meaningful judgment on the merits." *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (citation omitted).

---

would "coordinate their work with [U.S. DOGE Service] and advise their respective Agency Heads on implementing the President's DOGE Agenda." Exec. Order 14,158, 90 Fed. Reg. 8,441, 8,441 (Jan. 20, 2025).

Preliminary relief is appropriate when plaintiffs show that: "(1) there is a likelihood of success on the merits; (2) there is a likelihood the movant will suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in movant's favor; and (4) the injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). The balance of equities and the public interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, all factors weigh in Plaintiffs' favor.

### 1. Plaintiffs Are Likely to Succeed on the Merits

#### a. Defendants' Actions Violate the Administrative Procedure Act

The APA authorizes courts to review "final agency action," and set aside any that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706(2)(C), (A).

##### i. Defendants' Dismantling of AmeriCorps Is a Justiciable Final Agency Action

Agency action is "final" when the action (1) marks the "consummation of the agency's decision making process" and (2) "is one by which rights or obligations have been determined," or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks and citations omitted); *see also Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001) ("[T]he word 'action' … "cover[s] comprehensively every manner in which an agency may exercise power.").

An agency decision "applying some particular measure across the board … can of course be challenged under the APA." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 n.2 (1990). Accordingly, courts have recognized that terminations of programs, staff, or funding that are "categorical in nature" rather than "individualized assessments of [the agency's] authority to pause

individual funding streams" are final agency actions. *New York v. Trump*, 133 F.4th 51, 64 (1st Cir. 2025); *see also, e.g.*, *Rhode Island v. Trump*, 2025 WL 1303868, at *8 (D.R.I. May 6, 2025) (holding that decision to dismantle agencies by terminating most staff and many, but not all, grants, was reviewable).

Defendants implemented a final decision to dismantle AmeriCorps over the course of less than two weeks, through their categorical, non-individualized terminations. That final decision was implemented through a series of actions that led to the termination of the entire NCCC program and over a thousand grants, as well as their termination without cause or individualized assessments of the vast majority of the staff who do the work of the agency. Defendants have described this decision and the actions implementing this decision as final, telling grant recipients, including multiple plaintiffs, that revocation of their grants was "final agency action and not administratively appealable." *See, e.g.*, Ex. 1, Adams Decl., Att. A. Their termination notices to the State Service Commissions say the same thing. *See* Compl. Ex. G, H, *Maryland v. Corp. for Nat'l & Comm'y Serv.*, No. 25-cv-1363, Dkt. No. 1-7, 1-8 (D. Md. Apr. 29, 2025). The termination of all NCCC members and 85% of staff from service is similarly final. *See, e.g.*, Ex. 19, AE1 Decl., Att. A; Ex. 16, Doe 1 Decl., Att. A; Ex. 15, Daly Decl. ¶ 16.

Nothing about these actions is "tentative or interlocutory." *Bennett*, 520 U.S. at 178. Nor were they "informal, or only the ruling of a subordinate official," *Abbott Labs. v. Gardner*, 387 U.S. 136, 151 (1967); they came from AmeriCorps directly, purportedly from the Interim Agency Head, Defendant Tahmasebi. *See, e.g.*, Ex. 1, Adams Decl., Att. A; Ex. 17, Doe 2 Decl., Att. A. And they purported to implement "[t]he decisionmaking processes set out in [the] agency's governing statutes and regulations," *Jake's Fireworks Inc. v. U.S. Consumer Product Safety Comm*, 105 F.4th 627, 631 (4th Cir. 2024), citing 2 C.F.R. § 200.340(a)(4), the regulatory

provision authorizing agencies to terminate an award that "no longer effectuates the program goals or agency priorities." *See, e.g.*, Ex. 1, Adams Decl., Att. A; Ex. 17, Doe 2 Decl., Att. A.

It is equally clear that Defendants' actions determined rights or obligations and that legal consequences flow from the "definitive" actions. *U.S. Army Corps of Eng'r v. Hawkes Co., Inc.*, 578 U.S. 590, 598 (2016). Nonprofit Plaintiffs no longer have access to their awards, and have been forced to terminate employees, send their AmeriCorps participants home, and cancel programming. *See infra* Part III.A.2.b. AmeriCorps participants have been instructed to follow closeout procedures and stop reporting to work immediately. *See id.* Members of Local 2027 have lost access to all AmeriCorps systems and have been informed in no uncertain terms that they are being "separated from the Federal Service." *Id.* And the public at large, which benefits from AmeriCorps programs in communities across the country, is already receiving fewer services and less programming because of Defendants' actions. *See generally infra* Part III.A.2; *see also Dep't of Homeland Security v. Regents of Univ. of Ca.*, 591 U.S. 1, 31 (2020) (agency must consider consequences of its decision that "radiate outward" to third parties before acting).

## ii.    The Agency's Actions Are Arbitrary and Capricious

The Court has the power to review and set aside final agency action that is "arbitrary and capricious." 5 U.S.C. § 706(2)(A). The agency must "provide an explanation of its decision that includes a rational connection between the facts found and the choice made." *Ohio Valley Env't Coal. v. Aracoma Coal. Co.*, 556 F.3d 177, 192 (2009). It also must demonstrate that it considered reliance interests that its policies have engendered before changing course. *Encino Motorcars v. Navarro*, 579 U.S. 211, 221–22 (2016). "But where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." *Id*. at 221.

*No explanation or analysis*: AmeriCorps offered no explanation or justification for

terminating statutorily mandated programs and the staff that service them—an omission that in and of itself renders the action arbitrary and capricious. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Instead of relying on new fact-finding or evidence to justify its actions, AmeriCorps abruptly abandoned the agency's long-standing policies—built on years of research and demonstrated benefits for the public, organizations, and participants—without any rational explanation. The agency simply told grantees that "it has been determined that your award no longer effectuates agency priorities." *See, e.g.*, Ex. 1, Adams Decl., Att. A. But the agency provided no explanation of what those priorities are, how it came to them, or how it determined which awards to terminate. These sorts of conclusory statements, devoid of any reasoning or explanation, "will not do" under the APA. *Amerijet Int'l, Inc. v Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (citations omitted). *See also Rhode Island*, 2025 WL 1303868, at *10–11 (finding agency dismantlement likely arbitrary and capricious in light of "an absence of any reasonable explanation" from the government; termination of grants that were "no longer consistent with the agency's priorities" was inadequate reasoning under the APA).

*Entirely failed to consider important aspects of the problem*: AmeriCorps failed to consider the effects its actions would have on its staff, award recipients, service corps members, and the broader public. Agencies are "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec.*, 591 U.S. at 30, 33. They must consider "congressionally prescribed factors." *Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647, 660 (D. Md. 2018). And they must "consider and explain [their] rejection of 'reasonably obvious alternatives.'" *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) (quoting *Nat. Res. Def. Council v. SEC*,

12

606 F.2d 1031, 1053 (D.C. Cir. 1979)). Failure to do so "alone renders [the Agency's] decision arbitrary and capricious." *Dep't of Homeland Sec.*, 591 U.S. at 30.

Defendants proceeded with the plan to dismantle AmeriCorps without any serious consideration of the reliance interests of the agency's grantees, members, employees, or the public at large. AmeriCorps' grantees relied not only on their awards but also on technical assistance from agency employees to implement these programs, while AmeriCorps' participants relied on the programs to build their careers, develop important skills, and serve their country. *See infra* Part III.A.2.a–b. Communities nationwide counted on AmeriCorps to, *inter alia*, access free afterschool programming and mentorship services, to preserve local lands, and to clean up areas hit hard by natural disaster. The agency's lack of consideration for these reliance interests is in and of itself arbitrary and capricious. *See, e.g.*, *Rhode Island*, 2025 WL 1301868, at *11 (agency must consider reliance interests of third parties, including "program beneficiaries" and "grantees").

