# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **ELEV8 BALTIMORE, INC.,** *et al.*, | * | |
| | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | Civ. No. MJM-25-1458 |
| **v.** | * | |
| | * | |
| **CORPORATION FOR NATIONAL AND** | * | |
| **COMMUNITY SERVICE,** *operating as* | * | |
| **AMERICORPS,** *et al.*, | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

The Corporation for National and Community Service, operating as AmeriCorps, is a government corporation that was created to operate and fund community service programs throughout the United States. A group of organizational and individual plaintiffs ("Plaintiffs") commenced this civil action seeking preliminary and permanent injunctive relief against defendants AmeriCorps; Jennifer Bastress Tahmasebi, in her official capacity as Interim Agency Head of AmeriCorps; and Nate Cavanaugh, in his official capacity as Department of Government Efficiency ("DOGE") Team Lead for AmeriCorps (collectively, "Defendants"), alleging violations of the Administrative Procedures Act ("APA"), separation of powers, and the Appointments Clause of Article II of the United States Constitution. ECF No. 1 (Complaint). Plaintiffs include nonprofit organizational recipients of AmeriCorps grants and subgrants that have been terminated, a labor union that represents AmeriCorps employees who have been placed on

administrative leave and received reduction-in-force ("RIF") notices, and individual participants in AmeriCorps programs whose terms of service were terminated.

Currently pending before the Court is Plaintiffs' motion for a preliminary injunction. ECF No. 25. In summary, Plaintiffs seek to enjoin Defendants "from taking further action to dismantle [AmeriCorps] or its operations;" to compel Defendants to restore AmeriCorps to its status prior to April 15, 2025, including by reinstating employees, returning program participants to service, and restoring grants. ECF No. 25-2 (Pl. Proposed Order). Defendants filed a response in opposition to Plaintiffs' motion, ECF No. 33, and Plaintiffs filed a reply in support, ECF No. 37. Also pending is Plaintiffs' motion for leave to file supplemental declarations, ECF No. 41, which is unopposed and shall be granted. Upon consideration of the parties' filings and arguments made at the hearing on Plaintiffs' motion, and for the reasons set forth below, the Court shall grant the motion in part and enter a preliminary injunction.

## I.    BACKGROUND

### A.  History and Structure of AmeriCorps

In a separate action filed in this district,[1] Judge Deborah L. Boardman recently issued a memorandum opinion describing the history of AmeriCorps as follows:

> The Corporation for National and Community Service ("CNCS"), operating as "AmeriCorps," is a federal agency that "administer[s] the programs established under the national service laws." 42 U.S.C. § 12651; *see* 45 C.F.R. § 2500.2(a). The agency's origins date back to the Domestic and Volunteer Service Act of 1973, which established Volunteers in Service to America

---

[1] In *Maryland v. Corporation for National and Community Service* ("*Maryland v. AmeriCorps*"), Civ. No. DLB-25-1363, 2025 WL 1585051 (D. Md. June 5, 2025), 24 States and the District of Columbia seek declaratory and injunctive relief against AmeriCorps' recent termination of grants and volunteers. As in the instant action, the plaintiffs in *Maryland v. AmeriCorps* allege that the defendants acted in excess of their authority and violated the APA and separation of powers. 2025 WL 1585051, at *11. In that case, Judge Boardman has granted a preliminary injunction that, among other things, bars the defendants from effectuating certain grant terminations and directs them to restore certain AmeriCorps programs. *Id.* at *41–42.

> ("VISTA"), the National Older Americans Volunteer Program, and
> the "ACTION Agency" charged with operating these programs.
> Pub. L. No. 93-113, § 401, 87 Stat. 394, 405 ("the 1973 Act"). In
> 1990, Congress authorized new grant programs to support additional
> service initiatives and established a "Commission on National and
> Community Service" to administer the new programs. National and
> Community Service Act of 1990, Pub. L. No. 101-610, § 190, 104
> Stat. 3127, 3168 ("the 1990 Act"). In 1993, Congress merged the
> Commission on National and Community Service with the ACTION
> Agency to form CNCS, known today as AmeriCorps. National and
> Community Service Trust Act of 1993, Pub. L. No. 103-82, §§ 191
> & 203(c)(2), 107 Stat. 785, 873, 892 ("the 1993 Act") (codified at
> 42 U.S.C. §§ 12501 *et seq.*).
>
> Congress created AmeriCorps in part to "renew the ethic of
> civic responsibility and the spirit of community and service," to
> "encourage citizens of the United States . . . to engage in full-time
> or part-time national service," and to "leverage Federal investments
> to increase State, local, business, and philanthropic resources to
> address national and local challenges." 42 U.S.C. § 12501.

*Maryland v. Corp. for Nat'l & Cmty. Serv.* ("*Maryland v. AmeriCorps*"), Civ. No. DLB-25-1363,

2025 WL 1585051, at *2 (D. Md. June 5, 2025).

AmeriCorps is a government corporation led by a Board of Directors (the "Board") and a

Chief Executive Office (the "CEO"), both appointed by the President of the United States with the

advice and consent of the Senate. 42 U.S.C. §§ 12651, 12651a(a), 12651c. The Board is

"responsib[e] for setting overall policy for the Corporation" and "review[s] and advise[s] the

[CEO] regarding[] the actions of the [CEO] with respect to the personnel of the Corporation, and

with respect to such standards, policies, procedures, programs, and initiatives as are necessary or

appropriate to carry out the national service laws." *Id.* § 12651b(g)(5)(A). The CEO exercises the

powers and discharges the duties of the Corporation "that are not reserved to the Board" and has

"authority and control over all personnel of the Corporation," except for the decisions reserved for

the Inspector General. *Id.* § 12651d(a) (citing 5 U.S.C. § 414). The CEO also may "generally

perform such functions and take such steps consistent with the objectives and provisions of the

national service laws, as the [CEO] determines to be necessary or appropriate to carry out such provisions." *Id.* § 12651d(c)(11).

Additionally, AmeriCorps employs agency staff to carry out its policies and programs. Before the events that gave rise to this litigation, AmeriCorps employed approximately 720 people across the country, including staff who reviewed grant applications, managed service projects and grants, or provided training to individuals participating in service projects. ECF No. 25-17 (Ex. 15, Daly Decl.), ¶¶ 17, 19, 22, 23, 25, 26.

### B. Relevant AmeriCorps Grants and Programs

AmeriCorps oversees multiple statutorily mandated programs, including the National Civilian Community Corps ("NCCC"), VISTA, State and National Grants, State Service Commission Subgrants, and the Volunteer Generation Fund ("VGF").

By statute, AmeriCorps' authority to cancel grants or contracts is limited to instances of "material failure to comply" with statutory or grant requirements. 42 U.S.C. § 12636(a)–(b); 45 C.F.R. § 2540.400. Before grant termination, grantees or contracting parties are entitled to reasonable notice and a fair hearing, including at least seven days to respond and show good cause as to why their federal assistance should continue. 45 C.F.R. § 2540.400. These procedural protections apply to all core AmeriCorps programs, including NCCC, VISTA, State and National Grants, State Service Commission Subgrants, and VGF. For VISTA, implementing regulations strictly limit the early termination or suspension of participants without proper notice and opportunity to be heard. *Id.* §§ 2556.400(a), 2556.425.

### 1. AmeriCorps State and National Grants

AmeriCorps is authorized by statute to "make grants to States, subdivisions of States, territories, Indian tribes, [and] public or private nonprofit organizations" to "carry out . . . national

service programs" and to "make grants in support of other national service programs . . . that are

carried out by other entities." *See* 42 U.S.C. § 12571(a). "Authorized grants include planning

grants, which fund, for up to one year, the development of a service program; operational grants,

which fund, for up to three years, the 'establishment, operation, or expansion' of a service program;

and replication grants, which fund, for up to three years, expansion of proven service programs to

other geographic locations." *Maryland v. AmeriCorps*, 2025 WL 1585051, at *2 (quoting 42

U.S.C. § 12574, and 45 C.F.R. § 2521.20). By statute, "AmeriCorps must allot a certain amount

of funding to 'formula grants' in each state, the District of Columbia, and Puerto Rico." *Id.* at *3;

42 U.S.C. § 12581(e); *see also* 42 U.S.C. § 12581(a)–(b). Roughly one-third of State and National

Grant funds are allotted as formula grants to states. *See* 45 C.F.R. § 2521.30(a). States also may

apply for "direct" grants, which are awarded on a competitive basis to states, nonprofits, and Indian

tribes. 42 U.S.C. § 12581(d)(1).

> The awarding of AmeriCorps State and National grants is
> governed by certain "service priorities." *See id.* § 12572(f)(1).
> AmeriCorps establishes national service priorities for programs
> funded through AmeriCorps State and National direct grants. *See id.*
> § 12572(f)(1)(A). The statute requires the agency to "provide
> advance notice to potential applicants of any national service
> priorities to be in effect under this subsection for a fiscal year" and
> "by regulation establish procedures to ensure the equitable treatment
> of national service programs" that "receive funding under this
> division for multiple years" and "would be adversely affected by
> annual revisions in such national service priorities." *Id.* §
> 12572(f)(2)–(3). The statute also requires states to "establish,
> and . . . periodically alter priorities as appropriate regarding the
> national service programs to be assisted" under formula grants. *Id.*
> § 12572(f)(1)(B). State priorities for formula grants are "subject to
> [the agency's] review as part of the application process." *Id.* Under
> current agency regulations, "[a] State may apply priorities different
> than those of AmeriCorps in selecting its formula programs." 45
> C.F.R. § 2522.460(b).

*Maryland v. AmeriCorps*, 2025 WL 1585051, at *3. "With funds from formula and direct grants, states may operate service programs through subgrants to other entities, such as non-profit organizations." *Id.* at *4 (citing 42 U.S.C. § 12572(b)(1)).

### 2. State Service Commission Subgrants

For states to receive AmeriCorps grants and national service positions, they must "maintain a State Commission on National and Community Service." 42 U.S.C. § 12638(a)(1). State Service Commissions receive grants and make subgrants to service programs, *id.*, including to Nonprofit Plaintiffs[2] Bur Oak Land Trust, ECF No. 25-5 (Ex. 3, Taylor Decl.), ¶ 7 ("Bur Oak is currently in year two of a three-year AmeriCorps grant administered through Volunteer Iowa, the Iowa State Service Commission."); Democracy Maine, ECF No. 25-12 (Ex. 10, Kellar Decl.), ¶ 4 ("At Democracy Maine, we are currently in the middle of a one-year AmeriCorps planning award from the Maine State Service Commission, Volunteer Maine."); Seed Coalition, ECF No. 25-15 (Ex. 13, Barron Decl.), ¶ 4 ("We have two key AmeriCorps grants: a VISTA grant and an AmeriCorps State and National award from the Iowa Commission on Volunteer Service."); and some of National College Attainment Network's member organizations, such as Plaintiff Michigan College Access Network, ECF No. 25-8 (Ex. 6, Fewins-Bliss Decl.), ¶ 6 ("we had three subgrants from the Michigan Community Service Commission"); ECF No. 25-7 (Ex. 5, Cook Decl.), ¶ 7 ("[A]t least 50 of our members received funding from AmeriCorps, either directly or through subgrants. This covers a wide range of AmeriCorps programs, including . . . subgrants from State Service Commissions . . . ."). By statute, these grants cannot be revoked without providing grantees,

---

[2] The plaintiff nonprofit organizations in this suit ("Nonprofit Plaintiffs") include Elev8 Baltimore Inc., Red Cloud Indian School, Inc./ Maȟpíya Lúta, Bur Oak Land Trust, Partners for Campus-Community Engagement, National College Attainment Network, Michigan College Access Network, North Carolina Housing Coalition, Housing & Community Development Network of New Jersey, HandsOn Suburban Chicago, Democracy Maine, The Service Collaborative of WNY, Inc., Rainbow Labs, Seed Coalition, and Aspire Afterschool Learning.

including the states and their subgrantees, notice and an opportunity to be heard. 42 U.S.C. §
12636(a)–(b). "With the agency's permission, states can entrust the duties" of a State Service
Commission to a private entity. *Maryland v. AmeriCorps*, 2025 WL 1585051, at *6 (citing 42
U.S.C. § 12636(a)). "Every organization that applies for AmeriCorps State and National direct
grants must 'consult with and coordinate activities with the State Commission for each State in
which the program will operate . . . .'" *Id.* (quoting 42 U.S.C. § 12583(c)(3)); *see also* 45 C.F.R. §
2550.80(a).

### 3.  National Civilian Community Corps

Creation of the NCCC is specifically authorized by 42 U.S.C. § 12612(a). The NCCC is a
full-time, team-based service program for individuals aged 18 to 26 to participate in projects to
serve critical community needs nationwide. 42 U.S.C. § 12613. NCCC participants assist with
disaster relief; help collect, harvest, and distribute food; support medical institutions; and work
with disadvantaged youth; among other activities. ECF No. 25-17 (Ex. 15, Daly Decl.), ¶ 12. While
AmeriCorps directly oversees the NCCC, its members are not paid salaries and are not considered
federal employees, except for the limited purposes of work-related injuries and tort liability. 42
U.S.C. §§ 12615(a), 12620.

The CEO of AmeriCorps has supervisory authority over the NCCC's operations and "shall
establish a permanent cadre" that includes the director of the NCCC and other supervisors and
training instructors. *Id.* § 12619(a), (c). Congress assigned various mandatory duties to the NCCC
director and the heads of NCCC campuses. For example, campus directors "shall select projects"
that serve statutorily specified purposes, such as addressing needs related to "natural and other
disasters;" "infrastructure improvement;" "environmental stewardship and conservation;" "energy

conservation;" and "urban and rural development." *Id.* §§ 12611, 12617(c)(1); *see generally id.* §§ 12611–26.

"NCCC members are assigned to regional campuses and deployed to states to conduct service projects to 'meet an identifiable public need,' with an 'emphasis on projects in support of infrastructure improvement, energy conservation, and urban and rural development.'" *Maryland v. AmeriCorps*, 2025 WL 1585051, at *5 (quoting 42 U.S.C. §§ 12615(c)–(d), 12617(a)(1)). "Like AmeriCorps members enrolled in programs funded by AmeriCorps State and National Grants, NCCC members receive a living allowance, health insurance, and upon completion of service, an education award." *Id.*; *see* 42 U.S.C. § 12618.

### 4.  Volunteers in Service to America

The VISTA program, dating back to 1973, was created as a "full-time volunteer service" in order "to strengthen and supplement efforts to eliminate and alleviate poverty[,]" by encouraging meaningful volunteer service and supporting the efforts of local agencies and community organizations. *Id.* § 4951. Congress imposed certain statutory duties on the VISTA program, including the requirement that "the people of the communities to be served by [VISTA] volunteers" be included in "planning, developing, and implementing programs" "[t]o the maximum extent practicable." 42 U.S.C. § 4956; *see generally id.* §§ 4953–60. "The VISTA program partners with organizations to send members across the country for service projects. *See* 45 C.F.R. § 2500.20(a)(4). VISTA members are placed at both private organizations and state and local government agencies. *See id.* § 2566.100." *Maryland v. AmeriCorps*, 2025 WL 1585051, at *5. "AmeriCorps also provides grants to entities that conduct VISTA-supported projects." *Id.* (citing 42 U.S.C. §§ 4960, 5081); *see also* ECF No. 25-10 (Ex. 8, Berger Decl.), ¶¶ 6–8.