Similarly, the agency's disregard for Congress's purpose and directives in creating and funding AmeriCorps renders its conduct arbitrary and capricious. Congress repeatedly made clear that these programs exist to "foster and expand voluntary citizen service," 42 U.S.C. § 4950(b), "support efforts to build institutional capacity," *id.* § 12521(b), and "support … local community-based entities, that recruit, manage, or support volunteers." *Id.* § 12653p(a)(2). There is no evidence that Defendants considered the "long-term damage" that will be done to these priorities by ripping from "the next generation of community leaders … the confidence that they can embark on service-oriented careers without sacrificing their own personal stability." Ex. 11, Sarata Decl. ¶ 18.

Nor did the agency consider obvious alternatives, such as providing time for an orderly wind-down of programs. As Plaintiffs' declarants explain, if Defendants had given grantees notice

so that they could "put a plan in place to meet [their] ongoing needs, [they] might have been able to mitigate some of the immediate harm." Ex. 8, Berger Decl. ¶ 19. Instead, "[t]he termination without warning made it impossible for [Plaintiffs] to mitigate the damage and protect [their] participants, staff, and campus members from the worst of the fallout." Ex. 4, Harker Decl. ¶ 18.

For these reasons, AmeriCorps' actions are arbitrary and capricious, and this Court must set them aside.

### iii.    The Agency's Actions Are Not in Accordance with Law, Contrary to Constitutional Power, and in Excess of Statutory Authority

Courts must ensure that agency action complies with all "constitutional," "statutory," and "procedur[al]" requirements, and is otherwise "in accordance with law." 5 U.S.C. §§ 706(2)(A), (B), (C). Importantly, an agency cannot "decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013).

Defendants have violated and overstepped their duties in ways both broad and specific. At the most profound level, they have violated the Constitution, usurping the legislative power and disregarding the Appointments Clause, as discussed *infra* Part III.A.1.c. They have closed entire programs that carry out statutorily mandated functions, like NCCC. *See* 42 U.S.C. § 12613(a);[3] *Rhode Island*, 2025 WL 1303868, at *14 (Plaintiffs likely to succeed in showing agencies "violated the APA by acting 'not in accordance' with their respective statutory mandates and congressional appropriations acts when effectively absconding their statutory mandates by terminating core services and grant programs"). They are withholding appropriations that they must expend,

---

[3] At the time that NCCC was established, the statute stated that the Corporation "may establish the" NCCC. *See* 42 U.S.C. § 12612(a)  Once the Corporation did create NCCC, it became responsible for overseeing the program's mandatory functions, and nothing in the statute or the regulations gives AmeriCorps the authority to unilaterally terminate the program. *Id.* § 12615(a) ("Upon the establishment of the [NCCC], the [NCCC] shall be under the direction of the Director"); *id.* § 12617(a)(1) "The service projects carried out by the [NCCC] shall meet an identifiable public need.").

violating appropriations acts and the Impoundment Control Act, 2 U.S.C. § 683.[4] *See Aiken*, 725

F.3d at 261 n.1 (Kavanaugh, J.) ("[T]he President does not have unilateral authority to refuse to

spend [Congressionally appropriated] funds." (cleaned up)); *Am. Libr. Ass'n v. Sonderling*, 2025

WL 1262054, at *2 (D.D.C. May 1, 2025) (plaintiffs likely to succeed on claim that government

grant terminations and mass firings "contravenes Congress's appropriation" to the agency). They

have attempted to stymie Congressional commands by decimating agency staff, such that the work

becomes "an impossible task." Ex. 15, Daly Decl. ¶ 20; *Rhode Island*, 2025 WL 1303868, at *13

(granting relief where "nothing suggests that [the agency's] remaining employees can continue to

perform its statutory duties").

They have also ignored numerous discrete statutory requirements. For example, Congress

required that the board "set[] overall policy," 42 U.S.C. § 12651b(g), and that AmeriCorps "make

any significant changes to program requirements, service delivery or policy only through public

notice and comment rulemaking." Further Consolidated Appropriations Act, 2024 § 401, 138 Stat.

at 695; Full-Year Continuing Appropriations Act, 2025, § 1101(a)(8), 139 Stat. at 11.   For

example, Congress specifically directed AmeriCorps to provide 35.3% of the $557 million in State

and National grants to states by population. 42 U.S.C. § 12581(e)(2)-(3). Yet Defendants have

terminated some states' funding in their entirety and slashed others without regard for the statutory

formula. *See* Mem. ISO Pls.' Mot. for Prelim. Inj. at 6–7, 7 n.2, *Corp. for Nat'l & Comm'y Serv.*,

No. 1:25-cv-01363 (May 6, 2025). Congress required that the Board "set[] overall policy," 42

U.S.C. § 12651b(g), and the agency conduct notice-and-comment rulemaking before "any

---

[4] Congress appropriated $975,525,000 for the Corporation's 2025 operating expenses. Further Consolidated Appropriations Act, 2024, § 312, 138 Stat. at 694–95; Full-Year Continuing Appropriations Act, 2025, § 1101(a)(8), 139 Stat. at 11. Of that amount, Congress earmarked $37,735,000 for NCCC, $103,285,000 for VISTA, $557,094,000 for State and National Grants, $236,917,000 for National Older American Volunteer Programs, $19,538,000 for State Commission Grants, and $14,706,000 for Innovation Assistance and Other Activities. 170 Cong. Rec. H2060–61 (Mar. 22, 2024).

significant changes to program requirements, service delivery or policy," Full-Year Continuing Appropriations Act, 2025, § 1101a(8), 138 Stat. at 695, but the actions here were made without notice and comment or Board approval. Congress established a detailed training scheme for NCCC, 42 U.S.C. § 12616, including a "permanent cadre" of "training instructors," *id.* § 12619(c)(2)(A), that now no longer exists. Congress required that "the people of the communities to be served by volunteers" under VISTA be included in "planning, developing, and implementing programs" "[t]o the maximum extent practicable," 42 U.S.C. § 4956, but AmeriCorps did not include them at all in planning or implementing their termination. The list goes on.

Not only that, Defendants blatantly disregarded statutory and regulatory requirements governing the termination of AmeriCorps awards. Instead of identifying any material failure to comply with grant requirements—the only lawful basis for termination—Defendants abruptly canceled more than a thousand grants without cause, without reasonable notice, and without offering grantees the required opportunity for a full and fair hearing. *See supra* Part II.A (describing statutory termination procedures). Grantees were told that the decisions were final, not administratively appealable, and effective immediately, in direct violation of AmeriCorps's own statutes and regulations, which restrict terminations to cases of material noncompliance and require "reasonable notice and opportunity for a full and fair hearing." 42 U.S.C. § 12636(a)(2)(B); 45 C.F.R. § 2540.400(b); *see supra* Part II.A.

### iv. The Agency Actions Were Done Without Observance of Procedure Required by Law

"An agency of the government must scrupulously observe rules, regulations, or procedures which it has established. When it fails to do so, its actions cannot stand and courts will strike it down." *Morris v. McCaddin*, 553 F.2d 866, 870 (4th Cir. 1977) (compiling authorities). The APA requires that a reviewing court "hold unlawful and set aside agency action" done "without

16

observance of procedure required by law." 5 U.S.C. § 706(2)(D). Here, the agency failed to observe required procedures in two ways.

First, as discussed above, Defendants were bound by law to follow the agency's procedures before undertaking sweeping action to dismantle the agency—terminating NCCC, revoking over a thousand grants, and firing the vast majority of the staff who do the work of the agency. *See supra* Part III.A.1.iii. They failed to comply with any procedures.

Second, cutting the agency's budget in half and reducing its staff by more than 80 percent undeniably constitutes "significant change" as discussed above, and Defendants failed to undertake the required notice and comment procedures mandated by Congress, in clear violation of federal law.

For these reasons, the agency's actions are procedurally invalid and unlawful under Section 706(2)(D), and the Court should set them aside.

## v. The Agency Unlawfully Withheld And Delayed Agency Action

Under the APA, a reviewing court must "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). A claim under section 706(1) "can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis in original).