Like NCCC members, VISTA participants are not paid salaries and "are not considered federal employees except for limited purposes under federal law, such as tort liability." *Maryland v. AmeriCorps*, 2025 WL 1585051, at *5 (citing 42 U.S.C. § 5055(a)). VISTA participants "receive a living allowance, health coverage, and childcare—paid directly by AmeriCorps—and are eligible for an education award or a cash stipend upon completion of service." *Id.* (citing 42 U.S.C. §§ 4955, 12595); *see also* 45 C.F.R. § 2556.320; ECF No. 25-20 (Doe 3 Decl.), ¶ 5 ("Once I completed my AmeriCorps work, I hoped to go back to school and earn my Master of Arts in history, using my AmeriCorps education award to help pay for it."). By statute, AmeriCorps may terminate VISTA participants for cause, "due to a deficiency, or deficiencies, in conduct or performance." 45 C.F.R. § 2556.400(a). A participant terminated for cause has appeal rights regarding that termination. *Id.* § 2556.425. AmeriCorps may terminate a participant from their project early without cause for limited reasons, such as the participant voluntarily resigning before a decision is made on their for-cause termination, failing to "secure a suitable reassignment to another project," or needing a "medical termination." 45 C.F.R. § 2556.430.

Under applicable statutes and regulations, AmeriCorps may suspend VISTA projects only for a "material failure" or "threatened material failure" to comply with the applicable terms of the statute and regulations, VISTA program policy, or a Memorandum of Agreement between the sponsor and AmeriCorps. *Id.* § 2556.135; *see also* 42 U.S.C. § 12636(a). Procedural protections, including notice and opportunity to be heard, attach to such suspensions. 45 C.F.R. § 2556.135(a)–(d).

### 5. Volunteer Generation Fund

The VGF was created to "carry out volunteer programs or to develop and support community-based entities that recruit, manage, or support volunteers." 42 U.S.C. § 12653p(c)(1).

9

Grants associated with the VGF include those to "recruit, manage, or support volunteers to a community-based entity such as a volunteer coordinating agency, a nonprofit resource center, a volunteer training clearinghouse, an institution of higher education, or a collaborative partnership of faith-based and community-based organizations." *Id.* § 12653p(c)(2)(B).

### C. Congressional Appropriations

> AmeriCorps programs are funded by annual congressional appropriations. In Fiscal Year 2024, Congress appropriated $975,525,000 "[f]or necessary expenses for [AmeriCorps] to carry out [the 1973 Act] and [the 1990 Act]." Further Consolidated Appropriations Act, 2024 ("2024 Appropriations Act"), Pub. L. No. 118-47, 138 Stat. 460, 694. The annual appropriations bill also stated that "of the amounts provided under this heading . . . $19,538,000 shall be available to provide assistance to State commissions on national and community service" under the statute authorizing State Commission Support Grants, "$37,735,000 shall be available to carry out" the statute authorizing the establishment of the NCCC, and "$8,558,000 shall be available for expenses authorized" by the statute authorizing the Volunteer Generation Fund, which "shall be awarded by CNCS on a competitive basis." *Id.* at 694–95. In the joint explanatory statement accompanying the bill, Congress indicated that $557,094,000 of the funds appropriated was for AmeriCorps State and National grants, $103,285,000 was for the VISTA program, and $236,917,000 was for AmeriCorps Seniors. *See* 170 Cong. Rec. H2060–61 (daily ed. Mar. 22, 2024).
>
>                     ***
>
> In addition to appropriating funds, Congress included an "administrative provision[ ]" for Fiscal Year 2024 that "[AmeriCorps] shall make any significant changes to program requirements, service delivery or policy only through public notice and comment rulemaking." 2024 Appropriations Act § 401, 138 Stat. at 695.

*Maryland v. AmeriCorps*, 2025 WL 1585051, at *6–7 (alterations in original).

### D. Defendants' Recent Actions

On February 11, 2025, President Donald J. Trump issued Executive Order No. 14,210, titled "Implementing the President's 'Department of Government Efficiency' Workforce

Optimization Initiative." Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025). To achieve

its goals of eliminating "waste," the Executive Order directs agency heads to prepare for large

RIFs. *Id.* §§ 1, 3.[3] On February 26, 2025, the President issued Executive Order No. 14,222, titled

"Implementing the President's 'Department of Government Efficiency' Cost Efficiency

Initiative." Exec. Order No. 14222, 90 Fed. Reg. 11095 (Feb. 26, 2025). This Executive Order

calls for "transforming" federal spending on contracts, grants, and loans to ensure transparency.

*Id.* § 1.

> [T]he order instructs agency heads to, among other things, consult
> with the Department of Government Efficiency ("DOGE") "team
> lead" to "review all existing covered contracts and grants and, where
> appropriate and consistent with applicable law, terminate or modify
> (including through renegotiation) such covered contracts and grants
> to reduce overall Federal spending or reallocate spending to promote
> efficiency and advance the policies of [the] Administration." *Id.* §
> 3(b). "Covered contracts and grants" are defined as "discretionary
> spending through Federal contracts, grants, loans, and related
> instruments, but excludes direct assistance to individuals;
> expenditures related to immigration enforcement, law enforcement,
> the military, public safety, and the intelligence community; and
> other critical, acute, or emergency spending, as determined by the
> relevant Agency Head." *Id.* § 2(d).

*Maryland v. AmeriCorps*, 2025 WL 1585051, at *7.

    In response to the foregoing Executive Orders, AmeriCorps took actions described below.

## 1. NCCC Is Terminated

    On April 15, 2025, AmeriCorps terminated all NCCC projects and all 2,000 NCCC

participants, effective immediately. ECF No. 25-17 (Ex. 15, Daly Decl.), ¶ 11. Because the NCCC

---

[3] Defendants are currently enjoined from further implementation of Executive Order No. 14,210 or from
executing existing RIF notices or issuing further RIF notices. *See* Order, *Am. Fed'n of Gov't Emps., AFL-
CIO v. Trump*, No. 25-CV-03698-SI, 2025 WL 1358477 (N.D. Cal. May 9, 2025), *on reconsideration in
part*, 2025 WL 1413762 (N.D. Cal. May 15, 2025).

project sponsors rely on the participants' work, the terminations left the sponsors with service projects unfinished. *Id.* ¶ 13.

Plaintiffs Doe 1 and Doe 2 were among the terminated NCCC participants. ECF No. 25-18 (Ex. 16, Doe 1 Decl.), ¶¶ 10–11; ECF No. 25-19 (Ex. 17, Doe 2 Decl.), ¶¶ 8–9. On April 15, 2025, Doe 1 received an unsigned email from ANCCC@americorps.gov confirming that they, and all NCCC members, would be placed on administrative hold until April 30, 2025, at which time they would be exited from the NCCC program and sent home. ECF No. 25-18 (Ex. 16, Doe 1 Decl.), ¶ 11, Attachment A. The same day, Doe 2 was informed during an urgent conference call that their team should stop working and immediately report to the NCCC regional campus. ECF No. 25-19 (Ex. 17, Doe 2 Decl.), ¶ 8. Doe 2 later received a memo stating that they were approved for "early release from the NCCC program for compelling personal circumstances[,]" effective April 30, 2025. *Id.* at Attachments A, B.

### 2. Grants Are Terminated

Defendants cancelled $400 million in AmeriCorps grants and terminated funding to both direct grantees and subgrantees of State Service Commission. *See Maryland v. AmeriCorps*, 2025 WL 1585051, at *9. The Nonprofit Plaintiffs were among the organizations that lost VISTA sponsorships, direct State and National Grants, subgrants from State Service Commissions, and VGF grants. Plaintiff Doe 3 was a VISTA participant who was terminated as a part of the grant cancellations. ECF No. 25-20 (Ex. 18, Doe 3 Decl.), ¶¶ 2, 6. On April 28, 2025, Doe 3 received an email stating that their AmeriCorps position had been eliminated and that they would be put on administrative leave for two weeks and terminated on May 20. *Id.* ¶ 6, Attachment A.

Nonprofit Plaintiffs were advised by email from Defendant Bastress Tahmasebi that their grants were being terminated under 2 C.F.R. § 200.340(a)(4) because the agency had determined

the awards "no longer effectuate[] agency priorities." *See, e.g.*, ECF No. 25-15 (Ex. 13, Barron Decl.) at Attachment A. The messages stated the decision to terminate the grants was final and not subject to administrative appeal, required grant recipients to notify subrecipients and community partners and begin internal closeout procedures, and ordered immediate cessation of all grant activities. *See, e.g.*, *id.* Subgrantees of State Service Commissions received similar notices from their respective commissions, confirming that AmeriCorps had terminated the states' grants under 2 C.F.R. § 200.340(a)(4) and directing the subgrantees to wind down their programs. *See, e.g.*, *id.* at Attachment C. Grantees were informed that their AmeriCorps participants were prohibited from reporting to their projects or working on project-related activities. *See, e.g.*, ECF No. 25-10 (Ex. 8, Berger Decl.), ¶ 10, Attachment B.

### 3.  Elimination of AmeriCorps Staff

On April 16, 2025, Defendants placed over 600 AmeriCorps employees—amounting to approximately 85% of the staff—on administrative leave and instructed them to immediately stop working. ECF No. 25-17 (Ex. 15, Daly Decl.), ¶¶ 17, 18. Defendants locked the employees out of the AmeriCorps systems, including email, and barred them from AmeriCorps' offices. *Id.* ¶ 14, Attachment A; ECF No. 25-22 (Ex. 20, AmeriCorps Emp. 2 Decl.), ¶ 8. On April 25, 2025, AmeriCorps sent RIF notices to nearly all employees on administrative leave, informing them that they would be "separated from the Federal service effective Tuesday, June 24, 2025." ECF No. 25-17 (Ex. 15, Daly Decl.), ¶ 16, Attachment C. About 88% of the 419-member union for AmeriCorps employees, Plaintiff Local 2027, received RIF notices. *Id.* ¶ 17. At the time Plaintiffs' motion was filed, there were only 116 AmeriCorps employees remaining on active employment status nationwide. *Id.* ¶ 17. Plaintiffs contend that the remaining AmeriCorps staff members lack sufficient resources to keep AmeriCorps functioning as required by statute. *Id.* ¶¶ 18–20. For

example, the single "Trust Officer" left at AmeriCorps is now responsible for processing up to 29,801 AmeriCorps participants' education awards. *Id.* ¶ 19.

### E. Plaintiffs' Complaint and Motion for Preliminary Injunctive Relief

Plaintiffs are a coalition of fourteen nonprofit organizations ("Nonprofit Plaintiff"), one labor union, and three individual participants in AmeriCorps programs. The Nonprofit Plaintiffs operate AmeriCorps programs, support numerous AmeriCorps members, and receive millions of dollars in AmeriCorps grants and subgrants. They use AmeriCorps funding and participants to help prepare students for high school and college; connect students with higher education opportunities; provide teachers to underfunded indigenous school districts; provide education and guidance to low-income families seeking housing assistance and access to affordable housing; provide early literacy support for children; advance biodiversity by protecting landscapes; develop civic education and engagement programs for rural communities; create service opportunities focused on education, park and neighborhood revitalization, and workforce development; connect communities to service opportunities; help LGBTQ+ youth find community and safe-spaces; teach college students about civic responsibility; and provide holistic afterschool and summer learning programs at no cost to families. *See generally* ECF Nos. 25-3 through 25-16 (Declarations of representatives of Nonprofit Plaintiffs).

Plaintiff Local 2027 represents a collective bargaining unit of more than 400 AmeriCorps employees who live and work throughout the country, spanning AmeriCorps' entire range of operations. ECF No. 25-17 (Ex. 15, Daly Decl.), ¶¶ 2, 7. Local 2027 is the exclusive representative for a bargaining unit of nonsupervisory employees of AmeriCorps and is statutorily authorized to represent the interests of all AmeriCorps employees in the bargaining unit. *Id.* ¶¶ 6, 9. Local 2027 also provides support, guidance, and resources to its members. *Id.* ¶ 8.

Doe 1, Doe 2, and Doe 3 (collectively, "Individual Plaintiffs") are individual participants in AmeriCorps programs. Doe 1 was an NCCC participant from February 2025 until their termination in April 2025. ECF No. 25-18 (Ex. 16, Doe 1 Decl.), ¶ 2. Doe 1 was working on a service project at Habitat for Humanity in Vermont and preparing for their next service project in Ohio before learning that their service project was terminated and that they must return home immediately. *Id.* ¶¶ 10, 11, 14. Doe 2 was leading a team of fellow NCCC participants to help low-income individuals prepare their taxes when they received notice that their service was terminated and that they must return home immediately. ECF No. 25-19 (Ex. 17, Doe 2 Decl.), ¶¶ 2, 9. Doe 3 was a VISTA participant placed through Nonprofit Plaintiff North Carolina Housing Coalition to work at a local housing counseling agency, a nonprofit organization in Fayetteville, North Carolina, that helps first-time homebuyers with foreclosure prevention services and HUD-certified counseling. ECF No. 25-20 (Ex. 18, Doe 3 Decl.), ¶¶ 2–3. Doe 3 engaged directly with community members on a daily basis, answering 25 to 75 calls per day and helping community members access resources. *Id.* ¶ 3. Doe 3 began their VISTA service on a one-year commitment, before receiving an email stating that their VISTA program would be terminated after May 20, 2025, and that they should seek reassignment. *Id.* ¶ 8; *id.* at 6–7. Doe 3 has been unable to find any other program accepting VISTA participants as a result of Defendants' cuts. *Id.* ¶ 8.

On May 5, 2025, Plaintiffs filed a six-count Complaint seeking declaratory and injunctive relief against Defendants. The first four counts assert claims for violations of the APA. ECF No. 1 (Complaint), ¶¶ 142–65. Count Five asserts a claim for a violation of the separation of powers and ultra vires actions. *Id.* ¶¶ 166–72. These first five counts are asserted against all Defendants. *Id.* ¶¶ 142–72. Count Six asserts a claim for a violation of the Appointments Clause against Defendants Bastress Tahmasebi and Cavanaugh. *Id.* at 47–48.

Two weeks later, Plaintiffs filed a motion for preliminary injunction, pursuant to Federal Rule of Civil Procedure 65, seeking a court order enjoining Defendants from taking further actions to dismantle AmeriCorps, including placing additional AmeriCorps staff on administrative leave; issuing RIF notices or terminating the employment of other AmeriCorps staff, pausing, cancelling, or stopping payment on, or otherwise terminating grants, subgrants, or contracts that were in effect prior to April 15, 2025; and terminating, pausing, cancelling, stopping payment on, or otherwise interfering with NCCC projects that were in effect prior to April 15, 2025. ECF No. 25-2 (Pl. Proposed Order). Additionally, Plaintiffs seek an order directing Defendants to "take all necessary steps to return AmeriCorps, its employees, its grantees, and its program participants to their status prior to April 15, 2025," including by reinstating employees previously placed on administrative leave; rescinding RIF notices; not effectuating terminations pursuant to the RIF notices; reinstating all NCCC projects, AmeriCorps grants, subgrants, contracts, and other funding; immediately restoring access to offices, computer systems, and email; returning NCCC participants to active service; and complying with statutes and appropriations that require AmeriCorps to carry out programs and award grants. *Id.*

Plaintiffs' central claim in this litigation is that Defendants have begun dismantling AmeriCorps by slashing resources and abruptly ending the service of AmeriCorps participants, in violation of the APA, the separation of powers, and the Appointments Clause. *See generally* ECF No. 25-1 (Pl. Mem.). Plaintiffs argue that the Executive Branch lacks the authority to disregard Congressional commands that AmeriCorps perform statutorily mandated functions with appropriated funds. *Id.* at 8. Specifically, Plaintiffs contend, Defendants have unilaterally ended programs, impounded appropriations, and cut staffing to a level where compliance with statutory directives is impracticable. *Id.* Even if Defendants could lawfully take these actions, Plaintiffs

16

argue that the APA prohibits them from doing so without explanation and compliance with prescribed procedures. *Id.*

## II.    DISCUSSION

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 376, 172 L. Ed. 2d 249 (2008). Preliminary injunctive relief "involv[es] the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272 (4th Cir. 2002) (quoting *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001)). Awarding this extraordinary remedy thus requires "a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22, 129 S. Ct. at 375–76. To prevail on a motion for a preliminary injunction, a plaintiff must demonstrate (1) that it is likely to succeed on the merits of its claims, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of the equities tips in its favor, and (4) that an injunction is in the public interest. *Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023) (citing *Winter*, 555 U.S. at 20, 129 S. Ct. at 374). The third and fourth *Winter* factors are assessed "in tandem when the government . . . is the opposing party." *Id.* at 368 (citing *Winter*, 555 U.S. at 26, 129 S. Ct. at 378).