Defendants altogether eliminated the NCCC program—including all participants and staff responsible for its administration—even though both Congress and the statute explicitly require its existence. *See supra* Part II.B.1; 42 U.S.C. §§ 12612–12624. Similarly, they terminated hundreds of millions of dollars in State and National grants that they are required to award on the basis of state populations. *See supra* Part II.B.2; 42 U.S.C. § 12581(e)(2). Therefore, the Court should compel the agency to cease withholding these grants and reinstate these programs and the

AmeriCorps staff administering them.

### b. Defendants' Actions Violate the Separation of Powers and Are Ultra Vires

There is "an implied private right of action directly under the Constitution to challenge governmental action under the Appointments Clause or separation-of-powers principles." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (internal quotation marks and citation omitted).

Here, Plaintiffs have established that Defendants violated the Constitution by infringing on the legislative branch's exclusive power to make law, U.S. Const. art. I, § 1, and appropriate funds and direct their spending, U.S. Const. art. I, §§ 8–9. Congress "is given the establishment of offices, [and] the determination of their functions and jurisdiction." *Myers v. United States*, 272 U.S. 52, 129 (1926). Defendants have no constitutional power to unilaterally enact, amend, or repeal parts of duly enacted statutes. *Clinton v. City of New York*, 524 U.S. 417, 438–39 (1998). Congress exercised its Article I legislative authority to create AmeriCorps as an independent executive agency, mandated that AmeriCorps carry out specific functions, and appropriate funds that AmeriCorps must spend to carry out those functions. Defendants have usurped that authority by terminating AmeriCorps' statutorily mandated programs through eliminating the necessary staff and preventing the disbursement of congressionally appropriated funds. Therefore, Plaintiffs are likely to succeed on the merits of their Separation of Powers/Ultra Vires claim.

### c. Defendants' Actions Violate the Appointments Clause

Under the Appointments Clause of the Constitution, "officers" of the United States are those who wield "significant authority pursuant to the laws of the United States" while occupying a "continuing position." *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (quotation marks omitted). Officers may be appointed only in one of two ways. Principal officers may only be appointed by

the President, with confirmation by the Senate. U.S. Const. art. II, § 2, cl. 2. Inferior officers may be appointed the same way, or they may be appointed by the President, the judiciary, or a department head when Congress vests that power in them by law. *Id.* These are "the exclusive means of appointing 'Officers,'" *Lucia*, 585 U.S. at 244, and govern "all exercises of federal power," *Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 590 U.S. 448, 457 (2020).

The authorities of the AmeriCorps CEO and Board are plainly significant ones. Among other things, the CEO makes contracts, 42 U.S.C. § 12651d(b)(2)(B), prescribes rules, *id.* § 12651c(c), and allocates and expends funds, *id.* § 12651d(c). Each of these is a significant authority. *See United States v. Tingey*, 30 U.S. (5 Pet.) 115, 126 (1831) (making contracts); *Buckley v. Valeo*, 424 U.S. 1, 140 (1976) (rulemaking and determining eligibility for funds). The Board similarly makes contracts. 42 U.S.C. § 12651b(g)(10(A).[5] Nor can there be any dispute that they are continuing positions. *See United States v. Donziger*, 38 F.4th 290, 297 (2d Cir. 2022) (identifying "three factors that are helpful to consider in determining whether a temporary position is an office: (1) the position is not personal to a particular individual; (2) the position is not transient or fleeting; and (3) the duties of the position are more than incidental").

Thus, the duties of the CEO and Board may be exercised only by an officer. But Defendant Tahmasebi has not been appointed by the President and confirmed by the Senate, nor has she been appointed as Acting CEO pursuant to the Federal Vacancies Reform Act, 5 U.S.C. § 3345, or any other statute. Any attempt by her to exercise the powers and duties of the CEO—or to usurp the powers of the Board by "setting overall policy," 42 U.S.C. § 12651b(g)—therefore violate the Appointments Clause.

---

[5] While some of these authorities are not directly at issue in this case, when evaluating whether an individual exercises "significant" federal authority, courts must "consider all the powers of the officials in question ... not just those applied to the litigant bringing the challenge." *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1338 (D.C. Cir. 2012) (quoting *Freytag v. Comm'r*, 501 U.S. 868, 882 (1991)).

Even if Defendant Tahmasebi were a constitutional officer, the evidence will likely show that she did not actually affect the termination of the NCCC program or the placement of AmeriCorps's staff on administrative leave. *See* Ex. 19, AE1 Decl. ¶¶ 8–10; Ex. 20, AE2 Decl. ¶¶ 6–7. Rather, those actions were taken without her approval and even over her objection by Defendant Cavanaugh or staff acting at his direction. *See* Ex. 19, AE1 Decl. ¶¶ 8–10; Ex. 20, AE2 Decl. ¶ 7. But Defendant Cavanaugh is not a constitutional officer either: he holds no Senate-confirmed position, and Congress has not authorized the appointment of "DOGE Team Leads" like him as inferior officers. *See* U.S. Const. § art. II § 2, cl. 2.

### 2. Plaintiffs Are Suffering Immediate, Irreparable Harm

To show irreparable harm, a party must clearly show that it will suffer actual, imminent harm that "cannot be fully rectified" by a final judgment after trial. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (internal quotation marks and citations omitted).

### a. The Individual Plaintiffs Will Suffer Irreparable Harm

The Individual Plaintiffs are all young adults under the age of 25 who committed themselves to public service through one of our nation's most prestigious and reputable service programs. *See* Ex. 16, Doe 1 Decl. ¶¶ 2, 5–6; Ex. 17, Doe 2 Decl. ¶ 4; Ex. 18, Doe 3 Decl. ¶ 4. When their service terms were abruptly terminated by Defendants' actions, some of them lost the housing that they thought was guaranteed for the rest of their service term. *See, e.g.*, *Watkins v. Greene Metro. Hous. Auth.*, 397 F. Supp. 3d 1103, 1109 (S.D. Ohio 2019) ("A loss of housing constitutes an irreparable harm." (collecting cases)). They all lost access to the high-quality training, work experience, and networking opportunities that drew them to AmeriCorps. *See Faulkner v. Jones*, 10 F.3d 226, 229 (4th Cir. 1993) (upholding preliminary injunction based on harm of denial of access to unique training and education opportunities); *Hisp. Nat'l L. Enf't Ass'n*

*NCR v. Prince George's Cnty.*, 535 F. Supp. 3d 393, 427 (D. Md. 2021) (negative effects on "professional and leadership opportunities, as well as their long-term career trajectories" can constitute irreparable harm); *see also* AmeriCorps, *Answer the Call to Serve*, https://www.americorps.gov/serve/americorps [https://perma.cc/R9LJ-65PP] (advertising AmeriCorps as providing "transferable skills employers value" and access to "a network of like-minded leaders"). And they lost the opportunity to fulfill their personal calling to serve their communities and develop their ability to contribute to society. *See HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) ("hav[ing] to cease" mission-driven work is irreparable harm). As the Individual Plaintiffs explained, these are the very things that drew them to serve with AmeriCorps. *See, e.g.*, Ex. 16, Doe 1 Decl. ¶¶ 4–5; Ex. 17, Doe 2 Decl. ¶¶ 4–5, 7; Ex. 18 ,Doe 3 Decl. ¶¶ 4–5, 7.

Only immediate reinstatement will ensure that the Individual Plaintiffs can finish out their service terms and receive these benefits. Even if the NCCC and VISTA programs were later reinstated, these particular Individual Plaintiffs would not necessarily be able to finish their service terms, as they will have moved on in their life because they lack the ability to pause and wait for this litigation to conclude. *See* Ex. 16, Doe 1 Decl. ¶ 18; Ex. 18, Doe 3 Decl. ¶ 8. As such, the Court must grant immediate relief to ensure the Individual Plaintiffs are able to complete the service terms to which they committed, so that they may graduate from the AmeriCorps program with the training, experience, and benefits attendant to those programs. Moreover, their injuries can only be remedied by reinstating their programs as a whole. NCCC is a team-based project*, see* 42 U.S.C. § 12613(a), and VISTA participants work with sponsor organizations. Without these programs, and the infrastructure that enables training and oversight, the Individual Plaintiffs cannot perform the work and obtain the experience they have been denied."