### A.  Likelihood of Success on the Merits

Defendants argue that Plaintiffs cannot establish a likelihood of success on the merits for various reasons. Defendants first offer two jurisdictional arguments, that any challenges to grant terminations are subject to the Tucker Act and must be heard by the Court of Federal Claims, and that any challenges to the RIFs and employee removals are subject to the Civil Service Reform Act ("CSRA") and must be channeled to the appropriate administrative agency. ECF No. 33 (Def. Mem.) at 7–18. Moving onto Plaintiffs' APA claims, Defendants argue that those claims are

unlikely to succeed because there was no discrete, final agency action, *id.* at 18–23, staffing determinations are committed to agency discretion, *id.* at 23–27, and there was no statutory notice and comment requirement, *id.* at 27–29.

### 1. Standing

Defendants challenge Nonprofit Plaintiffs' standing to assert claims and seek injunctive relief based on injuries "stemming from the disbursement of National and State grants (as the presumptive recipients of subgrants made therefrom)." ECF No. 33 (Def. Mem.) at 30. The Court is not persuaded by this challenge to Nonprofit Plaintiffs' standing. Notably, Nonprofit Plaintiffs are challenging the cancellation of grants and subgrants *they were already receiving*—not merely funding they might presumptively receive in the future. And, as explained below, they have made a clear showing that the cancellation of the grants and subgrants has injured them, and they may obtain redress in this Court.

To establish standing, a plaintiff must show three elements: injury, traceable to the defendant's conduct, and that a court can provide adequate redress for that injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992). The injury "must be concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 133 S. Ct. 1138, 1147, 185 L. Ed. 2d 264 (2013) (internal quotation marks and citation omitted). When there are multiple plaintiffs in a single action, only "one plaintiff must demonstrate standing for each claim and form of requested relief." *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018) (citing *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439–40, 137 S. Ct. 1645, 1651, 198 L. Ed. 2d 64 (2017)).

"Associations can allege standing based upon two distinct theories:" (1) associational standing, which allows an organization to sue "as the representative of its members who have been

harmed[;]" and (2) organizational standing, which allows a group to sue on its own behalf. *Md. Highway Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1250 (4th Cir. 1991); *see also Equal Rights Ctr. v. Abercrombie & Fitch Co.*, 767 F. Supp. 2d 510, 518 (D. Md. 2010); *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343, 97 S. Ct. 2434, 2441, 53 L. Ed. 2d 383 (1977).

Thirteen of the fourteen Nonprofit Plaintiffs have had an AmeriCorps grant or subgrant terminated, lost AmeriCorps participants, and lost access to data and support provided by AmeriCorps staff. The final Nonprofit Plaintiff, National College Attainment Network, is comprised of dozens of member organizations that have lost AmeriCorps grants or subgrants, including Plaintiff Michigan College Access Network. ECF No. 25-7 (Ex. 5, Cook Decl.), ¶¶ 9–16; ECF No. 25-8 (Ex. 6, Fewins-Bliss Decl.), ¶¶ 6–9.[4] The losses of AmeriCorps grants and subgrants have damaged Nonprofit Plaintiffs' ability to carry out their core missions. *See, e.g.*, ECF No. 25-4 (Ex 2, Giorlando Decl.), ¶ 8 (Red Cloud "no longer ha[s] funding to bus children to and from after school programs or funding to provide academic testing to assess student growth in literacy and math."); ECF No. 25-6 (Ex. 4, Harker Decl.), ¶¶ 7–9 (Partners for Campus-Community Engagement "immediately cease[d] all ongoing events, programming, and upcoming VISTA projects," including, among others, development of a rural health network, a program to help seniors stay in their homes, and the launch of a food pantry); ECF No. 25-7 (Ex. 5, Cook Decl.), ¶¶ 12–16 (describing National College Attainment Network members who have cut college access programs or expect to do so); ECF No. 25-8 (Ex. 6, Fewins-Bliss Decl.), ¶ 9 ("As a result of the terminations, [the Michigan College Access Network] ha[s] been forced to cancel all of our

---

[4] The Court finds that National College Attainment Network has associational standing because (1) "its members would have standing to sue as individuals;" (2) "the interests it seeks to protect are germane to the organization's purpose;" and (3) "the suit does not require the participation of individual members." *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 99 (4th Cir. 2011) (citing *Hunt*, 432 U.S. at 343, 97 S. Ct. at 2441).

direct services work . . . ."); ECF No. 25-10 (Ex. 8, Berger Decl.), ¶ 12 ("[T]he terminations [at the Housing and Community Development Network of New Jersey] are making it impossible to operate our intake program for people trying to avoid or solve a housing crisis. We don't have the staff to answer the Housing Help hotline . . . . We can't process applications for the state's utility assistance program . . . ."); ECF No. 25-12 (Kellar Decl.), ¶ 9 (upon receiving grant termination email, Democracy Maine "immediately ceased planning for an expansion of the civic engagement program."). Many of the Nonprofit Plaintiffs must lay off staff, without whom they will be unable to carry out critical activities. *See, e.g.*, ECF No. 25-6 (Ex. 4, Harker Decl.), ¶ 12; ECF No. 25-8 (Ex. 6, Fewins-Bliss Decl.), ¶ 9; ECF No. 25-11 (Ex. 9, Cholewa Decl.), ¶ 13; ECF No. 25-13 (Ex. 11, Sarata Decl.), ¶ 15; Ex. 13, ECF No. 25-15 (Barron Decl.), ¶ 7; ECF No. 25-16 (Ex. 14, Fynboh Decl.), ¶ 7. Some Nonprofit Plaintiffs have lost as much as 50% of their operating budgets. *See, e.g.*, ECF No. 25-7 (Ex. 5, Cook Decl.), ¶ 11; ECF No. 25-11 (Ex. 9, Swope Cholewa Decl.), ¶ 5; ECF No. 25-13 (Ex. 11, Sarata Decl.), ¶ 6; Ex. 13, Barron Decl. ¶ 4.

In short, Nonprofit Plaintiffs have been injured in their ability to operate and perform core activities, and these injuries are traceable directly to Defendants' actions—not decisions made by third parties. *See, e.g.*, *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395, 144 S. Ct. 1540, 1564, 219 L. Ed. 2d 121 (2024) (standing found where challenged actions "directly affected and interfered with [nonprofit's] core business activities," although not where an organization merely "diverts its resources in response to a defendant's actions"). Nonprofit Plaintiffs' injuries are traceable to Defendants' actions in terminating grants and subgrants, closing AmeriCorps programs, and placing AmeriCorps staff on leave while instituting RIFs. This Court can redress these harms by enjoining Defendants' actions under the APA. Therefore, Nonprofit Plaintiffs have established standing to challenge Defendants' grant and subgrant terminations. The Supreme

Court's precedents permit Nonprofit Plaintiffs to establish standing even where they are harmed by Defendants' actions indirectly and based on a predictable series of events. *See, e.g.*, *Dep't of Com. v. New York*, 588 U.S. 752, 768 , 139 S. Ct. 2551, 2566, 204 L. Ed. 2d 978 (2019) (standing may "rel[y] . . . on the predictable effect of Government action on the decisions of third parties."); *Bennett v. Spear*, 520 U.S. 154, 169, 117 S. Ct. 1154, 1164, 137 L. Ed. 2d 281 (1997) (explaining that while injury cannot be based on independent action of a third-party not before the court, "that does not exclude injury produced by determinative or coercive effect upon the action of someone else."); *Warth v. Seldin*, 422 U.S. 490, 504–05, 95 S. Ct. 2197, 2208, 45 L. Ed. 2d 343 (1975) "([T]he fact that the harm to petitioners may have resulted indirectly does not in itself preclude standing.").[5]

### 2. Tucker Act

Defendants argue that this Court lacks jurisdiction over Plaintiffs' challenges to the termination of AmeriCorps grants because the Tucker Act vests exclusive jurisdiction over such claims in the Court of Federal Claims. ECF No. 33 (Def. Mem.) at 8–15. "The United States is immune from suit unless it unequivocally consents." *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 322, 140 S. Ct. 1308, 1327, 206 L. Ed. 2d 764 (2020). The Tucker Act grants the Court of Federal Claims exclusive jurisdiction "to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States . . . ." 28

---

[5] Plaintiff Local 2027 ("Union Plaintiff") establishes each of the required elements for both organizational and associational standing. Union Plaintiff asserts injury on behalf of the AmeriCorps employees who received RIF notices, ECF No. 25-17 (Ex. 15, Daly Decl.), ¶¶ 15–17, and as an organization based on impending direct financial harm because of lower membership and lower dues, *id.* ¶ 33. The harm experienced by Union Plaintiff is traceable to Defendants' actions in response to the Executive Orders calling for RIFs. And this Court can redress those harms by vacating Defendants' actions under the APA. Therefore, the Court finds that Union Plaintiff has standing to challenge the RIFs. *See Am. Fed'n of Gov't Emps. v. Trump*, No. 25-CV-03698-SI, 2025 WL 1482511 (N.D. Cal. May 22, 2025), *stay denied*, No. 25-3293, 2025 WL 1541714 (9th Cir. May 30, 2025).

U.S.C. § 1491(a)(1). This issue has been before judges of this Court, and others, frequently over the last few months, including at least two cases challenging cancellation of AmeriCorps grants: *Maryland v. AmeriCorps*, 2025 WL 1585051, and *La. Delta Serv. Corps v. Corp. for Nat'l & Community Serv.*, Civ. No. 25-378-JWD-RLB, 2025 WL 1787429 (M.D. La. June 27, 2025). This Court is persuaded by the careful and thorough analyses of Judge Boardman in *Maryland v. AmeriCorps*, Judge John W. deGravelles in *Louisiana Delta Service Corps*, and Judge Adam B. Abelson in *Green & Healthy Home Initiatives, Inc. v. EPA*, Civ. No. ABA-25-1096, 2025 WL 1697463, at *12–15 (D. Md. June 17, 2025). The Court finds the reasoning set forth in these opinions to be applicable here. The Tucker Act does not bar this Court's exercise of jurisdiction over Plaintiffs' APA and constitutional claims.

A civil action against the United States falls within the ambit of the Tucker Act when it is a contract action in essence. *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). Whether an action is a contract action "at its essence" depends on: (1) "the source of the rights upon which the plaintiff bases its claims," and (2) "the type of relief sought." *Id.* In performing this analysis, a court "must look beyond the form of the pleadings to the substance of the claim." *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 480 F.3d 1116, 1124 (Fed. Cir. 2007). If a plaintiff's claims are essentially contractual, they must seek relief in the Court of Federal Claims. *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1102 (D.C. Cir. 2022) (citing *Megapulse*, 672 F.2d at 967).

At the first step, determining the source of the rights, the court "considers whether, among other factors, the plaintiffs' asserted rights and the government's purported authority arise from statute," "whether the plaintiffs' rights exist prior to and apart from rights created under the contract," and "whether the plaintiffs seek to enforce any duty imposed upon the government by

the relevant contracts to which the government is a party." *Id.* at 1107 (citation modified) (first quoting *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985); and then quoting *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017)).

These considerations weigh in Plaintiffs' favor. At base, the source of the legal rights upon which Plaintiffs base their claims are federal constitutional and statutory provisions. Plaintiffs assert rights arising from federal laws that AmeriCorps allegedly violated when it terminated grants, terminated NCCC and VISTA participants without cause, and shut down the NCCC. Specifically, Plaintiffs allege violations of the APA, separation of powers, statutes and regulations that govern AmeriCorps, and the notice-and-comment rulemaking requirement in the 2024 and 2025 Appropriations Acts—not individual contracts. *See Maryland v. AmeriCorps*, 2025 WL 1585051, at *23 ("The States allege that AmeriCorps did not comply with, among other statutory provisions, the notice-and-comment rulemaking requirement in the 2024 Appropriations Act and the 2025 Appropriations Act.[ ] The right asserted—to participate in notice-and-comment rulemaking prior to significant changes to AmeriCorps' program requirements, service delivery or policy—is separate and apart from any rights that States have under the grants."); *La. Delta Serv. Corps*, 2025 WL 1787429, at *19 ("The rights [plaintiff] asserts—to a notice and hearing prior to termination, to the right to appeal termination, to termination only for the reasons stated in AmeriCorps regulations or Uniform Guidance regulations—are rights that arise not from the alleged contract (that is, the terms and conditions of the grant), but from statute and regulations.").

Defendants argue that Plaintiffs' claims are essentially contractual because, in part, Nonprofit Plaintiffs' purported entitlement to funds arises from grant agreements, ECF No. 33 (Def. Mem.) at 13–14, and Individual Plaintiffs seek to recover the full benefit of their program participation agreements with AmeriCorps, *id.* at 15. But mere reference to contractual terms is

not determinative. "Contract issues may arise in various types of cases where the action itself is

not founded on a contract." *Megapulse*, 672 F.2d at 968; *see also Normandy Apartments, Ltd. v.*

*U.S. Dep't of Hous. & Urb. Dev.*, 554 F.3d 1290, 1300 (10th Cir. 2009) ("When the source of

rights asserted is constitutional, statutory, or regulatory in nature, the fact that resolution of the

claim requires some reference to contract does not magically 'transform [the] action . . . into one

on the contract and deprive the court of jurisdiction it might otherwise have.'") (quoting

*Megapulse*, 672 F.2d at 968); *Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1083–84

(10th Cir. 2006) ("[L]itigants may bring statutory and constitutional claims in federal district court

even when the claims depend on the existence and terms of a contract with the government.")

(citation omitted); *Green & Healthy Home Initiatives*, 2025 WL 1697463, at *12.

Here, Plaintiffs' claims are not founded on individual contracts, but instead assert

constitutional, statutory, and regulatory violations. Specifically, Plaintiffs' Complaint alleges that

Defendants acted arbitrarily and capriciously by categorically terminating grants, shutting down

the NCCC, and instituting RIFs (Count 1); acted in excess of statutory authority by unilaterally

ceasing statutorily mandated functions (Count 2); unreasonably withheld agency action by cutting

Congressionally mandated programs and withholding appropriated funds (Count 3); failed to

observe procedures required by statute and regulation by making significant changes to program

requirements, service delivery, or policy without notice-and-comment rulemaking (Count 4); and

acted ultra vires and in excess of authority under Article II by terminating statutorily mandated

programs, eliminating necessary staff, and halting the disbursement of funds (Count 5). ECF No.