**b. The Nonprofit Plaintiffs Will Suffer Irreparable Harm**

Each of the Nonprofit Plaintiffs has lost funding, participants, and other support provided by AmeriCorps. As a result, they are currently losing something that cannot be remedied after trial: the ability to achieve their missions. "[O]bstacles" that "make it more difficult for [nonprofit organizations] to accomplish their primary mission" suffice to show irreparable harm. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). These can include "diversion of resources away from the [organizations'] core missions," "hav[ing] to cease" types of work, and the erosion of "community connections," among other things. *HIAS*, 985 F.3d at 326; *see, e.g.*, *Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, 2025 WL 8336917, at *23 (D. Md. Mar. 17, 2025) (irreparable harm where "loss of funding will cause some Grant Recipients to shutter their programs entirely" or "terminate staff"). Irreparable harm can also include "actual and imminent loss of good will or erosion of a company's customer base," *Real Time Medical Sys., Inc. v. PointClickCare Tech., Inc.*, 131 F.4th 205, 239 (4th Cir. 2025) (cleaned up), such as by being "forced to breach … contracts" and thereby causing "negative impacts on [the plaintiff's] customers and the consumers they serve," *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 829 (4th Cir. 2004).

Defendants' abrupt withdrawal of support has wrought all of these harms on the Nonprofit Plaintiffs, and they will mount over the coming weeks and months without interim relief.

*Harm to core activities.* Every one of the Nonprofit Plaintiffs has had to terminate or scale back core activities, or will have to do so imminently. *See, e.g.*, Ex 2, Giorlando Decl. ¶ 8 (Red Cloud "no longer ha[s] funding to bus children to and from after school programs or funding to provide academic testing to assess student growth in literacy and math."); Ex. 4, Harker Decl. ¶¶ 7–9 (PCCE "had to immediately cease all ongoing events, programming, and upcoming VISTA projects," including, *inter alia*, development of a rural health network, a program to help seniors

22

stay in their homes, and the launch of a food pantry); Ex. 8, Berger Decl. ¶ 12 ("[T]he terminations are making it impossible to operate our intake program for people trying to avoid or solve a housing crisis. We don't have the staff to answer the Housing Help hotline … . We can't process applications for the state's utility assistance program … ."); Ex. 6, Fewins-Bliss Decl. ¶ 9 ("As a result of the terminations, we have been forced to cancel all of our direct services work … ."); Ex. 5, Cook Decl. ¶¶ 12–16 (describing NCAN members who have cut college access programs or expect to do so). Many are about to lay off staff, without whom they will be unable to carry out critical activities. *See, e.g.*, Ex. 4, Harker Decl. ¶ 12; Ex. 9, Cholewa Decl. ¶ 13; Ex. 11, Sarata Decl. ¶ 15; Ex. 6, Fewins-Bliss Decl. ¶ 9; Ex. 14, Fynboh Decl. ¶ 7; Ex. 13, Barron Decl. ¶ 7. Some have lost as much as 50% of their operating budgets. *See, e.g.*, Ex. 11, Sarata Decl. ¶ 6; Ex. 9, Swope Cholewa Decl. ¶ 5; Ex. 9, Cook Decl. ¶ 11; Ex. 13, Barron Decl. ¶ 4.

*Diversion of resources.* Even for those who have been able to reallocate funding or find stopgaps, they have had to divert resources away from other parts of their mission and core activities. *See, e.g.*, Ex. 6, Fewins-Bliss Decl. ¶ 17 ("In order to sustain our AmeriCorps participants for 30 days, we shifted funds and focus away from other departments," including "cancel[ing] planned programming" and "decreas[ing] grantmaking to other organizations"); Ex. 5; Cook Decl. ¶ 17 (describing harms associated with "scramble" to find new funding); Ex. 9, Swope Cholewa Decl. ¶ 19 (similar); Ex. 1, Adams Decl. ¶ 8 (similar).

*Reputational injury.* Some are in danger of imminent default on contractual agreements, harming their partners and the communities they jointly serve. *See, e.g.*, Ex. 9, Swope Cholewa Decl. ¶ 14 ("Without immediate intervention, we are at serious risk of defaulting on our commitments to the district, which would disrupt services to students and damage longstanding school partnerships."); Ex. 8, Berger Decl. ¶ 15 (HCDNNJ "in danger of breaching … contract

with the New Jersey Department of Community Affairs"); Ex. 3, Taylor Decl. ¶ 14 ("We can no longer fulfill those contracts, damaging our relationships with landowners who were counting on us and paying us to care for their land"); Ex. 6, Fewins-Bliss Decl. ¶ 14 ("We have had to cancel MOUs with schools to which we had promised advisers … ."). As a result, their reputation for reliability will be tarnished, and they will lose partners, members, and volunteers, in further contravention of their missions. *See, e.g.*, Ex. 9, Swope Cholewa Decl. ¶ 16 ("Our partners will no longer be sure if they can rely on us and volunteers will lose interest and move on given our inability to respond."); Ex. 14, Fynboh Decl. ¶ 10 (Aspire "will be forced to go back on promises we have already made to our students and families," which "hurts our reputation and our future success as a community partner");  Ex. 1, Adams Decl. ¶ 11 ("Our reliability and our consistency mean everything to our students and families…This is a huge loss to our organizational reputation that will not be easily repaired."); Ex. 6, Fewins-Bliss Decl. 14 ("We cannot convince schools that we are a reliable partner if we cannot meet our core commitments, leaving their plans in disarray. The damage to our reputation will be long-lasting."); Ex. 12, Toups Decl. ¶ 11 ("With less staff capacity…[our schools] are not wrong to be concerned—we know that we will have fewer mentors and fewer resources to do this work in the months ahead.").

*Other harm to missions.* Additionally, the Nonprofit Plaintiffs are losing AmeriCorps participants who served as key connections to their partners and communities, and whose participation is vital to the Nonprofit Plaintiffs' missions. *See, e.g.*, Ex. 4, Harker Decl. ¶ 13 ("The VISTAS on our members' campuses are a major source of information about the needs of the school and local community. Without them, it will be much harder for us to identify ways to make an impact and respond to our members' needs."); Ex. 8, Berger Decl. ¶ 14; Ex. 5, Cook Decl. ¶ 22; Ex. 3, Taylor Decl. ¶ 15. Their mission to train future civic leaders has been compromised.

24

*See, e.g.*, Ex. 2, Giorlando Decl. ¶ 5 ("AmeriCorps has allowed us to train the next generation of Lakota educators and leaders," until now); Ex. 4, Harker Decl. ¶ 11 ("Training this next generation of civic leaders is a core part of our mission, and instead the 60 participants we had committed to support are left without jobs or training."); Ex. 11, Sarata Decl. ¶ 18 (loss of "the next generation of community leaders" undermines Service Collaborative's mission) Ex. 5, Cook Decl. ¶ 21 (same, NCAN); Ex. 7, Gunter Decl. ¶ 5 (same, NCHC).

Likewise, the cuts to AmeriCorps staff have deprived the Nonprofit Plaintiffs of information that they urgently need to fulfill their missions. *See, e.g.*, Ex. 9, Swope Cholewa Decl. ¶ 17 (explaining how the loss of contact with HandsOn's AmeriCorps Portfolio Manager has impeded their ability to rebudget another grant to mitigate damage); Ex. 4, Harker Decl. ¶ 17; Ex. 11, Sarata Decl. ¶¶ 16–17; Ex. 8, Berger Decl. ¶ 18. The ongoing and wide-ranging harm to the Plaintiffs' ability to "accomplish their primary mission" is undeniable. *League of Women Voters*, 838 F.3d at 9.