1 (Complaint), ¶¶ 141–72. In their essence, Plaintiffs' claims are not founded upon Defendants'

failure to comply with contractual terms of grant agreements, any duty owed under the grant

agreements, or any breach of individual grant agreements. Moreover, the purported authority

Defendants cited in their notices terminating the grants was a federal regulation: 2 C.F.R. § 200.340(a)(4), which generally permits termination of an award "if [it] no longer effectuates the program goals or agency priorities." *See, e.g.*, ECF No. 25-15 (Ex. 13, Barron Decl.) at Attachment A. Contractual terms particular to each individual grant are not necessary to sustain Plaintiff's claims or Defendants' apparent defenses. *See Maryland v. AmeriCorps*, 2025 WL 1585051, at *23 ("The grant terms are simply not relevant to this case at all."). "[I]t would be quite extraordinary to consider Plaintiffs' claims to sound in breach of contract when they do not at all depend on whether the terms of particular awards were breached—they instead challenge whether the agency action here was unlawful, irrespective of any breach." *Aids Vaccine Advocacy Coal. v. Dep't of State*, 770 F. Supp. 3d 121, 137 (D.D.C. 2025), *stay denied*, 145 S. Ct. 753 (2025) (mem.).

In sum, the source of the rights upon which Plaintiffs' claims are founded are constitutional, statutory, and regulatory provisions—not individual contracts. *See Green & Healthy Home Initiatives*, 2025 WL 1697463, at *12 (in a case involving EPA grant terminations, "this Court concludes that, under these facts, Plaintiffs are not alleging violations of the terms of the grants, but instead are asserting constitutional, statutory, and regulatory violations"); *Maryland v. AmeriCorps*, 2025 WL 1585051, at *23 (in a case involving AmeriCorps grant terminations, "the Court finds that the sources of the States' rights on which they base their claims are federal statutes, not the grants"); *La. Delta Serv. Corps*, 2025 WL 1787429, at *20 (finding, in a case challenging cancellation of AmeriCorps grant, "that the source of the rights Plaintiff asserts arises in statute, not contract"); *Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985) ("Maryland's claims ar[o]se under a federal grant program and turn[ed] on the interpretation of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties.").

The second step of the *Megapulse* inquiry requires the court to determine whether the type of relief sought is contractual in essence. "The crux of this inquiry . . . boils down to whether the plaintiff effectively seeks to attain monetary damages in the suit." *Crowley*, 38 F.4th at 1107. Defendants argue that the Court of Federal Claims has jurisdiction over this case because Plaintiffs' claims challenge the termination of grants and individual awards and that their requested relief is "reopening the spigot of grant disbursements." ECF No. 33 (Def. Mem.) at 14–15. Plaintiffs argue that this Court retains jurisdiction because they seek equitable relief "clarifying the parties' relationship going forward" and, specifically, that Individual Plaintiffs seek the resumption of their service terms, not money damages. ECF No. 37 (Pl. Reply) at 3–4.

"To determine whether a plaintiff seeks primarily injunctive relief such that a district court has jurisdiction over his claim, courts must look to the 'essence' of the complaint and whether the relief requested is 'not . . . an incident of, or collateral to, a monetary award.'" *Coleman v. Kendall*, 74 F.4th 610, 615–16 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 818, 218 L. Ed. 2d 29 (2024) (quoting *Randall v. United States*, 95 F.3d 339, 347 (4th Cir. 1996)). "A plaintiff does not 'in essence' seek monetary relief, however, merely because he or she hints at some interest in a monetary reward from the federal government or because success on the merits may obligate the United States to pay the complainant." *Maryland v. AmeriCorps*, 2025 WL 1585051, at *24 (quoting *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995)). "Still, 'Claims Court jurisdiction cannot be avoided by framing an essentially monetary claim in injunctive or declaratory terms.'" *Id.* (quoting *Portsmouth Redev. & Hous. Auth. v. Pierce*, 706 F.2d 471, 474 (4th Cir. 1983)).

The Supreme Court's decision in *Bowen v. Massachusetts*, 487 U.S. 879, 108 S. Ct. 2722, 101 L. Ed. 2d 749 (1988), is applicable here. In *Bowen*, the Supreme Court explained that not all suits involving the payment of money are for money damages. *Id.* at 893, 108 S. Ct. at 2731 ("First,

insofar as the complaints sought declaratory and injunctive relief, they were certainly not actions for money damages. Second, and more importantly, even the monetary aspects of the relief that the State sought are not 'money damages' as that term is used in the law."). An action at law for damages is "intended to provide a victim with monetary compensation for an injury to his person, property, or reputation." *Id.* at 893, 108 S. Ct. at 2732. An action for specific equitable relief, in contrast, may seek "an order providing for the reinstatement of an employee with backpay, or for 'the recovery of specific property or monies, ejectment from land, or injunction either directing or restraining the defendant officer's actions.'" *Id.* at 893, 108 S. Ct. at 2732 (quoting *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 688, 69 S. Ct. 1457, 1460, 93 L. Ed. 1628 (1949)). "The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Id.*

Here, the relief sought is not monetary damages; it is equitable relief. Plaintiffs "do not seek money as a substitute for a loss . . . or 'specific sums already calculated, past due, and designed to compensate for completed labors.'" *Maryland v. AmeriCorps*, 2025 WL 1585051, at *25 (quoting *Me. Cmty. Health Options*, 590 U.S. at 327, 140 S. Ct. at 1331). Instead, Plaintiffs seek a declaratory judgment that Defendants' "decision to dismantle AmeriCorps" was unlawful and violated the APA, the separation of powers, the Appointments Clause. ECF No. 1 (Complaint) at 48–49. Plaintiffs further seek an injunction against Defendants "effectuating the decision to dismantle AmeriCorps and order[ing] Defendants to restore all AmeriCorps programs, grants, contracts, Participants, and staff to their status as of April 14, 2025[.]" *Id.* Notably, an injunction restoring AmeriCorps grants and programs, and restoring participants to their service terms and employees to their positions, will not only involve the disbursement of funds but the provision of services by AmeriCorps program participants and staff members. That Plaintiffs' requested relief

will "require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Maryland v. AmeriCorps*, 2025 WL 1585051, at *25 (quoting *Bowen*, 487 U.S. at 893, 108 S. Ct. at 2732).

Many other courts faced with similar claims have concluded that such claims are not contractual in essence and, therefore, are not governed by the Tucker Act. *See Green & Healthy Home Initiatives*, 2025 WL 1697463, at *13 (holding that Tucker Act does not apply to claims that EPA violated APA by terminating certain grants); *Maryland v. AmeriCorps*, 2025 WL 1585051, at *1, 23, 25 (holding that Tucker Act does not apply to claim that AmeriCorps violated APA when it terminated grants); *La. Delta Serv. Corps*, 2025 WL 1787429, at *20 (finding plaintiff's request for an injunction against AmeriCorps' grant termination as unlawful under the APA, the Appropriations Clause, and the Fifth Amendment to be "the exact type of requests for specific relief that the Supreme Court described in *Bowen*."); *S. Educ. Found. v. U.S. Dep't of Educ.*, 2025 WL 1453047, at *5–11 (D.D.C. May 21, 2025) (holding that district court had jurisdiction over APA and non-APA claims arising out of federal grant terminations); *Climate United Fund v. Citibank, N.A.*, No. 25-CV-698 (TSC), 2025 WL 1131412, at *9–12 (D.D.C. Apr. 16, 2025) (holding Tucker Act did not apply to claims that EPA violated the APA and Constitution by terminating grants); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 1:25-CV-00097-MSM-PAS, 2025 WL 1116157, at *14 (D.R.I. Apr. 15, 2025) (holding that Tucker Act did not apply to claims that agencies violated the APA by freezing certain grants and contracts under two statutes); *Chicago Women in Trades v. Trump*, No. 25 C 2005, 2025 WL 1114466, at *8-10 (N.D. Ill. Apr. 14, 2025) (holding that Tucker Act did not apply to claims that Department of Labor had violated Constitution by terminating certain grants and contracts); *Maine v. United States Dep't of Agric.*, No. 1:25-CV-00131-JAW, 2025 WL 1088946, at *19 (D. Me. Apr. 11,

2025) (holding that Tucker Act did not apply to claims challenging agencies' "compliance with the APA"); *Pacito v. Trump*, No. 2:25-CV-255-JNW, 2025 WL 1077401, at *3 (W.D. Wash. Apr. 9, 2025) (holding that Tucker Act did not apply to claims challenging termination of funding for United States Refugee Assistance Program because "Plaintiffs here assert rights derived from statutory mandates, not contractual promises, and seek equitable enforcement of statutory obligations, not contractual remedies");[6] *Normandy Apartments*, 554 F.3d at 1296–1300 (holding that Tucker Act did not apply where plaintiff sought injunctive relief against HUD's "attempts to terminate Housing Assistance Payments").

In urging this Court to find that the Tucker Act applies to Plaintiffs' claims, Defendants rely primarily upon stay orders recently entered by the Supreme Court in *Department of Education v. California*, 145 S. Ct. 966, 221 L. Ed. 2d 515 (2025), and the Fourth Circuit in *American Association of Colleges for Teacher Education v. McMahon*, No. 25-1281, 2025 WL 1232337 (4th Cir. Apr. 10, 2025).[7] Importantly, each stay order "simply stays the District Court's injunction *pending a ruling on the merits*[;]" neither stay order is itself a ruling on the merits. *Merrill v. Milligan*, 142 S. Ct. 879 (2022) (Kavanaugh, J., concurring). In *Department of Education v. California*, the Supreme Court ordered the stay of a temporary restraining order that had, among other things, enjoined the government from terminating various education-related grants and required the government to pay out past-due grant obligations. 145 S. Ct. at 968. The Court found that the government was "likely to succeed in showing the District Court lacked jurisdiction to

---

[6] The Ninth Circuit entered a partial stay of the district court's order. *See Pacito v. Trump*, No. 25-1313, 2025 WL 1325305 (9th Cir. Mar. 25, 2025), *opinion clarified*, No. 25-1313, 2025 WL 1325306 (9th Cir. Apr. 21, 2025).

[7] After Defendants filed their response brief, the Fourth Circuit issued another stay order in *Sustainability Institute v. Trump*, No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025), granting a stay of an injunction based on the Supreme Court's order in *California*. The appellees in *Sustainability Institute* petitioned for rehearing *en banc* on June 10, 2025. *Sustainability Institute*, No. 25-1575, ECF No. 43.

order the payment of money under the APA." *Id.* Importantly, the emergency stay order "did not overrule *Bowen*[,]" *La. Delta Serv. Corps*, 2025 WL 1787429, at \*22; it reaffirmed *Bowen*. The Court recognized that, under *Bowen*, "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Dep't of Ed. v. California*, 145 S. Ct. at 968 (quoting *Bowen*, 487 U.S. at 910, 108 S. Ct. at 2740). Nonetheless, the Court reasoned that the "APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here." *Id.* (quoting *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212, 122 S. Ct. 708, 714, 151 L. Ed. 2d 635 (2002)).

The Court's reasoning in *Department of Education v. California* does not apply to the instant case. "Here, Plaintiffs do not seek to 'enforce a contractual obligation to pay money,' but rather seek a declaratory judgment that [AmeriCorps] has violated the Administrative Procedures Act and the Constitution, and relief including an order that [AmeriCorps] reinstate the terminated grants based on [AmeriCorps'] statutory and constitutional obligations." *Green & Healthy Home Initiatives*, 2025 WL 1697463, at \*14; *see also Maryland v. AmeriCorps*, 2025 WL 1585051, at \*27 ("[T]he [plaintiffs] seek prospective relief, rather than 'money as compensation for loss suffered.' . . . The only appropriate remedy for the alleged violation of the notice-and-comment requirement is to restore the AmeriCorps programs, including both the grant funding and members, until the agency conducts notice-and-comment rulemaking. The Court of Federal Claims cannot award this prospective relief . . . . Even if 'monetary consequences will flow through the [grants],' the Tucker Act is not the proper avenue of relief.") (internal citations omitted). *Department of Education v. California* is factually distinguishable. In that case, "the terms and conditions of each individual grant award [we]re at issue." *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96–97 (1st

Cir. 2025). Here, in contrast, "neither party relies on the terms and conditions of individual grant awards to either raise or defend against the legal challenge." *Maryland v. AmeriCorps*, 2025 WL 1585051, at *27. Plaintiffs "do not seek pay out for past-due grant obligations or enforcement of a contractual obligation to pay money." *Id.* "And here, the appropriate relief is not an order requiring the defendants 'to pay out past-due grant obligations and to continue paying obligations as they accrue.'" *Id.* (quoting *Department of Education v. California*, 145 S. Ct. at 968). Instead, Plaintiffs seek prospective remedies for Defendants' violation of constitutional provisions and statutory obligations. *Id.*

Defendants' reliance on other recent cases fares no better. *See* ECF No. 33 (Def. Mem.) at 9–10, 14–15 (citing *U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155 (D.D.C. 2025), *dismissed sub nom. United States Conf. of Cath. Bishops v. United States Dep't of State*, No. 25-5066, 2025 WL 1350103 (D.C. Cir. May 2, 2025), and *Sols. in Hometown Connections v. Noem*, Civ. No. LKG-25-885, 2025 WL 1103253 (D. Md. Apr. 14, 2025)). In both of those cases, the relief sought was found to be "money damages" akin to the specific past due sums sought in *Maine Community Health Options*, 590 U.S. at 327, 140 S. Ct. at 1331. *See Sols. in Hometown Connections*, 2025 WL 1103253, at *7, *13; *U.S. Conf. of Cath. Bishops*, 770 F. Supp. 3d at 163. Here, Plaintiffs do not seek reimbursement for expenses incurred or money damages "to substitute for a suffered loss." *Bowen*, 487 U.S. at 895, 108 S. Ct. at 2732 (quoting *Md. Dep't of Hum. Res.*, 763 F.2d at 1446) (emphasis omitted). This Court is similarly not constrained by the Fourth Circuit motions panel decision in *Sustainability Institute* and is instead, bound by *Bowen*, a precedential decision rendered on the merits. *See Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484, 109 S. Ct. 1917, 1921–22, 104 L. Ed. 2d 526 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions,

the [lower courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); *NetChoice, LLC v. Paxton*, 142 S. Ct. 1715, 1716, 213 L. Ed. 2d 1010 (2022) (Alito, J., dissenting) ("Members of this Court have argued that a determination regarding an applicant's likelihood of success must be made under 'existing law[.]'") (citing *Merrill* v. *Milligan*, 142 S. Ct. 879, 882 (2022) (Roberts, C. J., dissenting), and *Wisconsin Legislature* v. *Wisconsin Elections Commission*, 142 S. Ct. 1245, 1251 (2022) (Sotomayor, J., dissenting).

In sum, this Court finds that Plaintiffs' claims are for forward-facing equitable relief founded upon constitutional and statutory violations—and are not, in essence, claims for money damages based on contractual rights. Therefore, the Tucker Act does not apply. Plaintiffs' claims are, instead, subject to the APA's waiver of sovereign immunity. *See* 5 U.S.C. § 702 (providing that "[t]he United States may be named as a defendant in [an APA action]"). Accordingly, as Judge Boardman concluded in *Maryland v. AmeriCorps* and Judge Abelson concluded in *Green & Healthy Home Initiatives*, this Court finds that it has jurisdiction over Plaintiffs' claims. *See Green & Healthy Home Initiatives*, 2025 WL 1697463, at *15; *Maryland v. AmeriCorps*, 2025 WL 1585051, at *28.