Moreover, "[w]ith every passing week, the damage becomes more long term." Ex. 4, Harker Decl. ¶ 16; Ex. 1, Adams Decl. ¶¶ 7, 12 ("Getting students enrolled and invested in the program takes time and requires trust."). Many of the Nonprofit Plaintiffs were recruiting and planning for the coming four years, and will be "unable to start the next cycle on time" if funding isn't restored soon. *Id.*; *see also, e.g.*, Ex. 3, Taylor Decl. ¶ 12 ("When these stewardship services cannot be performed, invasive species can spread quickly, native species can dwindle, and the ecosystem of the entire state can be affected."); Ex. 9, Swope Cholewa Decl. ¶ 16 ("Lost personnel and cancelled programs can't be restored overnight; it typically takes a year to bring new hires on board and get them trained on our operations."); Ex. 11,  Sarata Decl. ¶ 15 (similar); Ex. 6, Fewins-Bliss Decl. ¶ 19 ("catastrophic" damage to mission if grant funding is not restored soon); Ex. 8,

Berger Decl. ¶ 14 (loss of staff undermines ability to obtain new grants). For some Plaintiffs, the cuts fell at particularly critical times of the year, such as the end of the school year or the summer. *See, e.g.*, Ex. 11, Sarata Decl. ¶ 12 (participants in pre-K program "won't be there for end-of-school testing or to complete their students' transition to their next year; they couldn't even say goodbye to the kids they had former relationships with."); Ex. 1, Adams Decl. ¶ 11 ("[w]e will not be able to tell our families at the end of this school year that we will be there for them next school year"); Ex. 6, Fewins-Bliss Decl. ¶¶ 11–12 ("These schools are about to lose a key staff member at a critical time … ."); Ex. 5, Cook Decl. ¶ 18 ("For many of [NCAN's] members, and the students they serve, the timing of the cuts makes the harm particularly devastating."); Ex. 8, Berger Decl. ¶ 12 (explaining that closing utility assistance program just before summer "is especially dire for people with medical conditions that require them to have air conditioning or other cooling options as the weather heats up"); Ex. 3, Taylor Decl. ¶ 12 ("When these stewardship services cannot be performed, invasive species can spread quickly, native species can dwindle, and the ecosystem of the entire state can be affected."). And many work with populations that risk irreparable, long-term damage from the withdrawal of services. *See, e.g.*, Ex. 11, Sarata Decl. ¶ 12 ("Given the shortage of reliable adults in some students' lives, the impact of these sudden withdrawals is heartbreaking."); Ex 14, Fynboh Decl. ¶ 9 ("Some of our students will home form the bus stop alone. Some will miss out on reading and math help as their parents juggle multiple jobs… Some will go without a hot meal."); Ex. 5, Cook Decl. ¶ 19 (explaining that ending NCAN's members programs will "likely cause[] significant emotional and developmental trauma" for the students they serve); Ex. 1, Adams Decl. ¶ 7 (explaining that bringing back the same programs and the same mentors and tutors "year after year…makes all the difference to our students and their families"). As the Executive Director of Plaintiff MCAN put it, "[w]hen you shatter a glass vase,

you can't simply put it together as it was before." Ex. 6, Fewins-Bliss Decl. ¶ 19.

Plaintiffs' inability to carry out their missions *right now* is quintessential irreparable injury, *HIAS*, 985 F.3d at 326, as is the long-term damage to their reputation and capacity, *Real Time Medical*, 131 F.4th at 239. Immediate relief restoring Plaintiffs to the status quo ante until the Court can consider their claims on the merits is the only way to mitigate these harms.

### c.  Local 2027 Will Suffer Irreparable Harm

<u>Local 2027 Members</u>. In the absence of preliminary relief, Local 2027 members will suffer, and currently are suffering, irreparable harm. 88% of the Union's bargaining unit has been placed on administrative leave, and *nearly all* those employees have received RIF notices informing them of impending termination on June 24, 2025. Ex. 15, Daly Decl. ¶ 17. These members are committed public servants who have dedicated their careers—for many of them, decades of their lives—to furthering volunteerism and service in this country. *Id.* at ¶ 34. The dismantling of AmeriCorps destroys their ability to carry out the mission to which they have devoted their careers, and, as the declaration of Local 2027 President (and member) Daly explains, there is no comparable way to promote that cause besides working for AmeriCorps. *Id.* at ¶ 34. Defendants' illegal actions, if not enjoined, will decimate Local 2027's members' opportunity to find comparably meaningful and specialized work and gives rise to commensurate emotional distress.  And those very few Local 2027 members not RIF'd will remain behind at an agency that is a shell of itself, having to do more with less and carry the stress of falling short in their mission—a harm that cannot be redressed later. *Id.*

These employees will lose salaries and health benefits for themselves and their families. For example, one Union member is currently pregnant, relies on her employer-sponsored health insurance for herself and her family, and is facing the prospect of losing that coverage as she goes into labor. *Id.* at ¶ 29. Defendants will no doubt respond that these amount to economic injuries

compensable by damages, but damages are not available in constitutional or APA cases, making this monetary harm irreparable. *See Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) ("economic damages may constitute irreparable harm where no remedy is available at the conclusion of litigation"). And regardless, loss of health insurance is irreparable for those members with health issues. *Risteen v. Youth for Understanding, Inc.*, 245 F. Supp. 2d 1, 16 (D.D.C. 2002).

Local 2027 as an Organizational Plaintiff. The Union is also independently irreparably harmed as an organization. Local 2027's operational budget relies almost entirely on members' voluntary membership dues. Ex. 15, Daly Decl. ¶ 33. Losing 88% of the bargaining unit, and thus the dues of the overwhelming majority of Union members, will make it nearly impossible for Local 2027 to continue to operate. *See Wis. Gas Co. v. Fed. Energy Reg. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (financial harm can "constitute irreparable harm . . . where the loss threatens the very existence of the movant's business); *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 668 (2d Cir. 2023) (holding that there is irreparable harm "where the viability of the plaintiff's business is threatened") (quotation marks omitted). The decimation of the Union will make it nearly impossible to advocate for the employees remaining at AmeriCorps, a core function of the Union. Collective bargaining relies on strength in numbers; with only a handful of members remaining after the RIF, the Union's bargaining power will be significantly diminished. *See Am. Ass'n of Colleges for Teacher Educ.*, 2025 WL 8336917, at *23 (actions that "complete[ly] eviscerate[]" Plaintiffs' missions" sufficient to show irreparable harm").

Defendants' actions are also interfering with Local 2027's organizational mission and forcing unexpected and immediate diversions of substantial resources to issues arising out of the dismantling of AmeriCorps. The Union has been inundated with communications by bargaining

unit employees who are concerned about their livelihoods, their future with AmeriCorps, and the mission of the agency. Ex. 15, Daly Decl. ¶ 29. The Local 2027 President has committed all her time to issues related to Defendants' actions since her and her coworkers' administrative leave began. *Id.* at ¶ 32. As a result, she has not been able to spend the necessary time on other core union services; for example, the Union has had to postpone training sessions for members on its new collective bargaining agreement and orientation for newly elected union officers, each of which directly take away from the Union's capacity to effectively represent its members. *Id.*; *see HIAS*, 985 F.3d at 326 (the "diversion of resources away from . . . core missions" is irreparable harm).

### 3. Balance Of Equities and Public Interest Weigh in Favor an Injunction

The final two factors, which address whether the balance of equities tips in a movant's favor and whether the injunction is in the public interest, "merge when the Government is the opposing party." *Nken*, 556 U.S at 435. Here, both favor Plaintiffs. "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. The public "undoubtedly has an interest in seeing its governmental institutions follow the law." *Roe v. Dep't of Def.*, 947 F.3d 207, 230–31 (4th Cir. 2020) (internal quotation marks and citation omitted). Moreover, Defendants will not suffer any harm if the status quo is maintained until the Court can consider Plaintiffs' claims on the merits.

### B. Plaintiffs Have Standing

Article III requires that plaintiffs establish that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision," *Spokeo, Inc. v. Robbins*, 578 U.S 330, 338 (2016). When there are multiple plaintiffs in a single action, only "one plaintiff must demonstrate standing for each claim and form of relief requested." *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018).