### 3. Administrative Channeling

Defendants argue that this Court lacks jurisdiction over Plaintiffs' employment-related claims because the CSRA, Pub. L. No. 95-454, § 701, 92 Stat. 1111, 1191–216 (1978) (codified at 5 U.S.C. §§ 7101–35), channels these claims to an administrative scheme for relief. This Court finds that it has jurisdiction because Plaintiffs' claims are not of the sort Congress intended to channel for review under the CSRA.

The CSRA "established a comprehensive system for reviewing personnel action taken against federal employees." *United States v. Fausto*, 484 U.S. 439, 455, 108 S. Ct. 668, 677, 98 L.Ed.2d 830 (1988). Under the CSRA, aggrieved "federal employees may obtain administrative and judicial review of specified adverse employment actions," including "removal, suspension for more than 14 days, reduction in grade or pay, or furlough for 30 days or less." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 5–6, 132 S. Ct. 2126, 2130, 183 L.Ed.2d 1 (2012) (citing 5 U.S.C. § 7512). Employees and labor unions may appeal decisions from the administrative body to the federal courts of appeals. 5 U.S.C. §§ 7101 *et seq.*

In *Thunder Basin Coal Company v. Reich*, the Supreme Court set out a two-step framework to assess whether Congress intended to divest the district courts of jurisdiction to hear challenges to federal agency action. 510 U.S. 200, 207–13, 114 S. Ct. 771, 776–79, 127 L. Ed. 2d 29 (1994); *see also Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185–86, 143 S. Ct. 890, 900–01, 215 L. Ed. 2d 151 (2023). First, a court must consider whether there is "fairly discernable" Congressional intent to channel initial review to an administrative body. *Thunder Basin*, 510 U.S. at 207, 114 S. Ct. at 776. In determining whether the statute is intended to preclude judicial review, courts may consider the language, structure, purpose, and legislative history of the statute. *Id.*; *see also Axon*, 598 U.S. at 185, 143 S. Ct. at 900.

If the court answers yes at the first step, it must move on to ask "whether the statutory review scheme, though exclusive where it applies, reaches the claim[s] in question." *Axon*, 598 U.S. at 186, 143 S. Ct. at 900–01. In other words, the court must determine "whether the particular claims brought were 'of the type Congress intended to be reviewed within this statutory structure.'" *Id.* at 186, 143 S. Ct. at 900 (quoting *Thunder Basin*, 510 U.S. at 212, 114 S. Ct. at 779). In considering the second question, courts apply three factors identified in *Thunder Basin*: (1)

whether "precluding district court jurisdiction" would "foreclose all meaningful judicial review of the claim," (2) whether the claim is "wholly collateral to [the] statute's review provisions," and (3) whether the claim is "outside the agency's expertise." *Id.* (quoting *Thunder Basin*, 510 U.S. at 212–13, 114 S. Ct. at 778–79) (alteration in *Axon*). "When the answer to all three questions is yes, 'we presume that Congress does not intend to limit jurisdiction.' . . . But the same conclusion might follow if the factors point in different directions." *Id.* (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489, 130 S. Ct. 3138, 3150, 177 L. Ed. 2d 706 (2010)).

The CSRA's statutory scheme "evince[s] a congressional intent to carve some agency-action claims out of the Court's typical federal-question jurisdiction" and into administrative review. *Maryland v. U.S. Dep't of Agric.*, Civ. No. JKB-25-0748, 2025 WL 973159, at *15 (D. Md. Apr. 1, 2025). The statute provides "for the original and exclusive administrative review of certain labor- and employment-related claims brought by federal employees and/or their unions." *Id.* (citing 5 U.S.C. §§ 7101–35); *see also Maryland v. U.S. Dep't of Agric.*, 770 F. Supp. 3d 779, 803 (D. Md. 2025).

Proceeding to the second step of the *Thunder Basin* analysis, the Court finds that the Nonprofit and Individual Plaintiffs' claims are not "of the type Congress intended to be reviewed within this statutory structure." *Thunder Basin*, 510 U.S. at 212, 114 S. Ct. at 779. The plain text of the CSRA applies only to labor unions and federal employees. *See* 5 U.S.C. § 7103(a)(1) (a "person" is an "individual, labor organization, or agency"); *id.* § 7103(a)(2) (an "employee" is either an individual "employed in an agency" or whose employment "has ceased because of any unfair labor practice," as described in the statute); *id.* § 7103(a)(4) (a "labor organization" is "an organization composed in whole or in part of employees, in which employees participate and pay dues, and which has as a purpose the dealing with an agency concerning grievances and conditions

of employment"). Neither Nonprofit Plaintiffs nor Individual Plaintiffs are federal employees or labor unions who would have access to administrative relief under the CSRA. As noted *supra*, as NCCC and VISTA participants, Individual Plaintiffs are not considered federal employees, except for limited purposes such as tort liability and work-related injuries. 42 U.S.C. §§ 5055(a) (VISTA); 12620 (NCCC).

Though Defendants argue that the CSRA is the "exclusive means for federal employees, applicants, labor unions *and other interested parties* to raise challenges to final, non-discrimination-related, adverse employment actions," ECF No. 33 (Def. Mem.) at 16 (emphasis added), "they do not cite to any authority supporting that 'other interested parties' are subject to the CSRA or define who these 'other interested parties' are," *New York v. McMahon*, Civ. No. 25-10601-MJJ, 2025 WL 1463009, at *19 (D. Mass. May 22, 2025), *stay denied sub. nom. Somerville Pub. Sch. v. McMahon*, 139 F.4th 63 (1st Cir. 2025). *See also Maryland v. U.S. Dep't of Agric.*, 2025 WL 973159, at *15–16 ("For that reason, the Government's citations to various cases for the proposition that the CSRA offers a limited review scheme—a statement with which the Court agrees—ring hollow. Each cited case involved a suit brought by employees or unions over employee or union problems.") (collecting cases).

Because Nonprofit and Individual Plaintiffs are not covered by the CSRA, and their claims cannot be channeled, precluding district court jurisdiction of their claims would "foreclose all meaningful judicial review." *Axon*, 598 U.S. at 186, 143 S. Ct. at 900. Accordingly, this Court retains jurisdiction of these claims.

The more difficult question is whether Plaintiff Local 2027's ("Union Plaintiff") claims must be channeled through the CSRA.[8] To answer this question, the Court must proceed with the second step of the *Thunder Basin* analysis and examine the three *Thunder Basin* factors: (1) whether "precluding district court jurisdiction" would "foreclose all meaningful judicial review of the claim," (2) whether the claim is "wholly collateral to the statute's review provisions," and (3) whether the claim is "outside the agency's expertise." *Axon*, 598 U.S. at 186, 143 S. Ct. at 900 (citation modified); *see also Thunder Basin*, 510 U.S. at 212–13, 114 S. Ct. at 778–79. All three factors weigh in favor of Union Plaintiff and this Court retaining jurisdiction.

First, precluding district court jurisdiction over Union Plaintiff's claims would foreclose meaningful judicial review. The administrative bodies at issue here lack the authority to adjudicate Plaintiffs' APA and constitutional claims. As recently explained by the Ninth Circuit:

> Two administrative bodies established by the CSRA are at issue. First, the Merit Systems Protection Board ("MSPB") reviews claims by federal employees arising out of specific adverse actions taken against them by their employer. 5 U.S.C. §§ 7512 (defining

---

[8] Defendants urge the Court to rely on the Fourth Circuit's recent stay order in *Maryland v. U.S. Department of Agriculture*, No. 25-1248, 2025 WL 1073657 (4th Cir. Apr. 9, 2025). In that case, 19 States and the District of Columbia brought suit against 41 federal executive departments and agencies and their heads, alleging violation of federal law based upon the defendants' mass layoffs of probationary employees. *Id.* at *1. The Fourth Circuit's stay order notes the government's arguments (1) that the plaintiff States lacked Article III standing to challenge the terminations of federal employees; and (2) that "the district court lacked subject-matter jurisdiction because the [CSRA] provides the exclusive means for review of personnel actions taken against federal employees." *Id.* The order then states, "The Government is likely to succeed in showing the district court lacked jurisdiction over Plaintiffs' claims, and the Government is unlikely to recover the funds disbursed to reinstated probationary employees." *Id.* The panel does not explain whether its conclusion was based on Article III standing or channeling under the CSRA. The panel's citations suggest that its conclusion was not based on the CSRA. *See id.* (citing *Dep't of Educ. v. California*, No. 24A910, 2025 WL 1008354, at *1 (U.S. Apr. 4, 2025) (per curiam) (finding government likely to succeed in showing that district court lacks jurisdiction because the claims asserted fall within Tucker Act); *Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps.*, No. 24A904, 2025 WL 1035208, at *1 (U.S. Apr. 8, 2025) (mem.) (entry of administrative stay of preliminary injunction based on lack of standing)); *Somerville Pub. Sch. v. McMahon*, 139 F.4th 63, 70 (1st Cir. 2025) (1st Cir. June 4, 2025) (distinguishing *Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps.*). This Court finds that the First Circuit's decision in *Somerville Public Schools v. McMahon*, 139 F.4th 63, 70 (1st Cir. 2025) and the Ninth Circuit's decision in *American Federation of Government Employees v. Trump*, No. 25-3293, 2025 WL 1541714 (9th Cir. May 30, 2025), to be applicable and persuasive, as explained *infra*.

"[a]ctions covered"), 7513(d) (providing for procedures to appeal
such actions to the MSPB); *see Elgin*, 567 U.S. at 13, 132 S. Ct.
2126, 2134 (noting that the CSRA is applicable when "a covered
employee challenges a covered action"). Second, the Federal Labor
Relations Authority ("FLRA") reviews "issues relating to the duty
to bargain in good faith" and unfair labor practices. 5 U.S.C. §§
7105(a)(2), 7117, 7118. Neither body has the authority to address
the type of constitutional and statutory claims raised by Plaintiffs.

*Am. Fed'n of Gov't Emps. v. Trump*, No. 25-3293, 2025 WL 1541714, at \*3 (9th Cir. May 30,

2025). Although Union Plaintiff and its individual members may be able to challenge individual

personnel decisions in front of those bodies, administrative review "would not obviate the need to

address their constitutional and statutory claims—which, again, allege injury not from this or that

personnel action but from subjection to unlawful executive authority." *Id.* (citation modified)

(quoting *Axon*, 598 U.S. at 195, 143 S. Ct. at 906). *See also New York v. Kennedy*, No. 25-CV-

196-MRD-PAS, 2025 WL 1803260, at \*9 (D.R.I. July 1, 2025) ("Channeling the claims would be

meaningless when 'entire offices and functions are being eliminated from federal agencies.'"

(quoting *Am. Fed'n of Gov't Emps.*, 2025 WL 1541714, at \*5)).

Second, Union Plaintiff's APA and constitutional claims are wholly collateral to the

CSRA's review provisions. As the Ninth Circuit recognized in *American Federation of*

*Government Employees v. Trump*, "[e]ven assuming that the MSPB or FLRA could adjudicate, for

example, an *ultra vires* claim within an individual employment dispute, such a 'constitutional

challenge would be "collateral" to the subject of that proceeding.'" *Id.* at \*4 (quoting *Axon*, 598

U.S. at 188, 143 S. Ct. at 902). *See also Elgin*, 567 U.S. at 25, 132 S. Ct. at 2141 (Alito, J.,

dissenting) ("I doubt that Congress intended to channel petitioners' constitutional claims into an

administrative tribunal that is powerless to decide them[.]").

Third, the APA and constitutional claims at issue here lie beyond the expertise of the MSPB

and FLRA. Union Plaintiff's claims are distinct from the individual employment-related disputes

that those administrative bodies were created to handle. "The heart of this case does not concern whether agencies followed established RIF regulations and procedures—subject matters within the administrative tribunals' expertise—but whether agencies were unlawfully instructed to initiate large-scale RIFs and reorganizations in the first place." *Am. Fed'n of Gov't Emps. v. Trump*, No. 25-CV-03698-SI, 2025 WL 1482511, at *15 (N.D. Cal. May 22, 2025), *stay denied Am. Fed'n of Gov't Emps. v. Trump*, No. 25-3293, 2025 WL 1541714 (9th Cir. May 30, 2025). As the Supreme Court recognized just two years ago, "agency adjudications are generally ill suited to address structural constitutional challenges." *Axon*, 598 U.S. at 195, 143 S. Ct. at 905 (quoting *Carr v. Saul*, 593 U.S. 83, 92 141 S. Ct. 1352, 1360, 209 L. Ed. 2d 376 (2021)). Constitutional challenges "usually fall outside the adjudicators' areas of technical expertise." *Carr*, 593 U.S. at 92, 141 S. Ct. at 1360. *See also, e.g.*, *Free Enter. Fund*, 561 U.S. at 491, 130 S. Ct. at 3151; *Califano v. Sanders*, 430 U.S. 99, 109, 97 S. Ct. 980, 986, 51 L. Ed. 2d 192 (1977); *Weinberger v. Salfi*, 422 U.S. 749, 765, 95 S. Ct. 2457, 2467, 45 L. Ed. 2d 522 (1975). The APA and constitutional claims asserted in the instant case "are more 'structural constitutional challenges' than challenges to the decisions stemming from the employment relationship." *New York v. Kennedy*, 2025 WL 1803260, at *9 (quoting *Carr*, 593 U.S. at 92, 141 S. Ct. 1352). The MSPB and the FLRA do not possess the expertise to adjudicate the claims asserted in this suit.

Lastly, even if Congress intended to channel Plaintiffs' claims, the administrative channels may be presently unavailable due to the firing of two Senate-confirmed members of the MSPB and the agency's Special Counsel. *See Harris v. Bessent*, 2025 WL 1021435, at *2 (D.C. Cir. Apr. 7, 2025) (ordering reinstatement of MSPB member following termination without cause), *administratively stayed sub. nom. Trump v. Wilcox*, No. 24A966, 2025 WL 1063917 (U.S. Apr. 9, 2025) (staying injunction); *Nat'l Ass'n of Immigr. Judges v. Owen*, No. 23-2235, 2025 WL

1560373 (4th Cir. June 3, 2025) (remanding to district court to determine whether the CSRA's adjudicatory scheme is currently functioning in the manner intended by Congress). The CSRA's for-cause termination protections are integral to ensuring the independence of those administrative bodies, *see id.*, and by extension, integral to ensuring meaningful administrative review— the most important *Thunder Basin* factor, *see Bennett v. SEC*, 844 F.3d 174, 183 n.7 (4th Cir. 2016); *Strickland v. United States*, 32 F.4th 311, 376 (4th Cir. 2022) (CSRA should be bypassed when it does not provide a forum for meaningful review).

For these reasons, the Court finds that Plaintiffs are likely to succeed in establishing that their claims are not subject to channeling to administrative review under the CSRA, and that the Court retains jurisdiction.