"Associations can allege standing based on two distinct theories:" (1) associational standing, which allows an organization "to sue as a representative of its members who have been harmed;" and (2) organizational standing, which allows a group to sue "on its own behalf." *Md. Highway Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1250 (4th Cir. 1991); *Equal Rights Ctr. v. Abercrombie & Fitch Co.*, 767 F. Supp. 2d 510, 518 (D. Md. 2010).

### 1. Individual Plaintiffs Have Standing

As a result of Defendants' actions, the Individual Plaintiffs have suffered "an injury that is concrete and particularized, as well as actual or imminent." *Daniels v. Arcade, L.P.*, 477 F. App'x 125, 129 (4th Cir. 2012). As detailed *supra* Part III.A.2.a, the Individual Plaintiffs committed to service terms of ten to twelve months to help our nation's neediest, with the promise of attendant benefits and educational grants upon the completion of their terms. They joined AmeriCorps to receive unique training and experience that this organization offered. *See* Ex. 16 Doe 1 Decl. ¶ 4; Ex. 17, Doe 2 Decl. ¶ 5; Ex. 18, Doe 3 Decl. ¶ 4. When the AmeriCorps cuts were made, each of the Individual Plaintiffs' service terms was abruptly terminated, depriving them of the opportunity to engage in meaningful public service with the support and benefits that AmeriCorps provides. *See* Ex. 16, Doe 1 Decl. ¶¶ 12–13; Ex. 17, Doe 2 Decl. ¶ 10; Ex. 18, Doe 3 Decl. ¶¶ 7–8. The Individual Plaintiffs have suffered additional injuries, including receiving only a prorated portion of their promised educational grant and the significant emotional harm of being abruptly sent home from their work in service of the public good. *See, e.g.*, Ex. 16, Doe 1 Decl. ¶ 12. All of these injuries are a direct result of Defendants' actions to terminate NCCC and VISTA participant service programs, and the Individual Plaintiffs' injuries can be addressed by enjoining these actions.

### 2. Each Nonprofit Plaintiff Has Organizational or Associational Standing

Thirteen of the fourteen Nonprofit Plaintiffs have had an AmeriCorps grant or subgrant

terminated, lost AmeriCorps participants who were helping them pursue their mission, and lost access to support and data provided by AmeriCorps staff. As explained *supra* Part III.A.2.b, these sudden losses have profoundly damaged their ability to pursue their organizational missions, forcing them to close or scale back numerous mission-critical programs. Courts have routinely found that interference by the government in nonprofits' core mission and daily operations confers standing on those nonprofits. *See, e.g.*, *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (standing where challenged actions "directly affected and interfered with [nonprofit's] core business activities"); *Kravitz v. Dep't of Com.*, 366 F. Supp. 3d 681, 738 (D. Md. 2019) (standing based on "a loss of funding from federal programs").

The remaining Nonprofit Plaintiff, NCAN, has dozens of members, including Plaintiff MCAN, which have lost grants or subgrants. *See* Ex. 5, Cook Decl. ¶¶ 9–16; Ex. 6, Fewins-Bliss Decl. ¶¶ 6–9. NCAN therefore has standing as a representative of its members because "its members would have standing to sue as individuals … the interests it seeks to protect are germane to the organization's purpose; and … the suit does not require the participation of individual members." *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 99 (4th Cir. 2011); *see also Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015) (finding associational standing where the case "turns entirely on whether [the agency] complied with its statutory obligations, and the relief [Plaintiffs] seek[] is invalidation of agency action").

### 3. Plaintiff Local 2027 Has Both Organizational and Associational Standing

Plaintiff Local 2027 has associational standing because its members have standing to sue in their own right; the interests Local 2027 seeks to vindicate in this suit are germane to its purpose; and the suit does not require the participation of individual members. *Equity in Athletics, Inc.*, 639 F.3d at 99; *see also Ctr. for Sustainable Econ.*, 779 F3d at 597. To prove associational standing, an organization need only show that "at least one identified member ha[s] suffered or would suffer

harm"; it is not necessary to prove that all members are harmed. *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013). As noted above, *supra* Part III.A.2.c, Plaintiff Local 2027's members have all experienced harm as a result of Defendants' actions. The suit vindicates interests germane to Local 2027's purpose of representing, providing services to, and bargaining on behalf of AmeriCorps employee members. Daly Decl. ¶ 8. Preserving the existence of the agency where its members work is certainly "germane to the organization's purpose." *Equity in Athletics, Inc.*, 639 F.3d at 99. Finally, Plaintiff Local 2027's request for injunctive relief does not depend upon proof particular to individual members. *See Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 187 (4th Cir. 2007) (finding that such injunctive relief is "the type of relief for which associational standing was originally recognized").

An organizational plaintiff independently may seek "redress for an injury suffered by the organization itself." *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005). Local 2027 has standing to sue on its own behalf because Defendants' unlawful actions have "impede[d] and frustrate[d] its core mission," and have caused the Union to "divert resources to . . . counteract the defendants' unlawful practices." *Equal Rights Ctr. v. Equity Residential*, 483 F. Supp. 2d 482, 487 (D. Md. 2007). The dismantling has "directly affected and interfered with [the Union's] core business activities," which include representing, providing advice to and services for, and bargaining on behalf of the unions' members. *All. for Hippocratic Med.*, 602 U.S. at 395; *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982); Ex. 15, Daly Decl. ¶¶ 29, 32. Local 2027 faces direct financial harm in the form of lost dues, which threaten the very existence of the Union. *See* Ex. 15, Daly Decl. ¶ 33; *Hunt v. Washington State Apple Advert. Comm'n*, 432, U.S. 333, 345 (1977) (loss of annual assessment fees from members harmed organizational

plaintiff).

### C. Plaintiffs' Claims Are Not Channeled by the CSRA

This Court has jurisdiction under 28 U.S.C. § 1331. Defendants may argue the Civil Service Reform Act (CSRA) impliedly channels these claims to an administrative scheme under *Thunder Basin Co. v. Reich*, 510 U.S. 200, 207–13 (1994); *see* 5 U.S.C. §§ 1101 *et seq*. However, this doctrine is inapplicable because Plaintiffs' claims arise from "the comprehensive dismantling of an entire agency" and "involve issues related to the appropriate distribution of authority to and within the executive branch, not [] individual employee or labor disputes the [CSRA] administrative bodies customarily handle." *Am. Fed'n of Gov't Emps. v. Trump*, 2025 WL 1358477, at *13 (N.D. Cal. May 9, 2025). This Court is not precluded "from entertaining these extraordinary claims." *Axon Enter., Inc. v. FTC,* 598 U.S. 175, 180 (2023).

*Thunder Basin* requires "fairly discernible" congressional intent to assign exclusive review to an administrative body. 510 U.S. at 207. It also requires the claim at issue be "of the type Congress intended to be reviewed within th[e] statutory structure." *Id*. at 212. Both are absent here.

### 1. No "fairly discernible" Congressional intent to channel

As a threshold matter, all plaintiffs besides Local 2027 lack access to CSRA administrative channels because they are not federal employees or their union, they are nonprofit organizations. Every court to examine the issue has concluded that such third parties are not subject to CSRA channeling. *Am. Fed'n of Gov't Emps. v. Trump,* 2025 WL 1358477, at *15; *Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, 2025 WL 660053, at *7 (N.D. Cal. Feb. 28, 2025); *Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, 2025 WL 914823, at *1 (9th Cir. Mar. 26, 2025); *Wiley v. Kennedy*, 2025 WL 1384768, at *11 (S.D.W. Va. May 13, 2025); *Widakuswara v. Lake*, 2025 WL 1166400,

at *10 (D.D.C. Apr. 22, 2025).[6]

Regardless, all Plaintiffs' constitutional and APA claims are outside the CSRA's intended scope. In determining whether claims fall within a comprehensive administrative scheme, the court must assess, claim by claim, whether each is "of the type Congress intended to be reviewed within th[e] statutory structure.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. at 489. Constitutional appointments clause and *ultra vires* claims challenging an agency's broad unconstitutional wielding of authority are not. *Axon*, 598 U.S. at 189; *see also Strickland v. United States*, 32 F.4th 311, 374–76 (4th Cir. 2022). The CSRA addresses specified personnel actions, not fundamental constitutional questions about an agency dismantling itself or acting without authority. *See United States v. Fausto*, 484 U.S. 439, 445–47 (1988); *Axon,* 598 U.S. at 180, 185. It is unfathomable that Congress, acting *sub silentio*, intended administrative agencies charged with labor and employment issues only to adjudicate whether an executive agency can decide to ignore Congressional mandates and largely dismantle itself, or whether it can take any action—let alone these patently unlawful actions—at the behest of individuals without decisionmaking authority. *Cf. Leedom v. Kyne*, 358 U.S. 184, 184 (1958) (creating an exception to statutory preclusion where, like here, agency has acted "in excess of its delegated powers and contrary to a specific prohibition in the Act").