### 4.    Jurisdiction Over APA Claims

Before turning to address the merits of Plaintiffs' APA claims, the Court must determine whether the claims fall within the scope of the APA's "basic presumption of judicial review." *See Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140, 87 S. Ct. 1507, 1511, 18 L. Ed. 2d 681 (1967). The APA permits judicial review of a "final agency action for which there is no other adequate remedy in a court . . . ." 5 U.S.C. § 704. In the Fourth Circuit, the question of whether an agency action is a reviewable final agency action is a jurisdictional issue. *See, e.g.*, *Jake's Fireworks Inc. v. United States Consumer Prod. Safety Comm'n*, 105 F.4th 627, 631 (4th Cir. 2024), *cert. denied sub nom. Jake's Fireworks Inc. v. Consumer Prod. Safety*, No. 24-693, 2025 WL 1426674 (U.S. May 19, 2025) (explaining that the APA waives the federal government's sovereign immunity and "[b]ecause sovereign immunity is jurisdictional in nature, finality under the APA is a jurisdictional requirement") (citation modified). "To constitute 'final agency action' within the meaning of Section 704, the challenged action must have two characteristics. First, the challenged action must

be 'circumscribed and discrete.' . . . Second, the 'agency action' must be 'final.'" *NAACP v. Bureau of the Census*, 945 F.3d 183, 189 (4th Cir. 2019) (internal citations omitted).

Defendants contend that Plaintiffs' APA claims do not challenge a discrete agency action, but are, instead, a nonjusticiable programmatic challenge. ECF No. 33 (Def. Mem.) at 18–21. *See also Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 194 (4th Cir. 2013) ("[L]imiting judicial review to *discrete* agency action 'precludes . . . broad programmatic attack[s],' . . . and helps ensure that courts are not injected 'into day-to-day agency management[.]'") (quoting *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 67, 124 S. Ct. 2373, 2379–80, 159 L. Ed. 2d 137 (2004)). This Court is not persuaded that Plaintiffs' APA claims are founded upon a nonreviewable programmatic challenge.

Although Plaintiffs describe the actions they challenge collectively as a "dismantling" of AmeriCorps, ECF No. 1 (Complaint), ¶¶ 1–3, 8, 12, 77–107; ECF No. 25-1 (Pl. Mem.) at 1–8, they make a clear showing that this "dismantling" consisted of several discrete agency actions: (1) a categorical termination of all NCCC projects and participants, including termination of Doe 1 and Doe 2, on April 15, 2025; (2) a sweeping cancellation of approximately $400,000,000 in AmeriCorps grants, including Nonprofit Plaintiffs' grants and subgrants and Doe 3's participation in VISTA, between April 25 and 28, 2025; and (3) a mass termination of more than 600 AmeriCorps employees, amounting to 85% of the staff, through placement on administrative leave on April 16, 2025, and issuance of RIF notices on April 24, 2025. The foregoing discrete agency actions all occurred within a period of less than two weeks and reflect a final and categorical decision on part of Defendants either to eliminate or reduce to a significant degree AmeriCorps' ability to operate as required by statute. *See Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 890 n.2, 110 S. Ct. 3177, 3189 n.2, 111 L. Ed. 2d 695 (1990) (distinguishing "a generic challenge to all

aspects of the 'land withdrawal review program,'" which is not reviewable under the APA, from "specific order or regulation, applying some particular measure across the board to all individual classification terminations and withdrawal revocations," which could be challenged under the APA, if final and ripe for review); *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 388 (D.C. Cir. 2018) (citing *National Wildlife Federation* for the proposition that "an agency's action in applying some particular measure across the board could of course still be challenged under the APA'") (quoting *Nat'l Wildlife Fed.*, 497 U.S. at 890 n.2, 110 S. Ct. at 3189 n.2) (citation modified); *New York v. Trump*, 133 F.4th 51, 67–68 (1st Cir. 2025) (same).

To the extent that such "dismantling" of AmeriCorps itself is not a reviewable agency action, each of the aforementioned actions by Defendants to terminate NCCC projects, cancel grants, and RIF AmeriCorps employees are clearly reviewable under the APA. The fact that the termination of the NCCC, grant cancellations, and personnel actions each occurred within a singular and brief time frame and were affected through boilerplate communications to impacted parties clearly shows that each action was sufficiently discrete to constitute a reviewable agency action.

Further, each of the aforementioned actions was a final action. Two conditions must be met for an agency action to be deemed final: (1) "the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature," and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S. Ct. 1154, 1168, 137 L. Ed. 2d 281 (1997) (citations omitted). "To meet [the second] requirement, a party must demonstrate that the challenged act had 'an immediate and practical impact,' or 'alter[ed] the legal regime' in which it operates." *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th

Cir. 2019) (first quoting *Golden & Zimmerman LLC v. Domenech*, 599 F.3d 426, 433 (4th Cir. 2010); and then quoting *Bennett*, 520 U.S. at 178, 117 S. Ct. at 1168).

As recently found by Judge Boardman in *Maryland v. AmeriCorps*: "The decision to close AmeriCorps programs was a final agency action. The termination letters said as much. The agency told AmeriCorps award recipients that the award termination, program closure, and forced exit or removal of AmeriCorps and VISTA members is 'a final agency action and is not administratively appealable.'" 2025 WL 1585051, at *14; *see also, e.g.*, ECF No. 25-3 (Ex. 1, Adams Decl.) at Attachment A. Here, terminating the grants and closing the programs "had 'an immediate and practical impact'" on Nonprofit Plaintiffs and Individual Plaintiffs. The participants were immediately removed from their programs, and grantees no longer receive funding or the services of AmeriCorps participants. *See City of New York*, 913 F.3d at 431 (quoting *Golden & Zimmerman LLC*, 599 F.3d at 433).

Similarly, the decisions to terminate 85% of AmeriCorps staff and "remove all NCCC members from service also [were] final." *Maryland v. AmeriCorps*, 2025 WL 1585051, at *14. AmeriCorps issued a notice to all NCCC members stating:

> AmeriCorps is sending all NCCC members to their homes of record as soon as possible. At this time, all teams are directed to return to their Region campus immediately—as soon as is safely practicable. NCCC Members will be moved into administrative hold with pay status through April 30th, 2025, after which they will be exited from the NCCC program. The program will exit all Members early with Compelling Personal Circumstances (CPC) status.

ECF No. 25-18 (Ex. 16, Doe 1 Decl.) at Attachment A (formatting modified). "The message was clear: The agency's decision-making process was complete, and all NCCC members were exited from the program . . . . The action marked the consummation of the agency decision-making process." *Maryland v. AmeriCorps*, 2025 WL 1585051, at *14 (citation omitted). Defendants' RIF

notices also made clear that the process of deciding to terminate the majority of AmeriCorps' staff was complete. ECF No. 25-17 (Ex. 15, Daly Decl). at Attachments B & C. The decisions to terminate NCCC members and issue RIF notices to the majority of AmeriCorps' staff also satisfy the second *Bennett* prong. These actions had "an immediate and practical impact" on each terminated staff member, on each NCCC participant, on each location where NCCC projects were underway, and on the ability of AmeriCorps to operate on a day-to-day basis. *City of New York v. U.S. Dep't of Def.*, 913 F.3d at 431 (quoting *Golden*, 599 F.3d at 433). *See also Maryland v. AmeriCorps*, 2025 WL 1585051, at *14–15 (holding that removal of NCCC members constitutes a final agency action reviewable under the APA); *New York v. McMahon*, No. 25-10601, 2025 WL 1463009, at *24 (D. Mass. May 22, 2025) (holding that "the mass terminations of half the Department of Education, and the transfer of certain programs out of the Department" were final agency actions subject to judicial review); *Am. Fed'n of Gov't Emps. v. U.S. Off. of Pers. Mgmt.*, No. 25-cv-1780, 2025 WL 660053, at *5 (N.D. Cal. Feb. 28, 2025) ("OPM's direction to the other agencies [to dismiss employees] constituted a final agency action for the purposes of the APA."); *Widakuswara v. Lake*, No. 1:25-CV-1015-RCL, 2025 WL 1166400 (D.D.C. Apr. 22, 2025), at *12 (holding that "blanket placement of employees on administrative leave" was a "discrete, final agency action[] subject to judicial review"); *Nat'l Treasury Emps. Union v. Vought*, No. CV 25-0381, 2025 WL 942772, at *12–13 (D.D.C. Mar. 28, 2025) (holding that a stop-work order issued at the Consumer Financial Protection Bureau constituted final agency action).

Defendants argue that their staffing decisions and decision to release NCCC members are committed to agency discretion and are therefore non-reviewable under the APA. ECF No. 33 (Def. Mem.) at 23–27, 29–30. "The APA prohibits judicial review of actions committed to agency discretion by law." *Pharm. Coal. for Patient Access v. United States*, 126 F.4th 947, 964 (4th Cir.

2025) (citing 5 U.S.C. § 701(a)(2)). District courts lack jurisdiction to review actions committed to agency discretion. *Id.* (citing *Angelex Ltd. v. United States*, 723 F.3d 500, 505–06 (4th Cir. 2013)). "Agency action is committed to the agency's discretion when no judicially manageable standards are available to assess how and when an agency should exercise its discretion such that a court would have 'no law to apply.'" *Id.* (quoting *Heckler v. Chaney*, 470 U.S. 821, 830–31, 105 S. Ct. 1649, 1655, 84 L. Ed. 2d 714 (1985)). By law, decisions committed to agency discretion include "an agency's decision not to institute enforcement proceedings," which implicates "'complicated balancing of a number of factors which are peculiarly within its expertise'"; the "refusal to grant reconsideration of an action because of material error" given "'the impossibility of devising an adequate standard of review for such agency action'"; and "[t]he allocation of funds from a lump-sum appropriation." *Lincoln v. Vigil*, 508 U.S. 182, 191–92, 113 S. Ct. 2024, 2031, 124 L. Ed. 2d 101 (1993) (first quoting *Heckler*, 470 U.S. at 827, 831, 105 S. Ct. at 1653, 1655; and then quoting *ICC v. Locomotive Eng'rs*, 482 U.S. 270, 282, 107 S. Ct. 2360, 2368, 96 L. Ed. 2d 222 (1987)).

This Court finds that Defendants' decision to terminate NCCC projects and release NCCC members is a reviewable action not committed to agency discretion. Although, as Defendants emphasize, 42 U.S.C. § 12612(a) states that AmeriCorps "*may* establish the [NCCC] to carry out" purposes detailed in § 12611, the statute goes on to set forth *requirements* for the operation and organization of the NCCC. *See, e.g.*, 42 U.S.C. § 12615 (setting forth requirements for how the NCCC "shall" be structured and how its members "shall" be selected); *id.* § 12616 (setting forth requirements for how NCCC members "shall" be trained); *id.* § 12617(a) (listing requirements for NCCC service projects). In addition, as Judge Boardman recognized in *Maryland v. AmeriCorps*, "[w]hen appropriating funds '[f]or necessary expenses for the [AmeriCorps] to carry out [the 1973

44

Act] and the [1990 Act]' in Fiscal Year 2024 and 2025, Congress allocated roughly $37.7 million to the NCCC." 2025 WL 1585051, at *17 (citing 2024 Appropriations Act, 138 Stat. at 694, and 2025 Appropriations Act § 1101(a), 139 Stat. at 10–11). Further, Congress "required that when AmeriCorps makes 'any significant changes to program requirements, service delivery or policy,' it must do so through notice-and-comment rulemaking." *Id.* (quoting 2024 Appropriations Act § 401, 138 Stat. at 695). Defendants' action either to eliminate or make a significant reduction in NCCC activities entailed "significant changes to program requirements, service delivery or policy," and therefore required notice-and-comment rulemaking and was not committed to agency discretion. *Id.* Accordingly, Judge Boardman found that the decision to remove NCCC members from service "was not committed to agency discretion by law." *Id.* (distinguishing *Lincoln v. Vigil*, 508 U.S. 182, 113 S. Ct. 2024); *accord La. Delta Serv. Corps*, 2025 WL 1787429, at *23. This Court agrees.

Furthermore, the Court finds that Defendants' singular decision to terminate 85% of AmeriCorps' staff is not committed to agency discretion by law. Plaintiffs have made a clear showing that this decision is not a commonplace personnel decision. Viewed within the context of other agency actions challenged in this suit, Defendants' decision to RIF the vast majority of its workforce is part of an effort to eliminate or substantially reduce AmeriCorps' operations and ability to perform functions mandated by statute. It is not a mere series of 600-plus individual personnel actions, and it is not an action committed to agency discretion by law. Other courts have come to the same conclusion in similar cases. *See, e.g.*, *Somerville Pub. Sch.*, 139 F.4th at 67, 73 (rejecting agency defendants' argument that RIF "impact[ing] approximately half of [U.S. Department of Education's] employees" was an action committed to agency discretion and not subject to judicial review); *New York v. Kennedy*, 2025 WL 1803260, at *18 ("Defendants have

45

not persuaded this Court that the Secretary's authority is 'so broad that [he] can unilaterally dismantle a department by firing nearly the entire staff, or that [his] discretion permits [him] to make a 'shell' department.'") (quoting *New York v. McMahon*, Civ. No. 25-10601-MJJ, 2025 WL 1463009, at *28 (D. Mass. May 22, 2025)).[9]

"[E]ven where action is committed to absolute agency discretion by law, courts have assumed the power to review allegations that an agency exceeded its legal authority, acted unconstitutionally, or failed to follow its own regulations[.]" *Elecs. of N. Carolina, Inc. v. Se. Power Admin.*, 774 F.2d 1262, 1267 (4th Cir. 1985) (quoting *Garcia v. Neagle*, 660 F.2d 983, 988 (4th Cir. 1981), *cert. denied*, 454 U.S. 1153, 102 S. Ct. 1023, 71 L. Ed. 2d 309 (1982)). That is precisely what Plaintiffs allege here. Plaintiffs allege that each of Defendants' actions—including terminating grants, terminating the NCCC, and issuing RIFs to 85% of AmeriCorps' staff—were taken in excess of lawful authority or were unconstitutional.

Lastly, Defendants argue that the broad termination of grants is not reviewable under the APA because grantmaking decisions are the type of administrative decision afforded substantial discretion. ECF No. 33 (Def. Mem.) at 26–27. But the decision to terminate grants is reviewable when there are regulations guiding how an agency may terminate a grant. *Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 75–84 (D.D.C. 2018). Here, Plaintiffs have identified statutory and regulatory requirements governing the termination of AmeriCorps

---

[9] Defendants' reliance on *Carter v. United States Dep't of Educ.*, Civ. No. 25-0744 (PLF), 2025 WL 1453562 (D.D.C. May 21, 2025), is misplaced. In that case, the district court could not find that the Department of Education's decision to reduce its workforce by "nearly 50%" interfered with its ability to satisfy its statutory obligations. *Carter*, 2025 WL 1453562, at *6–8. Here, Defendants seek to terminate a far greater proportion of its workforce: 85%. And as explained *infra*, Plaintiffs make a clear showing they are likely to succeed in establishing that Defendants' termination of 85% of AmeriCorps' staff has and would continue to interfere with the agency's ability to fulfill statutory mandates. *See Somerville Pub. Sch.*, 139 F.4th at 73 (distinguishing *Carter* on the ground that the RIF has made it impossible for the department to carry out statutorily mandated functions).

grants. *See* 42 U.S.C. § 12636(a)–(b) 45 C.F.R. § 2556.135. Termination in the face of these requirements is reviewable under the APA.

For all of the foregoing reasons, Plaintiffs are likely to succeed in establishing this Court's jurisdiction to review the agency actions challenged in this suit.

### 5. Merits of APA Claims

Plaintiffs are likely to succeed on the merits of their APA claim that AmeriCorps' failure to engage in notice-and-comment rulemaking before removing all NCCC members from service, terminating grants, and instituting RIFs for the vast majority of AmeriCorps staff was not in accordance with the law.