---

[6] A recent Fourth Circuit decision staying the district court's grant of injunctive relief to a group of state attorneys general who challenged the federal government's mass termination of probationary federal employees is inapposite because the decision did not involve non-profit organizations and was decided on the basis of a Supreme Court decision staying similar claims by non-union plaintiffs due to lack of standing, not based on CSRA channeling. *Maryland v. USDA*, 2025 WL 1073657, at *1 (4th Cir. Apr. 9, 2025) (citing *OPM v. Am. Fed'n of Gov't Emps.*, No. 24A904, 2025 WL 1035208, at *1 (U.S. Apr. 8, 2025) (mem.)). The Supreme Court recently stayed the order in *OPM*, but acted only on the basis of the third parties' standing, not channeling grounds. *See OPM v. Am. Fed'n of Gov't Emps.*, 2025 WL 1035208. The D.C. Circuit stayed the decision in *Widakuswara*, but did not address the effect of third parties on the channeling analysis. The "more concrete[] and persuasive[]" dissent found "no basis to conclude" the district court lacked jurisdiction to hear the claims of plaintiffs with no relationship to federal employment. *Am. Fed'n of Gov't Emps. v. Trump*, 2025 WL 1358477, at *13 (citing *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *8 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting)).

Separately, APA claims carry a presumption of judicial review. *Dep't of Com. v. New York*, 588 U.S. 752, 771–72 (2019); *see also U.S. Army Corps of Eng'rs*, 578 U.S. at 601–02. The Congress that enacted the CSRA and FSLMRS referenced the APA at least three times (5 U.S.C. §§ 1103, 1105, 7134) and cannot be said to have silently intended to eliminate the bedrock principle of APA review. *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (noting heavy burden to overcome express Congressional intent). There is no basis to conclude the CSRA bars all APA claims that implicate federal employment. *See also Feds for Med. Freedom v. Biden*, 63 F.4th 366, 375 (5th Cir. 2023) (en banc), *judgment vacated as moot*, 144 S. Ct. 480 (2023) (APA and constitutional challenge to government-wide federal vaccination mandate for employees was not channeled).

### 2. Claims are Not of Type Intended for CSRA Review

The only recent Fourth Circuit decision on CSRA channeling held that the employee plaintiff there, a federal public defender, could indeed sue the federal government for equitable relief to enjoin the government's *ultra vires* conduct, even though her claims included allegations that she was harassed at work and constructively discharged. *See Strickland,* 32 F.4th at 311. Following *Strickland*, which disfavors reflexively channeling structural constitutional claims under the CSRA, this Court should look for guidance to recent decisions from the Northern District of California finding channeling inapplicable under circumstances substantially similar to the instant case, reviewing each of the three *Thunder Basin* guideposts carefully. *See, e.g., Am. Fed'n of Gov't Emps. v. Trump*, 2025 WL 1358477, at *13–15.

Applying that framework, the claims at issue here are not the type that Congress meant to be channeled to CSRA review because (a) denying jurisdiction forecloses meaningful relief for most Plaintiffs and prevents the requested structural relief as lengthy CSRA review would render relief meaningless, *see, e.g.*, *Rydie v. Biden*, 2022 WL 1153249, at *5 (4th Cir. Apr. 19, 2022)

("[a] scheme that poses a risk of some additional and irreparable harm beyond the burdens associated with the dispute resolution process is not meaningful") (quoting *Tilton v. SEC*, 824 F.3d 276, 286 (2d Cir. 2016)); (b) the challenge is to the agency's dismantling and is collateral to individual employment actions, *See Am. Fed'n of Gov't Emps. v. Trump*, 2025 WL 1358477, at *14 (quoting *Widakuswara*, 2025 WL 1288817, at *8) (Pillard, J., dissenting); and (c) the case involves fundamental constitutional questions outside the agency's expertise, *see Axon,* 598 U.S. at 906.

Finally, even if Congress intended channeling when it enacted the CSRA, the current Administration's actions have undermined the CSRA's administrative channels by firing their Senate-confirmed members of without cause. *See, e.g., Harris v. Bessent*, 2025 WL 1021435, at *2 (D.C. Cir. Apr. 7, 2025), *administratively stayed by Trump v. Wilcox*, No. 24A966, 2025 WL 1063917 (U.S. Apr. 9, 2025) (staying reinstatement of MSPB Chair); *Dellinger v. Bessent*, 2025 WL 559669, at *3 (D.C. Cir. Feb. 15, 2025) (staying reinstatement of OSC Special Counsel). In doing so, the Administration has erased part of the CSRA's administrative review scheme, decimating its channels in violation of the CSRA itself and thereby defeating any *Thunder Basin* inference. *Thunder Basin* channeling is an implied doctrine based on the existence—and Congressional intent discernible from—a comprehensive statutory structure. 510 U.S. at 207. Part of the structure of the CSRA is the promise of for-cause removal protections for each of the administrative bodies created thereunder, and therefore, regardless of whether the removal protections are constitutional (as the Administration has contended they are not), they are part of the CSRA's scheme, which is the sole basis from which to infer Congressional intent to limit judicial review under *Thunder Basin*. They are also integral to ensuring meaningful review—the most important *Thunder Basin* factor. *See Bennett v. SEC*, 844 F.3d 174, 183 n.7 (4th Cir. 2016);

*Strickland*, 32 F.4th at 376 (where administrative scheme fails to provide meaningful review, it may be bypassed).  To Plaintiffs' knowledge, no case has yet addressed this unprecedented circumstance. *See Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, 2025 WL 900057, at *6 n.2 (N.D. Cal. Mar. 24, 2025) (declining to address argument because case did not meet *Thunder Basin* factors). In order "to avoid the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim," this Court should exercise review. *Webster v. Doe*, 486 U.S. 592, 603 (1988).

### D. The Tucker Act is Inapplicable

Defendants may also argue, as the Administration has elsewhere, that challenges to the unlawful termination of statutory grants must be brought in the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491. That argument is meritless.

The Tucker Act permits suits against the federal government "for liquidated or unliquidated damages" arising from, among other things, a contract with the United States to be brought in the Court of Federal Claims. 28 U.S.C. § 1491. The Tucker Act waives sovereign immunity for contract claims against the government seeking money damages but has no place in this litigation. Defendants will likely argue that actions to enjoin Defendants from cancelling their statutory grants fall within the jurisdiction of the Tucker Act and must be brought before the Court of Federal Claims, likely relying on *Department of Education v. California*, 145 S. Ct. 966, 968 (2025). But *California*—a non-precedential order on an expedited stay posture—does not govern here for several reasons.