"Congress enacted the APA to provide a general authorization for review of agency action in the district courts." *Bowen*, 487 U.S. at 903, 108 S. Ct. at 2737. A person legally wronged, adversely affected, or aggrieved by agency action may contest the action "on the ground that the agency has neglected to follow the statutory directives of Congress." *Webster v. Doe*, 486 U.S. 592, 599, 108 S. Ct. 2047, 2051, 100 L. Ed. 2d 632 (1988). Under the APA, courts may "hold unlawful and set aside agency action, findings, and conclusions found to be" (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" (2) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and (3) "without observance of procedure required by law[.]" 5 U.S.C. § 706(2)(A), (C), (D).

"[W]here an agency's decision does not comport with governing statutes or regulations, that decision is 'not in accordance with law' and must be set aside." *Maryland v. AmeriCorps*, 2025 WL 1585051, at *29 (quoting *J.E.C.M. ex rel. Saravia v. Lloyd*, 352 F. Supp. 3d 559, 583 (E.D. Va. 2018)). In determining whether agency action is "not in accordance with law," the court must "decide all relevant questions of law" and "interpret constitutional and statutory provisions."

*Perez v. Cuccinelli*, 949 F.3d 865, 872 (4th Cir. 2020) (quoting 5 U.S.C. § 706). "The APA thus codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to *Marbury*: that courts decide legal questions by applying their own judgment." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391–92, 144 S. Ct. 2244, 2261, 219 L. Ed. 2d 832 (2024).

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423, 141 S. Ct. 1150, 1158, 209 L. Ed. 2d 287 (2021). "Generally, an agency decision is arbitrary and capricious if 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 2867, 77 L. Ed. 2d 443 (1983)). Of course, "'agencies are free to change their existing policies as long as they provide a reasoned explanation for the change,' 'display awareness that they are changing position,' and consider 'serious reliance interests.'" *FDA v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 917, 221 L. Ed. 2d 436 (2025) (citation modified) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22, 136 S. Ct. 2117, 2125–26, 195 L. Ed. 2d 382 (2016)).

Plaintiffs contend that AmeriCorps violated the APA by failing to engage in notice-and-comment rulemaking before instituting RIFs, and terminating Nonprofit Plaintiffs' grants and NCCC members. As recently explained by Judge Boardman in *Maryland v. AmeriCorps*:

> A violation of a notice-and-comment rulemaking requirement can
> run afoul of the APA in three ways. An agency acts "contrary to

48

law" when it fails to engage in notice-and-comment procedures "explicitly required" by Congress. *Michigan v. EPA*, 268 F.3d 1075, 1088, 1089 (D.C. Cir. 2001) ("In making such determinations EPA must use notice and comment proceedings . . . . Because Congress's intent is clear, EPA's proposed approach is simply contrary to law."). Failure to adhere to a notice-and-comment rulemaking requirement is an action not "made in 'observance of procedure required by law.'" *HLI Lordship Indus., Inc. v. Comm. for Purchase from the Blind & Other Severely Handicapped*, 791 F.2d 1136, 1140 (4th Cir. 1986) (quoting 5 U.S.C. § 706(2)(D)). And such actions also "may be set aside as arbitrary and capricious." *Safari Club Int'l v. Zinke*, 878 F.3d 316, 325 (D.C. Cir. 2017).

2025 WL 1585051, at *29. She continued:

> In the act appropriating AmeriCorps funding for Fiscal Year 2024, Congress included the following requirement: "[AmeriCorps] shall make any significant changes to program requirements, service delivery or policy only through public notice and comment rulemaking." 2024 Appropriations Act § 401, 138 Stat. at 695. Congress re-adopted this requirement for Fiscal Year 2025 by reference. *See* 2025 Appropriations Act § 1101(a), 139 Stat. at 10–11 (appropriating funds for Fiscal Year 2025 "under the authority *and conditions* provided in applicable appropriations Acts for fiscal year 2024" (emphasis added)). In fact, this provision has been in the annual appropriations bill funding AmeriCorps for many years. *See, e.g.*, Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 401, 136 Stat. 4459, 4900 (2022) ("[AmeriCorps] shall make any significant changes to program requirements, service delivery or policy only through public notice and comment rulemaking."); Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, § 401, 136 Stat. 49, 488 (same). A version of this requirement first appeared in the 2004 appropriations statute, directing AmeriCorps to "make any significant changes to program requirements or policy only through public notice and comment rulemaking." Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, 118 Stat. 3, 402.

*Id.* at *30. As in *Maryland v. AmeriCorps*, Defendants here argue that the notice-and-comment provision in the 2024 and 2025 Appropriations Acts do not apply to the agency actions challenged in this suit. *See id.* And, like Judge Boardman, this Court disagrees. *Id.*

When construing a statute, the court must begin with its text. *Raplee v. United States*, 842 F.3d 328, 332 (4th Cir. 2016). "'[A]bsent ambiguity or a clearly expressed legislative intent to the

contrary,'" the court must "give a statute its 'plain meaning.'" *United States v. Abdelshafi*, 592 F.3d 602, 607 (4th Cir. 2010) (alteration in original) (quoting *United States v. Bell*, 5 F.3d 64, 68 (4th Cir. 1993)). "To determine a statute's plain meaning, [the] court looks not only to the statute's language, but also to the context in which that language appears, and the broader context of the statute as a whole." *Pharm. Coal.*, 126 F.4th at 953.

The 2024 Appropriations Act states that "[AmeriCorps] shall make any significant changes to program requirements, service delivery or policy only through public notice and comment rulemaking." 2024 Appropriations Act § 401, 138 Stat. at 695. This provision is adopted in the 2025 Appropriations Act. *See* 2025 Appropriations Act § 1101(a), 139 Stat. at 10–11. "The term 'service delivery' plainly means the delivery of service through service programs funded by AmeriCorps and carried out with the help of volunteers and service members . . . . Consideration of the specific context in which the language is used, and the broader context of the statute as a whole confirms this interpretation of 'service delivery.'" *Maryland v. AmeriCorps*, 2025 WL 1585051, at *30 (quoting *In re Total Realty Mgmt., LLC*, 706 F.3d 245, 251 (4th Cir. 2013)) (citation modified).

Here, Defendants cancelled approximately $400 million in AmeriCorps grants and terminated funding to both direct grantees and subgrantees of State Service Commissions, including Nonprofit Plaintiffs. In addition to losing their funding, grantees were instructed to cease all grant-related activities and begin internal closeout procedures. *See, e.g.*, ECF No. 25-15 (Ex. 13, Barron Decl.) at Attachment A. AmeriCorps informed grantees that their AmeriCorps participants were prohibited from reporting to their projects or working on project-related activities. *See, e.g.*, ECF No. 25-10 (Ex. 8, Berger Decl.), ¶ 10, Attachment B. These actions have led to significant disruptions in the delivery of services that were previously funded by

AmeriCorps and provided by the Nonprofit Plaintiffs. *See generally* ECF Nos. 25-3 through 25-16 (Nonprofit Plaintiffs' declarations). This disruption has included the termination or suspension of assistance with college applications, provision of teachers to indigenous school districts, housing assistance for low-income families, childhood literacy programs, summer and afterschool learning programs, and neighborhood revitalization programs, among other services. *See generally id.* By cutting Nonprofit Plaintiffs' funding and removing AmeriCorps participants from service, AmeriCorps clearly made "significant changes to . . . service delivery[,]" within the meaning of the 2024 and 2025 Appropriations Acts. *See Maryland v. AmeriCorps*, 2025 WL 1585051, at *31. *Cf. La. Delta Serv. Corps*, 2025 WL 1787429, at *28 ("Plaintiff has a substantial likelihood of success on its claim that the termination of the grant was not in accordance with law or failed to meet statutory, procedural, or constitutional requirements.").

Likewise, Defendants' decision to remove all NCCC members from service clearly constitutes "significant change[] to . . . service delivery." 2024 Appropriations Act § 401, 138 Stat. at 695. NCCC members assist with disaster relief, help collect, harvest, and distribute food, support medical institutions, and work with disadvantaged youth, among other services. ECF No. 25-17 (Ex. 15, Daly Decl.), ¶ 12. Removing all NCCC members clearly entails a significant change to service delivery. *See Maryland v. AmeriCorps*, 2025 WL 1585051, at *31 ("On April 15, 2025, the agency sent 'all NCCC members' to their homes of record and placed them on administrative hold pending their exit from the NCCC program . . . . As a result, NCCC members providing disaster relief services were pulled out of service projects, and planned service initiatives have been cancelled . . . . The states can no longer rely on NCCC members to assist them when disasters strike. These two agency actions—individually and collectively—constitute 'significant changes to . . . service delivery.'") (internal citations omitted).

Furthermore, Plaintiffs have made a clear showing that Defendants' decision to institute RIFs for 85% of AmeriCorps staff members brought a "significant change[] to . . . service delivery or policy." 2024 Appropriations Act § 401, 138 Stat. at 695. Most of Nonprofit Plaintiffs' grants have been restored in a preliminary basis through the preliminary injunction Judge Boardman granted last month in *Maryland v. AmeriCorps*, 2025 WL 1585051. Supplemental declarations from representatives of Plaintiffs Michigan College Access Network and Housing and Community Development Network of New Jersey make clear that AmeriCorps staff have been inaccessible when grantees have attempted to reach them for assistance in either re-enrolling participants or restarting grant funding. *See, e.g.*, ECF No. 41-2 (Fewins-Bliss Suppl. Decl.), ¶ 11 ("To my knowledge, there is no one at AmeriCorps we can reach out to for help."); ECF No. 41-3 (Berger Suppl. Decl.), ¶ 11 ("We have reached out to AmeriCorps to ask whether we can submit our continuation application now, but we haven't received a response."). Grantees' inability to contact staff at AmeriCorps to receive assistance since 85% of the staff was placed on administrative leave and received RIF notices clearly reflects a significant change to service delivery or policy at AmeriCorps.

Because the mass termination of AmeriCorps grants, program participants, and employees constitute "significant changes to . . . service delivery," under the 2024 and 2025 Appropriations Acts, these actions could only have been made through notice-and-comment rulemaking.[10] *See Maryland v. AmeriCorps*, 2025 WL 1585051, at *32. Because Defendants did not engage in any

---

[10] As in *Maryland v. AmeriCorps*, Defendants here point out that the APA's notice-and-comment requirements do not apply to matters "relating to agency management or personnel or to . . . grants." 5 U.S.C. § 553(a)(2); ECF No. 33 (Def. Mem.) at 27–28. "However, the APA is not the only source of procedural requirements for agency action. Indeed, the APA itself acknowledges as much . . . . If either of the agency actions challenged here is exempted from the APA's notice-and-comment requirement, that exemption is preempted by the more specific language in the appropriations act." *Maryland v. AmeriCorps*, 2025 WL 1585051, at *32 n.21 (citing 5 U.S.C. § 553(b)) (exempting certain agency rules from rulemaking requirements "[e]xcept when notice or hearing is required *by statute*" (emphasis added)).

notice-and-comment rulemaking process before taking the actions challenged here, Plaintiffs have demonstrated a likelihood of success that these "actions were contrary to law, arbitrary and capricious, and without observance of procedures required by law, in violation of the APA." *Id.*

### B. Irreparable Harm

A party seeking a preliminary injunction must demonstrate that that it is "likely to suffer irreparable harm in the absence of preliminary relief . . . ." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Winter*, 555 U.S. at 20, 129 S. Ct. at 374). "To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent'" and that the harm "cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (citations omitted).

#### 1. Individual Plaintiffs

Individual Plaintiffs Doe 1, Doe 2, and Doe 3 were participants in AmeriCorps' NCCC and VISTA programs until Defendants terminated their service in April 2025. Plaintiffs argue that Individual Plaintiffs establish irreparable harm because, among other things, they lost access to the high-quality training, work experience, and networking opportunities as a result of Defendants' actions. ECF No. 25-1 (Pl. Mem.) at 20–21. *See also Faulkner v. Jones*, 10 F.3d 226, 229, 232–33 (4th Cir. 1993) (affirming preliminary injunction based in part on harm of denying plaintiff access to unique training and educational opportunities); *Hisp. Nat'l L. Enf't Ass'n NCR v. Prince George's Cnty.*, 535 F. Supp. 3d 393, 427 (D. Md. 2021) (finding irreparable harm due to negative effect on "professional and leadership opportunities, as well as . . . long-term career trajectories."). These benefits drew Individual Plaintiffs to serve and participate in AmeriCorps programs. *See, e.g.*, ECF No. 25-18 (Ex. 16, Doe 1 Decl.), ¶¶ 4–5, 7; ECF No. 25-19 (Ex. 17, Doe 2 Decl.), ¶¶ 4–

5, 7; ECF No. 25-20 (Ex. 18, Doe 3 Decl.), ¶¶ 4–5, 7. Without an injunction against the likely unlawful closure of the NCCC and VISTA programs, Individual Defendants will continue to be deprived of irreplaceable work experience and training and networking opportunities that may not be available to them by the time a final judgment is entered in this case. The Court finds that Individual Plaintiffs have made a clear showing that they are likely to suffer irreparable harm in the absence of an injunction reinstating them as AmeriCorps program participants.

### 2. Nonprofit Plaintiffs

Nonprofit Plaintiffs are thirteen nonprofit organizations that are recipients of AmeriCorps grants and subgrants, and one associational nonprofit whose members receive AmeriCorps funding. Defendants argue that Nonprofit Plaintiffs fail to show irreparable harm because, in general, economic harm does not constitute irreparable injury, especially when those economic losses are recoverable at the end of the litigation. ECF No. 33 (Def. Mem.) at 37–38. According to Defendants, the harms Nonprofit Plaintiffs allege are "economic, speculative, or affect third parties." *Id.* at 38–39. The Court disagrees, for several reasons.

First, Nonprofit Plaintiffs demonstrate that, as a result of Defendants' termination of AmeriCorps grants and programs, they have had to, or will imminently have to, terminate or scale back activities that are central to their primary missions. *See, e.g.*, ECF No. 25-4 (Ex 2, Giorlando Decl.), ¶ 8 (Red Cloud "no longer ha[s] funding to bus children to and from after school programs or funding to provide academic testing to assess student growth in literacy and math."); ECF No. 25-6 (Ex. 4, Harker Decl.), ¶¶ 7–9 (Partners for Campus-Community Engagement "immediately cease[d] all ongoing events, programming, and upcoming VISTA projects," including, among others, development of a rural health network, a program to help seniors stay in their homes, and the launch of a food pantry); ECF No. 25-7 (Ex. 5, Cook Decl.), ¶¶ 12–16 (describing National

College Attainment Network members who have cut college access programs or expect to do so); ECF No. 25-8 (Ex. 6, Fewins-Bliss Decl.), ¶ 9 ("As a result of the terminations, [the Michigan College Access Network] ha[s] been forced to cancel all of our direct services work . . . ."); ECF No. 25-10 (Ex. 8, Berger Decl.), ¶ 12 ("[T]he terminations [at the Housing and Community Development Network of New Jersey] are making it impossible to operate our intake program for people trying to avoid or solve a housing crisis. We don't have the staff to answer the Housing Help hotline . . . . We can't process applications for the state's utility assistance program . . . ."); ECF No. 25-12 (Kellar Decl.), ¶ 9 (upon receiving grant termination email, Democracy Maine "immediately ceased planning for an expansion of the civic engagement program.").