First, the Tucker Act does not apply to Plaintiffs' constitutional claims, which seek equitable relief against officials exceeding their authority and face no sovereign immunity bar. *Strickland*, 32 F.4th at 363. The Tucker Act does not divest Article III courts of jurisdiction over constitutional claims. *See Webster*, 486 U.S. at 603 (1988) ("[W]here Congress intends to preclude

judicial review of constitutional claims its intent to do so must be clear."). The *California* case dealt solely with APA claims premised on the terms of competitive, discretionary grant agreements, not constitutional claims, and therefore has nothing to say about Plaintiffs' constitutional claims.[7]

Second, the Tucker Act is inapposite because the grants at issue here are not contracts. Federal grants of the type implicated here "are in reality gifts or gratuities to the recipient." *Cal. Hum. Dev. Corp. v. United States*, 87 Fed. Cl. 282, 295 (2009), *aff'd*, 379 F. App'x 979 (Fed. Cir. 2010); *see Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*, 703 F. Supp. 3d 126, 134 (D.D.C. 2023) (advancing policy interests is not consideration to the federal government). That is true even if the grants are contingent upon meeting performance standards. *See Imaginarium, LLC v. United States*, 166 Fed. Cl. 234, 244 (2023); *D. R. Smalley & Sons, Inc. v. United States*, 372 F.2d 505, 507 (Ct. Cl. 1967). As AmeriCorps' statutory structure makes clear, the agency considers its grants to be "assistance" to grantees, rather than the type of quid pro quo requisite to a contract. *See, e.g.*, 42 U.S.C. §§ 12572, 12574.

Third, even if the grant awards are contractual in nature, they are not Tucker Act claims, which arise only when the claim is "at its essence" contractual. *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967372 F.2d 50568 (D.C. Cir. 1982). The "Tucker Act yields when the . . . Administrative Procedure Act provides an avenue for relief." *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 324 (2020) (internal citation omitted).   In addition to their constitutional claims, Plaintiffs allege that Defendants violated the APA by failing to comply with duties laid out in statutes and regulations, and in unilaterally and without reasoned explanation cancelling a suite of AmeriCorps grants across the agency's various components. *See* Compl.

---

[7] For the same reason, the order in *Am. Ass'n of Colleges for Teacher Educ. v. McMahon*, 2025 WL 1232337 (4th Cir. Apr. 10, 2025), staying the district court's injunction, relying entirely on *California*, does not bear on this case.

¶¶ 87–96; *see also* 42 U.S.C. § 12636 (setting forth basis and procedure for grant cancellation); 45 C.F.R. § 2540.400 (setting forth grantee rights in event of cancelation). That is unlike *California* because, although the *California* plaintiffs styled their case as an APA action, they sought to enforce the terms of their specific grant agreements; the Supreme Court stayed an injunction expressly aimed to enforce compliance with those specific "grant terms and conditions." *California v. Dep't of Educ.*, 2025 WL 760825, at *5 (D. Mass. Mar. 10, 2025). Plaintiffs' claims are not similarly premised on the terms of any contract nor do they seek enforcement of such terms.

Fourth, this is not a Tucker Act case because it is one for forward-facing equitable relief, not money damages. *See Maine Cmty. Health*, 590 U.S. at 327 (Tucker Act is "suited to remedying particular categories of past injuries or labors"); *cf. Sols. in Hometown Connections v. Noem*, 2025 WL 1103253, at *11 (D. Md. Apr. 14, 2025) (finding Tucker Act applicable to grant terminations where requested relief was backward looking, for past expenses incurred). The Court of Federal Claims has jurisdiction under the Tucker Act only if the plaintiff "present[s] a claim for 'actual, presently due money damages from the United States.'" *Nat'l Air Traffic Controllers Ass'n v. United States*, 160 F.3d 714, 716 (Fed. Cir. 1998) (quoting *United States v. King*, 395 U.S. 1, 3 (1969)). To do that—and thereby to come within the "jurisdictional reach" of the Court of Federal Claims—the plaintiff must identify a "source of substantive law" that is "money-mandating" in the sense that it "mandat[es] compensation by the Federal Government for the damage sustained." *Sanford Health Plan v. United States*, 969 F.3d 1370, 1378 (Fed. Cir. 2020). A contract *can* be a money-mandating source of substantive law—but not all contracts are. *See, e.g.*, *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008). Plaintiffs' grant agreements, even if contractual, do not provide a basis for money damages and therefore are not money-mandating. Instead, they commit Defendants to "transfer a thing of value [to Plaintiffs] to carry

out a public purpose" authorized under the national service laws. 31 U.S.C. § 6304(1). Sometimes that thing of value is funding, but sometimes it is a commitment to provide a certain number of participants to assist the grantee in its work. *See, e.g.*, Ex. 8, Berger Decl. ¶ 6–8. Unlike money damages, which a recipient plaintiff is free to use however she sees fit, Plaintiffs' grant assistance, whether funds or services, can only be used for the purposes for which they were awarded.

Rather than seeking money damages, which are unavailable, Plaintiffs ask this Court to vacate the challenged unlawful agency actions and restore the parties to their "last uncontested status" preceding the controversy. *Real Time Med. Sys.*, 131 F.4th at 223 (citing *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014)); *see also* 5 U.S.C. § 706(2) (courts must "set aside agency action" that is unlawful). The Court of Federal Claims cannot provide that remedy, and the Tucker Act is not an appropriate means of clarifying the prospective terms of an ongoing relationship between the federal government and a recipient of federal money. *See Maine Cmty. Health*, 590 U.S. at 326–37; *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988). That is true even though vacating the unlawful action at issue would result in Defendants resuming funding to Plaintiffs: "The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893; *see also Strickland*, 32 F.4th at 365–66 (front pay is an equitable remedy, notwithstanding that it requires payment from the federal government to the plaintiff).

This case aligns with *Department of State v. AIDS Vaccine Advocacy Coalition*, in which, despite Tucker Act objections, the Supreme Court declined to stay the disbursement of two billion dollars to fulfill the government's commitments, via grants and cooperative agreements, to fund foreign assistance efforts. 145 S. Ct. 753 (2025); *see also AIDS Vaccine Advoc. Coal. v. Dep't of State,* 2025 WL 485324, at *1 (D.D.C. Feb. 13, 2025). It is therefore appropriately before this

40

Court.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant the relief requested in their Motion for Preliminary Injunction and enter their Proposed Order.

Dated: May 20, 2025

Respectfully submitted,

*/s/ Norman L. Eisen*
Norman L. Eisen [Bar No. 09460]
Tianna J. Mays [Bar No. 21597]
Pooja Chaudhuri [admitted PHV]
Sofia Fernandez Gold [admitted PHV]
Joshua Kolb [admitted PHV]
**DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Avenue SE
Suite 15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Tianna@statedemocracydefenders.org
Pooja@statedemocracydefenders.org
Sofia@statedemocracydefenders.org
Joshua@statedemocracydefenders.org

*Attorneys for All Plaintiffs*

*/s/ Elena S. Goldstein*
Elena S. Goldstein [admitted PHV]
Skye Perryman*
**DEMOCRACY FORWARD
FOUNDATION**
P.O. Box 34553
Washington, D.C. 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org

*Attorneys for All Plaintiffs*

*/s/ Abbe David Lowell*
Abbe David Lowell [Bar No. 11863]
Brenna L. Frey [admitted PHV]
Isabella M. Oishi [admitted PHV]
**LOWELL & ASSOCIATES, PLLC**
1250 H Street, N.W.
Second Floor
Washington, D.C. 20005
(202) 964-6110
ALowellpublicoutreach@lowellandassociates.com
BFrey@lowellandassociates.com
IOishi@lowellandassociates.com

*Attorneys for All Plaintiffs*

*/s/ Teague P. Paterson*
Teague P. Paterson*
Matthew S. Blumin*
Georgina C. Yeomans*
**AMERICAN FEDERATION OF STATE,
COUNTY, AND MUNICIPAL EMPLOYEES,
AFL-CIO**
1625 L. Street NW
Washington, DC 20036
Tel: (202) 775-5900
Fax: (202) 429-1293
TPaterson@afscme.org
MBlumin@afscme.org
GYeomans@afscme.org

*Attorneys for AMERICORPS EMPLOYEES
UNION, Local 2027 of the American Federation
of State, County, and Municipal Employees, AFL-
CIO*

41

\* Application for admission or admission pro hac vice forthcoming.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 20 day of May, 2025, a copy of the foregoing Plaintiffs' Motion for Preliminary Injunction and all accompanying documents were served electronically on all parties receiving service via CM/ECF in this case.

*/s/ Abbe David Lowell*
Abbe David Lowell [Bar No. 11863]