Many of the Nonprofit Plaintiffs must lay off staff, without whom they will be unable to carry out critical activities. *See, e.g.*, ECF No. 25-6 (Ex. 4, Harker Decl.), ¶ 12; ECF No. 25-8 (Ex. 6, Fewins-Bliss Decl.), ¶ 9; ECF No. 25-11 (Ex. 9, Cholewa Decl.), ¶ 13; ECF No. 25-13 (Ex. 11, Sarata Decl.), ¶ 15; Ex. 13, ECF No. 25-15 (Barron Decl.), ¶ 7; ECF No. 25-16 (Ex. 14, Fynboh Decl.), ¶ 7. Some Nonprofit Plaintiffs have lost as much as 50% of their operating budgets. *See, e.g.*, ECF No. 25-7 (Ex. 5, Cook Decl.), ¶ 11; ECF No. 25-11 (Ex. 9, Swope Cholewa Decl.), ¶ 5; ECF No. 25-13 (Ex. 11, Sarata Decl.), ¶ 6; Ex. 13, Barron Decl. ¶ 4. Courts have recognized such harms to be irreparable and to warrant injunctive relief. *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (holding that increased difficulty for plaintiff to accomplish their "primary mission" is adequate to show irreparable harm); *Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 858–59 (D. Md. 2025), *reconsideration denied*, Civ. No. JRR-25-00702, 2025 WL 863319 (D. Md. Mar. 19, 2025) (irreparable harm shown where loss of funding will cause grant recipients to close teacher preparation programs).

Second, Nonprofit Plaintiffs that have been able to reallocate funding or adopt stopgap measures to continue operating have been forced to divert resources away from core activities and mission-driven work. *See, e.g.*, ECF No. 25-8 (Ex. 6, Fewins-Bliss Decl.), ¶ 17 ("In order to sustain our AmeriCorps participants for 30 days, we shifted funds and focus away from other departments," including "cancel[ing] planned programming" and "decreas[ing] grantmaking to other organizations"); ECF No. 25-7 (Ex. 5; Cook Decl.), ¶ 16 (describing harms associated with "scramble" to find new funding); ECF No. 25-11 (Ex. 9, Swope Cholewa Decl.), ¶ 19 (similar); ECF No. 25-3 (Ex. 1, Adams Decl.), ¶ 8 (similar). Courts have found similar harms to constitute irreparable injury. *See, e.g.*, *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (irreparable injury shown where plaintiffs were required to divert resources away from their core missions).

Third, Nonprofit Plaintiffs face serious injuries to their reputations and to working relationships and contracts with other organizations. Some Nonprofit Plaintiffs are in imminent danger of defaulting on contractual agreements, harming their community partners. *See, e.g.*, ECF No. 25-5 (Ex. 3, Taylor Decl.), ¶ 14 ("We can no longer fulfill those contracts, damaging our relationships with landowners who were counting on us and paying us to care for their land"); ECF No. 25-8 (Ex. 6, Fewins-Bliss Decl.), ¶ 14 ("We have had to cancel MOUs with schools to which we had promised advisers"); ECF No. 25-10 (Ex. 8, Berger Decl.), ¶ 15 (Housing and Community Development Network of New Jersey is "in danger of breaching contracts," including one with the New Jersey Department of Community Affairs); ECF No. 25-11, (Ex. 9, Swope Cholewa Decl.), ¶ 14 ("Without immediate intervention, we are at serious risk of defaulting on our commitments to the district, which would disrupt services to students and damage longstanding school partnerships.").

Defaulting on agreements they have with other entities will tarnish Nonprofit Plaintiffs' reputations for reliability, causing them to lose partners, members, and volunteers—further endangering their missions. *See, e.g.*, ECF No. 25-3 (Ex. 1, Adams Decl.), ¶ 11 ("Our reliability and our consistency mean everything to our students and families. . . . This is a huge loss to our organizational reputation that will not be easily repaired."); ECF No. 25-8 (Ex. 6, Fewins-Bliss Decl.), ¶ 14 ("We cannot convince schools that we are a reliable partner if we cannot meet our core commitments, leaving their plans in disarray. The damage to our reputation will be long-lasting."); ECF No. 25-9 (Ex. 7, Gunter Decl.), ¶ 8 ("suddenly and inexplicably terminating those relationships harms [North Carolina Housing Coalition's] reputation and rapport with critical partners who relied on the promise of VISTA participant capacity."); ECF No. 25-11 (Ex. 9, Swope Cholewa Decl.), ¶ 17 ("Our partners will no longer be sure if they can rely on us and volunteers will lose interest and move on given our inability to respond. Our ability to pursue our mission has been badly compromised, and our reputation will be damaged."); ECF No. 25-14 (Ex. 12, Toups Decl.), ¶ 11 ("With less staff capacity . . . [our schools] are not wrong to be concerned—we know that we will have fewer mentors and fewer resources to do this work in the months ahead."); ECF No. 25-16 (Ex. 14, Fynboh Decl.), ¶ 10 (Aspire "will be forced to go back on promises we have already made to our students and families," which "hurts our reputation and our future success as a community partner").

The Fourth Circuit has recognized that similar injuries to a party's reputation and contractual relationships may constitute irreparable harm. *See Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205 (4th Cir. 2025) ("[I]rreparable harm can include actual and imminent loss of good will or erosion of a company's customer base.") (citation modified); *E. Tennessee Nat. Gas Co. v. Sage*, 361 F.3d 808 (4th Cir. 2004) (affirming preliminary injunction

and holding that being forced to breach contracts, causing negative impacts on customers and consumers served by those customers, is irreparable harm).

Finally, Nonprofit Plaintiffs have shown that, in many cases, the abrupt terminations of AmeriCorps grants have severe, long-term impacts on the communities they serve. *See* ECF No. 25-5 (Ex. 3, Taylor Decl.), ¶ 12 (describing how loss of stewardship services will allow invasive species to spread quickly, causing native species to dwindle and affecting "the ecosystem of the entire state"); ECF No. 25-3 (Ex. 1, Adams Decl.), ¶ 10 (students will lack access to mentoring and tutoring services without Elev8); ECF No. 25-7 (Ex. 5, Cook Decl.), ¶ 18 (describing how disruption in counseling relationships with students "likely causes significant emotional and developmental trauma") ECF No. 25-4 (Ex 2, Giorlando Decl.), ¶ 10 (describing loss of "a critical workforce development program" and "essential educational services"). Imminent loss of personnel, programs, and services will require long periods of time for Nonprofit Plaintiffs to restore. *See* ECF No. 25-3 (Ex. 1, Adams Decl.), ¶¶ 7, 11 (describing how relationships with students and families "take time to develop"); ECF No. 25-11 (Ex. 9, Swope Cholewa Decl.), ¶ 17 ("Lost personnel and cancelled programs can't be restored overnight; it typically takes a year to bring new hires on board and get them trained on our operations."); ECF No. 25-13 (Ex. 11, Sarata Decl.), ¶ 15 ("If we do lay people off—or if people leave due to the uncertainty, as seems likely— it will take a long time to fully recover even if we do get our funding back, due to the need to hire and train new employees."); *La. Delta Serv. Corps*, 2025 WL 1787429, at *29 ("Plaintiff here has shown that enough employees will be forced to leave to cause more than de minimis harm to Plaintiff, which will rapidly become irreparable.").

For the foregoing reasons, Nonprofit Plaintiffs have made a clear showing that they are likely to suffer irreparable harm without an injunction restoring AmeriCorps grants and programs.[11]

### 3. Union Plaintiff

Union Plaintiff is a bargaining unit comprised of approximately 400 AmeriCorps employees. ECF No. 25-17 (Ex. 13, Daly Decl.), ¶ 2. Plaintiffs argue that Union Plaintiff is currently suffering irreparable harm because 88% of its membership is on admirative leave, and most of those employees have received RIF notices stating their impending termination. ECF No. 25-1 (Pl. Mem.) at 27; ECF No. 25-17 (Ex. 15, Daly Decl.), ¶¶ 14–17.

Apart from harms to its individual members, Plaintiffs argue that Union Plaintiff faces irreparable harm as an organization. ECF No. 25-1 (Pl. Mem.) at 28–29. Union Plaintiff's budget relies almost entirely on voluntary membership dues, and losing dues from 88% of the bargaining unit will make it "nearly impossible" for Union Plaintiff to continue operating. *Id.*; *see also* ECF No. 37 (Pl. Reply) at 18–19. The Court finds this threat to Union Plaintiff's continued existence constitutes an irreparable harm. *See Mountain Valley Pipeline*, 915 F.3d at 218 (noting that economic losses are irreparable if "a temporary delay in recovery . . . threaten[s] a party's very existence by, for instance, driving it out of business . . . ."); *Wis. Gas Co. v. Fed. Energy Reg. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (recognizing that while "economic loss does not, in and of itself, constitute irreparable harm," "[r]ecoverable monetary loss may constitute irreparable

---

[11] As noted *supra*, in *Maryland v. AmeriCorps*, Judge Boardman recently entered a preliminary injunction that applies to 24 states and the District of Columbia and, among other things, enjoins AmeriCorps from effectuating grant terminations. 2025 WL 1585051, at *40–41. The order covers a number of the grants at issue in the instant case but not every grant. Although most Nonprofit Plaintiffs have been afforded preliminary relief in *Maryland v. AmeriCorps*, this Court cannot predict the outcome of that case or how long the injunction in that case will remain in force. Accordingly, the preliminary injunctive relief granted in that case does not affect this Court's analysis of Nonprofit Plaintiffs' irreparable injuries in the instant case.

harm only where the loss threatens the very existence of the movant's business."); *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 668 (2d Cir. 2023) (finding irreparable harm in franchisor-franchisee dispute "where the very viability of the plaintiff's business is threatened.") (citation and quotation marks omitted). Losing 88% of its bargaining unit will make it "nearly impossible" for Union Plaintiff to advocate for its members that remain AmeriCorps employees, jeopardizing Union Plaintiff's ability to perform its core function. Further, Defendants' mass termination of AmeriCorps employees has interfered with Union Plaintiff's ability to fulfill its organizational mission by forcing the union president to commit her time to responding to Defendants' likely unlawful actions at the expense of core union services. ECF No. 25-17 (Ex. 15, Daly Decl.), ¶¶ 29, 32. Union Plaintiff has had to postpone training sessions for its members on its new collective bargaining agreement and orientation for newly elected union officers, which directly and negatively impact Union Plaintiffs' ability to represent its members. *Id.* ¶ 32. For these reasons, the Court finds that Union Plaintiff has made a clear showing that it will likely suffer irreparable harm without an injunction.

### C.  Balance of the Equities and Public Interest

The court's consideration of the public interest merges with the balance of the equities when the government is the party opposing the preliminary injunction. *Nken v. Holder*, 556 U.S. 418, 435, 129 S. Ct. 1749, 1753, 173 L. Ed. 2d 550 (2009). The court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," with "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24, 129 S. Ct. 365, 376–77 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542, 107 S. Ct. 1396, 1402, 94 L. Ed. 2d 542 (1987)); *see also Ass'n of Am. Publishers, Inc. v. Frosh*, 586 F. Supp. 3d 379, 397 (D. Md. 2022)

(same). The court considers "the 'harm to the plaintiff if the injunction is erroneously denied versus harm to the defendant if the injunction is erroneously granted.'" *Students for Fair Admissions v. United States Naval Acad.*, 707 F. Supp. 3d 486, 509 (D. Md. 2023) (quoting *Planned Parenthood of Ind. & Ky., Inc. v. Adams*, 937 F.3d 973, 980 (7th Cir. 2019)).

Plaintiffs argue that the balance of equities weigh in favor of an injunction because "[t]here is generally no public interest in the perpetuation of unlawful agency action[s]," *League of Women Voters*, 838 F.3d at 12, the public "undoubtedly has an interest in seeing its governmental institutions follow the law," *Roe v. Dep't of Def.*, 947 F.3d 207, 230–31 (4th Cir. 2020) (internal quotation marks and citation omitted), and Defendants will not suffer any harm if the status quo ante is maintained. ECF No. 25-1 (Pl. Mem.) at 29. Defendants, on the other hand, argue that the balance of the equities and the public interest do not support issuance of an injunction because granting an injunction would "disrupt the agencies' efforts to comply with Executive Orders 14,222 and 14, 210," and require them to spend public funds that may not be retrievable later. ECF No. 33 (Def. Mem.) at 41.

The Court finds that the public interest and balance of equities weigh in favor of a preliminary injunction. Defendants' likely unlawful agency actions—including placement of most of AmeriCorps employees on administrative leave with intent to carry out RIFs, and terminating grants and participant service terms—has jeopardized or resulted in closure of AmeriCorps funded programs throughout the United States. *See Maryland v. AmeriCorps*, 2025 WL 1585051, at *37–38. The programs have provided valuable—and, in some cases, essential—services to communities across the country, and Defendants' likely unlawful actions have deprived these communities of these services. In addition, Defendants' actions have deprived AmeriCorps participants of irreplaceable training and educational opportunities. The public interest in

maintaining the services delivered through AmeriCorps grants and programs and the work

performed by AmeriCorps employees is clear and outweighs any harm to Defendants that would

result from a wrongfully imposed preliminary injunction. As Judge Boardman found in *Maryland*

*v. AmeriCorps*:

> These public funds were allocated to AmeriCorps by Congress "to
> carry out" the national service laws. *See* 2024 Appropriations Act,
> 138 Stat. at 694. In turn, AmeriCorps used the public funds to award
> grants to the states for service projects that help local communities.
> If, at the end of this litigation, the government is vindicated and
> cannot recover the funds that Congress appropriated for national
> service, the funds will have been spent on improving the lives of
> everyday Americans: veterans, people with substance use disorder,
> people with disabilities, children with learning differences,
> indigenous communities, people impacted by natural disasters, and
> people trying to survive below the poverty line. Any harm the
> defendants might face if the agency actions are enjoined pales in
> comparison to the concrete harms that the States and the
> communities served by AmeriCorps programs have suffered and
> will continue to suffer.

2025 WL 1585051, at *38. For the same reasons, this Court finds that the balance of equities and

the public interest heavily favor granting Plaintiffs preliminary injunctive relief.

### D. Bond

Rule 65(c) of the Federal Rules of Civil Procedure provides that a court "may issue a

preliminary injunction . . . only if the movant gives security in an amount that the court considers

proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined

or restrained." "Importantly, a 'district court retains the discretion to set the bond amount as it sees

fit or waive the security requirement' altogether." *XL Specialty Ins. Co. v. Bighorn Constr. &*

*Reclamation, LLC*, Civ. No. BAH-21-3068, 2022 WL 2105925, at *11 (D. Md. June 10, 2022)

(quoting *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013)). "[I]f the court finds that the risk of

harm to the enjoined party is 'remote,' then 'a nominal bond may suffice.'" *Brightview Grp., LP*

*v. Teeters*, 441 F. Supp. 3d 115, 144 (D. Md. 2020) (quoting *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999)).

The Court finds that a nominal bond is appropriate in this case. This action is "a quintessential public interest lawsuit[,]" in which Plaintiffs "have challenged an abrupt and massive disruption to the NCCC's service projects and hundreds of AmeriCorps-funded service programs across the country." *Maryland v. AmeriCorps*, 2025 WL 1585051, at *39. The risk that Defendants will be harmed by the preliminary injunction is remote, especially considering that Congress specifically contemplated that the funds appropriated to AmeriCorps would be spent in the manner directed by the injunction. Accordingly, as in *Maryland v. AmeriCorps* and *Louisiana Delta Service Corps*, the Court will impose a nominal bond of $100 per Plaintiff in the instant case. *See id.*; *La. Delta Serv. Corps*, 2025 WL 1787429, at *31.

## III.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction will be granted in part.

A separate Order will follow.

July 7, 2025
_____
Date

_____
Matthew J. Maddox
United States District Judge